# EXHIBIT 1

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3
 4
   SAMUEL KATZ, individually    )
 5 and on behalf of all others  )
   similarly situated,          )
 6                              )
       Plaintiffs,              )  Case No. 1:22-cv-05277
 7                              )
   v.                           )
 8                              )
   ALLIED FIRST BANK, SB, et    )
 9 al.,                         )
                                )
10     Defendants.              )
   _____)
11
12
13
14            VIDEOCONFERENCE DEPOSITION OF
15                    CRAIG MATTSON
16
                      May 7, 2025
17                    9:23 a.m.
18            ZOOM VIDEOCONFERENCE DEPOSITION
19
20
21
22
23
   REPORTED BY:  RICHAEL M. SILVIA, RMR, CRR, CRCR
24               Arizona CR No. 51017
                 New Mexico CR No. 554
25
```

```
                                                        Page 4
 1          The following proceedings were taken pursuant
 2     to the Federal Rules of Civil Procedure.
 3                       CRAIG MATTSON,
 4     having been first duly sworn to state the whole truth,
 5     testified as follows:
 6          MR. POLANSKY:  All right.  Anthony, usual
 7     stipulations?
 8          MR. PARONICH:  Yes, confirmed.
 9          MR. POLANSKY:  Okay.  Great.
10                        EXAMINATION
11     BY MR. POLANSKY:
12        Q.   Good morning, Mr. Mattson.  My name is
13     Kevin Polansky, and I represent Allied First in a
14     lawsuit filed by Samuel Katz.  You've been subpoenaed
15     here to give testimony; is that correct?
16        A.   Yes.
17        Q.   And the subpoena was served at 6820 East
18     Valley Vista Lane, Paradise Valley, Arizona; is that
19     right?
20        A.   Correct.
21        Q.   Is that your current home location?
22        A.   It is.
23        Q.   Okay.  In the subpoena there was a request
24     for documents.  Did you do a search for the documents
25     requested in the subpoena?
```

```
                                                           Page 13
 1        Q.    Okay.  Without -- you mentioned earlier that
 2   while working for Allied First, you said you had some
 3   side businesses?
 4        A.    When I worked at Allied First, yes.
 5        Q.    Was one of those called Suncovia?
 6        A.    No.
 7        Q.    Have you ever heard of Suncovia?
 8        A.    Yeah, I started Suncovia after I left Allied.
 9        Q.    And when did you start Suncovia?
10        A.    December of 2022.
11        Q.    Okay.  And what is Suncovia?
12        A.    It's a solar company.
13        Q.    Okay.  As part of that solar company, did you
14   purchase leads from sources?
15        A.    Yes, we -- yes.
16        Q.    Was there any mix between Suncovia and Allied
17   First with respect to leads?
18        A.    No.
19        Q.    So the loads -- the leads that you purchased
20   for Suncovia were distinct from those you purchased for
21   Allied First?
22        A.    Yes.  It's a solar lead not a mortgage lead.
23   So they're never, never the same.
24        Q.    Have you heard of Diamond Select Lead Group?
25        A.    Yes.
```

Page 14

1  Q.   What is that?
2  A.   It was a telemarketing company that I had
3  that generated leads for mortgage.
4  Q.   And who owned that company?
5  A.   I did.
6  Q.   And it was specifically for mortgage leads?
7  A.   Yes.
8  Q.   And when did you start that company?
9  A.   I'm not sure.  Seven or eight years ago,
10 maybe.
11 Q.   Is it still in business?
12 A.   No.  It's no longer in business as of, I
13 don't know -- I want to say 12 months ago or so.
14 Q.   Twelve months?  Okay.
15 A.   Or longer, maybe 12 or 15 months ago.
16 Q.   Okay.  And when -- when you were working at
17 Allied First, was there any -- any mix between Allied
18 First and Diamond Select?
19 A.   No.  We were not really using it, no.
20 Q.   Did Allied First ever purchase leads from
21 Diamond Select?
22 A.   Yes.
23 Q.   And was there any sort of contract
24 relationship between the parties?
25 A.   No.

