**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated )<br><br>     Plaintiff, )<br><br> v. )<br><br>ALLIED FIRST BANK, SB )<br><br>     Defendant. ) | Case No. 1:22-cv-05277 |

**DEFENDANT ALLIED FIRST BANK, SB'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(a), Defendant Allied First Bank, SB ("Allied First"), now known as Servbank, N.A., by and through its undersigned counsel, requests that this Court enter summary judgment in its favor on all claims as a matter of law. The grounds for this Motion are fully set forth in the accompanying Memorandum of Law and contemporaneously-filed Statement of Undisputed Facts.

WHEREFORE, Defendant Allied First Bank, SB, now known as Servbank, N.A., respectfully requests that this Court grant its Motion for Summary Judgment.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Jeffrey M. Schieber*
Jeffrey Schieber
Nelson Mullins Riley & Scarborough, LLP
123 N. Wacker Drive, Suite 2100
Chicago, Illinois 60606
Tel: (312) 376-1110
Email: jeff.schieber@nelsonmullins.com

Nathan E. Hoffman
Nelson Mullins Riley & Scarborough, LLP
One Nashville Place, Suite 1100
150 Fourth Avenue North

Nashville, Tennessee 37219
Tel: (615) 664-5300
Email: nathan.hoffman@nelsonmullins.com
P.O. Box 641040
Chicago, Illinois 60664
Tel: (312) 205-7950

Kevin P. Polansky
*Pro Hac Vice*
Nelson Mullins Riley & Scarborough, LLP
One Financial Center, Suite 3500
Boston, Massachusetts 02111
Tel: (617) 217-4720
Email: kevin.polansky@nelsonmullins.com

***Attorneys for Defendant***
***Allied First Bank, SB***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September 2025, a copy of the foregoing was served via the Court's ECF/CM filing system upon all counsel of record.

*/s/ Jeffrey Schieber*
Jeffrey Schieber

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated | ) ) ) |
| Plaintiff, | ) ) Case No. 1:22-cv-05277 |
| v. | ) ) ) |
| ALLIED FIRST BANK, SB | ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ALLIED FIRST BANK, SB'S MOTION FOR SUMMARY JUDGMENT**

Defendant Allied First Bank, SB ("Allied First"), now known as Servbank, N.A., by and through its undersigned counsel, hereby files this Memorandum of Law in Support of its Motion for Summary Judgment and states as follows:

**I.     INTRODUCTION**

On September 27, 2022, Plaintiff initiated this action against Allied First alleging violations of the Telephone Consumer Protection Act ("TCPA"). (ECF No. 1). On July 1, 2023, Plaintiff filed a First Amended Complaint ("FAC") adding Consumer Nsight LLC ("Consumer Nsight") as a defendant. Plaintiff alleges that Allied First and Consumer Nsight made telemarketing calls to his residential telephone number in violation of the TCPA. *See* FAC at ¶¶ 3, 11, 32.

Summary judgment must be granted in Allied First's favor because there is no genuine dispute of material fact that Allied First, or its agent, initiated any telemarketing calls to Plaintiff. Allied First engaged Consumer Nsight to provide live phone call transfers to Allied First for leads of potential customers who had expressed interest in refinancing their mortgage loans and who

had consented to be called about the refinance opportunities. Consumer Nsight then obtained leads for individuals who were interested in potential mortgage options. Allied First did not control how the calls were made and, instead, relied on Consumer Nsight to conduct the calls in compliance with all applicable laws, as had been agreed. Consumer Nsight engaged a third-party call center, Iconic Results LLC ("Iconic Results") to conduct the calls to effectuate the agreement between Allied First and Consumer Nsight. Iconic Results then contacted Plaintiff as part of its scope of work with Consumer Nsight. To the extent Plaintiff may have valid claims, liability would lie against Iconic Results and Consumer Nsight, both of whom have already compensated Plaintiff for their alleged violation of the TCPA.

Further, summary judgment is appropriate because Allied First did not violate the TCPA as a matter of law. The calls at issue did not violate the TCPA and, even if they did, Plaintiff himself consented to be contacted for the telemarketing purposes which are the subject of the calls. Accordingly, and for the reasons set forth herein, Allied First respectfully requests that this Court grant its Motion for Summary Judgment, enter judgment in Allied First's favor, and grant such other and further relief as this Court deems just and proper.