```
                                                          Page 49
 1         A.    I don't recall.
 2         Q.    Okay.  Do you recall anything about those
 3   conversations?
 4         A.    Yeah, I mean, I know that there was a couple
 5   conversations where I -- I think this was my first time
 6   ever doing business with them, and I said, "Hey,
 7   these -- these leads are not good."  Like, you're
 8   just -- some of them -- some of them were just -- we
 9   weren't taking many applications, I remember that.  It
10   wasn't a very high-quality lead, I wasn't very happy
11   about that.  I remember that at the time but that's it.
12         Q.    Okay.  And what was your role at Allied First
13   during the campaign?  Was it to generate the leads for
14   the loan officers?
15         A.    Yes.
16         Q.    Okay.  You personally didn't initiate any
17   calls, did you?
18         A.    No.
19         Q.    Okay.  What about did you follow up on any
20   calls to consumers?
21         A.    If there was a consumer complaint or
22   something, I would -- I would get involved.
23         Q.    Okay.  For this warm transfer campaign from
24   Consumer Nsight, did DSLG assist in tracking any of the
25   calls?
```

```
                                                        Page 50
 1      A.   No.  I don't believe so, no.
 2      Q.   Was DSLG compensated for tracking any of the
 3   calls?
 4      A.   No.
 5      Q.   Okay.  Did DSLG make any follow-up calls with
 6   respect to any warm transfers from Consumer Nsight?
 7      A.   I don't believe so, no.
 8      Q.   Okay.  Did you ever personally speak to
 9   Mr. Katz himself or --
10      A.   I don't believe I did, no.
11      Q.   Okay.  Did anyone from Allied First ever call
12   Mr. Katz directly?
13      A.   Not that I'm aware of.
14      Q.   Okay.  Just a couple more follow-up
15   questions.  So to confirm, you hired Consumer Nsight
16   yourself; is that right?
17      A.   Yes, with approval of the bank, yes.
18      Q.   And you managed the scope of that
19   relationship with Consumer Nsight?
20      A.   I did, yes.
21      Q.   You did not direct Consumer Nsight on how to
22   provide leads; is that right?
23      A.   Correct.
24      Q.   And you did not control how Consumer Nsight
25   procured those leads, right?
```

```
 1
 2
        A C K N O W L E D G E M E N T
 3
 4
 5              I, CRAIG MATTSON, certify
 6      that I have read the transcript of my
 7      testimony taken under oath on May 7,
 8      2025, and that the transcript is a
 9      true, complete and correct record of
10      what was asked, answered and said
11      during this deposition, and that the
12      answers on the record as given by me
13      are true and correct.
14
15                          _____
16                          CRAIG MATTSON
17
18   Signed and subscribed to
19   before me, this      day
20   of                , 20 .
21   _____
22   Notary Public
23
24
25
```

```
                                                      Page 62
 1                  CERTIFICATE OF REPORTERS
 2
 3   STATE OF ARIZONA            )
                                 )    ss.
 4   CITY AND COUNTY OF PIMA     )
 5          I, RICHAEL M. SILVIA, Registered Merit
     Reporter, Certified Realtime Reporter, and Certified
 6   Reporter in the State of Arizona, do hereby certify
     that the foregoing deposition was taken before me in
 7   the County of Pima, State of Arizona; that an oath or
     affirmation was duly administered by me to the witness,
 8   CRAIG MATTSON, pursuant to A.R.S. 41-324(B); that the
     questions propounded to the witness and the answers of
 9   the witness thereto were taken down by me in shorthand
     and thereafter reduced to typewriting; that the
10   transcript is a full, true and accurate record of the
     proceeding, all done to the best of my skill and
11   ability; that the preparation, production and
     distribution of the transcript and copies of the
12   transcript comply with the Arizona Revised Statutes and
     in ACJA 7-206(F)(3); ACJA 7-206 J(1)(g)(1) and (2); and
13   ACJA 7-206 J(3)(b).
            The witness herein, CRAIG MATTSON, requested
14   review and signature.
            I FURTHER CERTIFY that I am in no way related
15   to any of the parties nor am I in any way interested in
     the outcome hereof.
16          IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Pima, State of Arizona, this
17   21st day of May 2025.
18
19              [signature: Richael Silvia]
20
21
22          Richael M. Silvia, RMR, CRR, CRCR
23          Arizona CR No. 51017
24
25
```