## II.      FACTUAL BACKGROUND

### A.      Plaintiff's Allegations

Plaintiff alleges that Allied First and Consumer Nsight made telemarketing calls to his residential telephone number in violation of the TCPA. *See* FAC at ¶¶ 3, 11, 32. Specifically, the FAC alleges that Consumer Nsight "placed telemarketing calls for Allied First" to Plaintiff between January and March 2022 and that Consumer Nsight "transferred" Plaintiff to Allied First's call center. *Id.* at ¶¶ 21, 38. Plaintiff further asserts that the call made by Consumer Nsight and "transferred" to Allied First violated the TCPA because his phone number was registered on the

2

National-Do-Not-Call registry. *Id.* at ¶ 20. Plaintiff seeks damages and "injunctive relief prohibiting Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any residential number listed on the National Do Not Call Registry in the future." *Id.* at Prayer for Relief.

### B. The Mortgage Refinance Campaign

The conduct at issue in this case centers around a former Allied First employee—Craig Mattson ("Mr. Mattson"). Mr. Mattson worked for Allied First as a branch manager in Scottsdale, Arizona. *See* Allied First's Rule 56.1 Statement of Undisputed Facts (filed contemporaneously) ("Allied First's Rule 56.1 Stmt.") at ¶ 10 (citing Dep. Craig Mattson ("Mattson Dep.") (Ex. 1), attached thereto as **Exhibit No. 1**, at 8:11-18). His responsibilities included managing 80-81 loan officers and generating leads through various outlets. *Id.* (citing Mattson Dep. (Ex. 1) at 8:24-12). Mr. Mattson worked with various vendors to purchase leads. *Id.* at 22:17. One of the vendors that Mr. Mattson worked with was Consumer Nsight. *Id.* at ¶ 11 (citing Mattson Dep. (Ex. 1) at 22:20). Mr. Mattson had a long-standing relationship with Consumer Nsight and had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight. *Id.* (citing Mattson Dep. (Ex. 1) at 22:22-23:11). In fact, Mr. Mattson's relationship with Rick Sabatino ("Mr. Sabatino"), Chief Executive Officer ("CEO") of Consumer Nsight, predated his employment with Allied First. *Id.* (citing Mattson Dep. (Ex. 1) at 22:22-23:11).

On January 28, 2022, Mr. Sabatino contacted Mr. Mattson to inquire whether Mr. Mattson would be interested in utilizing Consumer Nsight's services for live call transfers to Allied First for individuals interested in mortgage refinances. *Id.* at ¶ 12 (citing Decl. Rick Sabatino ("Sabatino Decl."), attached thereto as **Exhibit No. 2**, at ¶ 8). Pursuant to this agreement, Consumer Nsight provided advertising services to Allied First, including "consulting services for live contact

3

telephone transfers from a call center to Allied First representatives." *Id*. at ¶ 13 (citing Sabatino Decl. (Ex. 2) at ¶ 6). Mr. Mattson testified that he was not familiar with Consumer Nsight's processes for effectuating these leads. *Id.* at ¶ 14 (citing Mattson Dep. (Ex. 1) at 24:19-21). However, he did ensure that all the leads he purchased for Allied First were TCPA compliant. *Id.* (citing Mattson Dep. (Ex. 1) at 26:24-27:9). Mr. Mattson would purchase "form fills" wherein a consumer would fill out a form to be contacted regarding Allied First's services. *Id*. (citing Mattson Dep. (Ex. 1) at 27:19-28:1). In this sense, the consumers would "opt in" to receive the communications. *Id.* (citing Mattson Dep. (Ex. 1) at 27:19-28:1). Mr. Mattson further ensured that the forms to be executed by the consumers would include a TCPA disclosure statement. *Id.* (citing Mattson Dep. (Ex. 1) at 128:8-12).

Consumer Nsight then engaged Iconic Results to conduct the calls and initiate the live call transfers to Allied First. *Id.* at ¶ 15 (citing Sabatino Decl. (Ex. 2) at ¶ 10). Specifically, Iconic Results "called consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transferred qualifying consumers to companies that placed orders for such 'warm transfer' calls." *Id.* at ¶ 16 (citing Decl. Mituin Varma ("Varma Decl."), attached thereto as **Exhibit No. 3** at ¶ 4).

Allied First had no contract, arrangement, or otherwise any relationship with Iconic Results. *Id.* at ¶ 17 (citing Sabatino Decl. at ¶ 6; *see also* Varma Decl. (Ex. 3) at ¶ 15). Rather, Consumer Nsight placed three (3) orders with Iconic Results between November 2021 and October 2022 for a total of 90 mortgage lead transfers. *Id.* at ¶ 18 (citing Sabatino Decl. (Ex. 2) at ¶ 7). Consumer Nsight placed the orders and received the warm transfer calls. *Id.* (citing Sabatino Decl. (Ex. 2) at ¶ 7). Iconic Results invoiced Consumer Nsight for the calls it made as part of the campaign. *Id.* at ¶ 18 (citing Varma Decl. (Ex. 3) at ¶ 14). Iconic Results was clear that it did not

4

sent invoices to Allied First because "it had no contractual relationship" with Allied First. *Id.* at ¶ 19 (citing Varma Decl. (Ex. 3) at ¶ 15). In fact, Mr. Mattson testified that he was not familiar with Iconic Results' call center and its processes. *Id.* at ¶ 19 (citing Mattson Dep. (Ex. 1) at 37:21-23).

### C. The Calls at Issue

In January 2022, an online inquiry form was executed at the webpage lenderconsultant.com. *Id.* at ¶ 20 (citing Varma Decl. (Ex. 3) at ¶ 10). The name provided on the form was "James Weim" and the phone number provided was (207) 802-1001. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 10). The following consent language was agreed to along with the inquiry:

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and pre-recorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

*Id.* at ¶ 21 (citing Varma Decl. (Ex. 3) at ¶ 10). Plaintiff admitted in deposition that he has used the alias "James Weim" in relation to telemarketing calls. *Id.* at ¶ 22 (citing Dep. Samuel Katz ("Katz Dep."), attached thereto as **Exhibit No. 4** at 54:2-17). Plaintiff further admitted that his telephone number is (207) 802-1001. *Id.* (citing Katz Dep. (Ex. 4) at 14:22-25).

Between January 12, 2022 and March 7, 2022, Iconic Results contacted "Mr. Weim" to discuss his interest in mortgage refinancing pursuant to the online inquiry. *Id.* at ¶ 23 (citing Varma Decl. (Ex. 3) at ¶ 11). Iconic Results affirmed that it did not "place prerecorded or artificial calls, or calls placed with an Automatic Telephone Dialing System ("ATDS") restricted by the TCPA." *Id.* at ¶ 24 (citing Varma Decl. (Ex. 3) at ¶ 13). Plaintiff answered the tenth call on March 7, 2022. *Id.* at ¶ 25 (citing Varma Decl. (Ex. 3) at ¶ 13). Plaintiff stated that he was "James Weim" and

5

confirmed that he was interested in hearing mortgage rate offers. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 12). The call was then transferred to Allied First to discuss mortgage refinancing options with the consumer. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 12).

Jason Aldridge ("Mr. Aldridge"), a loan officer with Allied First, continued the call with Plaintiff. *Id.* at ¶ 26 (citing Transcript of March 7, 2022 Phone Call ("Call Transcript"), attached thereto as **Exhibit No. 5**).[1] Plaintiff verified his home address and phone number on the call. *Id.* at ¶ 27 (citing Call Transcript (Ex. 5)). Plaintiff then informed Mr. Aldridge that he was interested in learning more about a cash out refinance. *Id.* (citing Call Transcript (Ex. 5)). Shortly after Mr. Aldridge began to pull Plaintiff's property information, Plaintiff stated that he had to get going and asked if there was a way for him to call Mr. Aldridge back at another time. *Id.* at ¶ 28 (citing Call Transcript (Ex. 5)). Mr. Aldridge then provided Plaintiff with his direct phone number. *Id.* (citing Call Transcript (Ex. 5)). Mr. Aldridge informed Plaintiff that a call back would give him a chance to get information on Plaintiff's property so they could have an informed conversation, to which Plaintiff responded "okay, yes. Sounds good." *Id.* (citing Call Transcript (Ex. 5)).

Following the phone call, Mr. Aldridge sent a message to Plaintiff where he stated that it was good speaking with Plaintiff and provided him with his contact information so they could chat further. *Id.* at ¶ 29 (citing March 2022 Conversation History ("Conversation History"), attached thereto as **Exhibit No. 6**). Plaintiff immediately responded to Mr. Aldridge's message by stating "Please send a copy of your do not call policy to [] & stop calling me." *Id.* at ¶ 30 (citing Conversation History (Ex. 6)). Mr. Aldridge responded by stating "I have not called you since we spoke, Mr. Weim. I will add DO NO CALL to your record in our system. Enjoy your day." *Id.*

---

[1] Plaintiff authenticated the March 7, 2022 call at deposition. *Id.* at fn 1 (citing Katz Dep. (Ex. 4) at 68:13-15).

(citing Conversation History (Ex. 6)). Plaintiff then inquired as to who was the lead generator that provided his contact information. *Id.* at ¶ 31 (citing Conversation History (Ex. 6)). Mr. Aldridge responded that he does not have anything to do with marketing and he assumed that Plaintiff would have provided his information to the person who made the initial call. *Id.* (citing Conversation History (Ex. 6)). Plaintiff affirmed at deposition that he did not believe he had received any calls or text messages from Allied First since March 7, 2022. *Id.* at ¶ 32 (citing Katz Dep. (Ex. 4) at 68:7-15. When asked about his commentary on the call that he was interested in mortgage refinancing, Plaintiff responded that he was just "play[ing] along." *Id.* at ¶ 33 (citing Katz Dep. (Ex. 4) at 68:21-25).

### D. Plaintiff Samuel Katz

Plaintiff is a serial filer of TCPA actions. In fact, Plaintiff estimates that he has filed between five (5) and ten (10) TCPA actions over the last ten (10) years, if not more. *Id.* at ¶ 34 (citing Katz Dep. (Ex. 4) at 6:1-19). This is also not Plaintiff's first TCPA complaint against Allied First. *Id.* at ¶ 35. In or around June 2016, Plaintiff entered into a confidential settlement agreement with Allied First relating to calls he received that he alleged were in violation of the TCPA. *Id.* (citing Katz Dep. (Ex. 4) at 24:18-25:24).

Plaintiff is not naïve when it comes to the TCPA. *Id.* at ¶ 36. When asked at deposition if he had ever signed an online web form to receive marketing calls, Plaintiff responding that he considered those to be "lead laundering where an unscrupulous third party will take data lists and put them into web forms and amass to manufacture consent where none exists." *Id.* (citing Katz Dep. (Ex. 4) at 32:22-33:7). It is Plaintiff's position that where he does fill an online webform, "the consent to receive telemarketing calls is separate from the consent related to the transaction." *Id.* at ¶ 37 (citing Katz Dep. (Ex. 4) at 33:20-34:1). Plaintiff confirmed that he used the alias "James

7

Weim" "in the context of an illegal telemarketing call," and even confirmed that he would entertain the calls to "play along" with telemarketers, but conveniently did not recall using that alias in this matter and denied filing out a webform with the alias "James Weim" and his personal contact information. *Id.* at ¶ 38 (citing Katz Dep. (Ex. 4) at 57:4-9; 58:22-25; 59:24-60:2).

### III. LEGAL STANDARD

Fed. R. Civ. P. 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Indeed, a Court must grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "The movant need not entirely foreclose the possibility that there could exist an issue of material fact, he need only claim that the nonmovant has failed, or by necessity will fail, to appropriately raise the issue." *Youngblood v. Vistronix, Inc.*, No. 05-21, 2006 WL 2092636, at *2 (D.D.C. July 27, 2006) (citing *Celotex*, 477 U.S. at 323-24). Once a moving party demonstrates that there is an absence of evidence to support the nonmoving party's case, the "non-movant must show, without resting on only its earlier pleadings, that the claim under attack raises a genuine issue of material fact." *Id.*

### IV. ARGUMENT

#### A. Allied First Did Not Place The Calls At Issue.

Allied First cannot be held directly liable for a violation of the TCPA because Allied First did not place the calls at issue. "Direct liability under the TCPA [] applies only to entities who 'initiate' the telemarketing calls." *Smith v. State Farm. Mut. Ins. Co.*, 30 F.Supp.3d 765, 771 (N.D.Ill. Aug. 11, 2014); *see also In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R.

8

6574, 6582 ¶ 24 (2013) ("[W]e clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call…"). There is no dispute that Iconic Results, not Allied First, placed the calls at issue. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 23 (citing Varma Decl. (Ex. 3) at ¶ 11. Accordingly, Allied First did not directly violate the TCPA and summary judgment must be entered in its favor.

### B. No Agent Of Allied First Placed The Calls At Issue.

Although there is no dispute that Allied First did not place the calls at issue, Allied First may still be liable if its agent contacted Plaintiff in violation of the TCPA. "[W]hile a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles for violations of either section 227(b) or 227(c) that are committed by third-party telemarketers." *In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6574 ¶ 1 (2013). Specifically, a seller may be vicarious liability for TCPA violations "under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Id.* at 6584 ¶ 28. Here, no agent of Allied First, either an actual or apparent agent, contacted Plaintiff in violation of the TCPA. Similarly, Allied First did not ratify the alleged conduct of any of its agents who contacted Plaintiff in violation of the TCPA.

#### i. *No Actual Agent of Allied First Placed the Calls at Issue.*

No actual agent of Allied First placed the calls at issue in violation of the TCPA. "Agency" is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Toney v Quality Resources, Inc.*, 75 F.Supp.3d 727, 742 (N.D. Ill. Dec. 1, 2014). (quoting Restatement (Third) of

9

Agency § 1.01 (2006)). "An essential element of agency is the principal's right to control the agent's actions." *Id.* "In particular, '[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.'" *Id.*

Mr. Mattson entered into an agreement with Consumer Nsight to provide advertising services to Allied First, including "consulting services for live contact telephone transfers from a call center to Allied First employees." *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 13 (citing Sabatino Decl. (Ex. 2) at ¶ 6). Consumer Nsight was not an agent of Allied First. Neither Allied First, nor Mr. Mattson, controlled the actions of Consumer Nsight as they related to the telemarketing services. The only instructions given to Consumer Nsight were the nature of the calls to be transferred and the requirement that the calls be TCPA compliant. *Id.* at ¶ 14 (citing Mattson Dep. (Ex. 1) at 26:24-27:9). Allied First did not control any aspect as to how the warm transfer calls would be placed.

And even if this Court were to consider Consumer Nsight to be an agent of Allied First (and it is not) Consumer Nsight is not the entity that placed the calls at issue. Rather, Iconic Results, a company engaged directly by Consumer Nsight, placed the calls. *Id.* at ¶ 15 (citing Sabatino Decl. (Ex. 2) at ¶ 10). Allied First had no contract, arrangement or otherwise any relationship with Iconic Results. *Id.* at ¶ 17 (citing Sabatino Decl. (Ex. 2) at ¶ 6; *see also* Varma Decl. (Ex. 3) at ¶ 15). Iconic Results declared that "it had no contractual relationship" with Allied First, and Mr. Mattson was clear he was not familiar with Iconic Results' call center and its processes. *Id.* at ¶ 19 (citing Varma Decl. (Ex. 3) at ¶ 15; Mattson Dep. (Ex. 1) at 37:21-23. Thus, Allied First cannot be held liable for the conduct of Iconic Results as Iconic Results was not its actual agent.

*ii. No Apparent Agent of Allied First Placed the Calls at Issue.*

No apparent agent of Allied First placed the calls at issue in violation of the TCPA. "'Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.'" *Smith*, 30 F.Supp.3d at 777 (quoting Restatement (Third) of Agency § 2.03 cmt. C (2006)). "It is well established that apparent authority must derive from the statements or actions of the alleged principal, not the alleged agent." *Id.* at 778. "In other words, for apparent authority to exist, the principal 'must communicate either directly or indirectly with the third party' or take some action that instills in the third party a reasonable belief that the actor had authority to act as the principal's agent." *Toney*, 75 F.Supp.3d at 744 (quoting *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 CV 5601, 2013 WL 4495221 at *3 (N.D. Ill. Aug. 21, 2013)).

Again, no apparent agent of Allied First placed the calls at issue. Allied First did not communicate either directly or indirectly with Iconic Results. Consumer Nsight engaged Iconic Results to conduct the calls and initiate the live transfers to Allied First. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 15 (citing Sabatino Decl. (Ex. 2) at ¶ 10. No relationship existed between Iconic Results and Allied First.

Additionally, Allied First did not take any actions that would instill in a third party a reasonable belief that Iconic Results had authority to act as Allied First's agent. Allied First had no relationship with Iconic Results that would lead a third party to believe that Iconic Results was its agent. Moreover, when Plaintiff inquired who generated the lead for his call, Mr. Aldridge of Allied First responded that he does not have anything to do with marketing and he assumed that Plaintiff would have provided his information to the person who made the initial call. *Id.* at ¶ 31 (citing Conversation History (Ex. 6). So, to the extent that Plaintiff even did believe that Iconic

11

Results acted as the agent of Allied First (which there is no evidence of), such notion was dispelled immediately following the live transfer. Thus, once again, Allied First cannot be held liable for the conduct of Iconic Results as Iconic Results was not its apparent agent.

### iii. Allied First did not Ratify the Conduct of its Alleged Agent.

Finally, Allied First did not ratify the conduct of its alleged agent. "'Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.'" *Smith*, 30 F.Supp.3d at 779 (quoting Restatement (Third) of Agency § 4.01(1) (2006)). "'A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relationships, or (b) conduct that justifies a reasonable assumption that the person so consents.'" *Id.* Importantly, "[a] principal, however, 'is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking.'" *Id.* (quoting § 4.01(2)).

There is absolutely no evidence in the record that Allied First ratified the conduct of Iconic Results. Allied First had no knowledge of who conducted the live transfers and had no information as to the means by which Iconic Results placed the calls. Moreover, it was Allied First's understanding that consumers, like Plaintiff, provided their information on an online web page to be contacted regarding mortgage refinancing options and that such form included a TCPA disclosure statement. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 14 (citing Mattson Dep. (Ex. 1) at 26:4-28:12). This is further evidenced by Mr. Aldridge's own statements to Plaintiff that he believed that Plaintiff provided his contact information to the party who initiated the phone call. *Id.* at ¶ 31 (citing Conversation History (Ex. 6). Allied First cannot be held liable for the actions of an independent third party, Iconic Results. *See Sapan v. LendingTree, LLC*, 2025 WL 1148281 at *3 (C.D. Cal. Mar. 18, 2025). Thus, Allied First did not ratify the conduct of Iconic Results.

12

### C. The Calls Did Not Violate the TCPA.

Plaintiff's claim for violation of the TCPA fails as a matter of law because the calls at issue do not violate the TCPA. Under the TCPA, it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii). There can be no TCPA violation if the calling party did not use an automatic telephone dialing system ("ATDS") to conduct the calls. *See Blow v. Bijora, Inc.*, 191 F.Supp.3d 780, 785 (N.D. Ill. Feb. 4, 2016).

Iconic Results placed the calls at issue. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 23 (citing Varma Decl. (Ex. 3) at ¶ 11). Iconic Results affirms that it did not "place prerecorded or artificial calls, or calls placed with an [ATDS] restricted by the TCPA" and there is no evidence in the record to the contrary. *Id.* at ¶ 24 (citing Varma Decl. (Ex. 3) at ¶ 13). Accordingly, Plaintiff cannot establish that the calls were placed with an ATDS and, thus, his claim for violation of the TCPA fails as a matter of law.

### D. Plaintiff Consented To Receive The Calls At Issue.

Plaintiff's claim for violation of the TCPA similarly fails as a matter of law because Plaintiff consented to receive the calls. "A defendant may avoid liability under [the TCPA] by proving that it made the call with the prior express consent of the called party." *Toney*, 75 F.Supp.3d at 734. "[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary. Hence, telemarketers will not violate [TCPA rules] by calling a number which was

13

provided as one at which the called party wishes to be reached." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 7 FCC Rcd. 8752, 8769 ¶ 31 (Oct. 16, 1992).

Plaintiff consented to receive mortgage refinancing calls. In January 2022, an online inquiry form was executed at the webpage lenderconsultant.com. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶ 20 (citing Varma Decl. (Ex. 3) at ¶ 10). The name provided on the form was "James Weim" and the phone number provided was (207) 802-1001. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 10). The following consent language was agreed to along with the inquiry:

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and pre-recorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

*Id.* at ¶ 21 (citing Varma Decl. (Ex. 3) at ¶ 10). Plaintiff admitted in deposition that he has used the alias "James Weim" in relation to telemarketing calls. *Id.* at ¶ 22 (citing Katz Dep. (Ex. 4) at 54:2-17). Plaintiff further admitted that his telephone number is (207) 802-1001. *Id.* (citing Katz Dep. (Ex. 4) at 14:22-25). Between January 12, 2022 and March 7, 2022, Iconic Results contacted "Mr. Weim" to discuss his interest in mortgage refinancing pursuant to the online inquiry. *Id.* at ¶ 23 (citing Varma Decl. (Ex. 3) at ¶ 11). Plaintiff answered the tenth call on March 7, 2022. *Id.* at ¶ 25 (citing Varma Decl. (Ex. 3) at ¶ 11). Plaintiff stated that he was "James Weim" and confirmed that he was interested in hearing mortgage rate offers. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 12). The call was then transferred to Allied First to discuss mortgage refinancing options with Plaintiff. *Id.* (citing Varma Decl. (Ex. 3) at ¶ 12).

There can be no genuine dispute that Plaintiff filled out the online form. The form included his telephone number and an alias that he admittedly uses in relation to telemarketing calls. Further, in deposition, Plaintiff verified that he answered the phone when Iconic Results contacted him where he stated that he was "James Weim" and confirmed his interest in learning about mortgage rate offers. Plaintiff's ploy to bait telemarketers by using an alias cannot be ignored. Plaintiff expressly consented to be contacted regarding mortgage refinancing and, thus, his claim for violation of the TCPA fails as a matter of law.

### E. Summary Judgment Is Appropriate Because Plaintiff Recovered All Available Damages.

Finally, summary judgment is appropriate because Plaintiff already recovered all statutorily available damages and has been fully compensated for any alleged harm. The TCPA provides that a plaintiff is entitled to receive $500 in damages per violation of the statute, and treble damages are recoverable if a court finds that the defendant willfully or knowingly violated the TCPA. 47 U.S.C. § 227(b)(3). Even assuming that Allied First willfully or knowingly violated the TCPA (and it did not), and Plaintiff is entitled to $1,500 per violation, Plaintiff is no longer harmed as both Consumer Nsight and Iconic Results settled their claims with Plaintiff in excess of the statutory maximum. *See*, *e.g.*, Allied First's Rule 56.1 Stmt. at ¶¶ 39-40. Accordingly, because Plaintiff is no longer entitled to damages, summary judgment is appropriate.

### V. CONCLUSION

For the foregoing reasons, Defendant Allied First Bank, SB, now known as Servbank, N.A., respectfully requests that this Court grant its Motion for Summary Judgment, enter judgment in Allied First's favor on all claims, and grant such other and further relief as this Court deems just and proper.

Dated: September 30, 2025

Respectfully submitted,

*/s/ Jeffrey Schieber*
Jeffrey Schieber
Nelson Mullins Riley & Scarborough, LLP
123 N. Wacker Drive, Suite 2100
Chicago, Illinois 60606
Tel: (312) 376-1110
Email: jeff.schieber@nelsonmullins.com

Nathan E. Hoffman
Nelson Mullins Riley & Scarborough, LLP
One Nashville Place, Suite 1100
150 Fourth Avenue North
Nashville, Tennessee 37219
Tel: (615) 664-5300
Email: nathan.hoffman@nelsonmullins.com
P.O. Box 641040
Chicago, Illinois 60664
Tel: (312) 205-7950

Kevin P. Polansky
*Pro Hac Vice*
Nelson Mullins Riley & Scarborough, LLP
One Financial Center, Suite 3500
Boston, Massachusetts 02111
Tel: (617) 217-4720
Email: kevin.polansky@nelsonmullins.com

***Attorneys for Defendant***
***Allied First Bank, SB***

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>ALLIED FIRST BANK, SB<br><br>        Defendant. | Case No. 1:22-cv-05277 |

## ORDER

**UPON CONSIDERATION** of Defendant Allied First Bank, SB's Motion for Summary Judgment, any Opposition thereto, and any Reply submitted in further support thereof, the record in this case, and the applicable law, it is this _____ day of _____ 2025, hereby:

**ORDERED**, that Defendant Allied First Bank, SB's Motion for Summary Judgment shall be, and the same hereby is, **GRANTED**.

_____
Hon. Robert W. Gettleman
U.S. District Court for the Northern District of Illinois

cc: All Counsel of Record