IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SAMUEL KATZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ALLIED FIRST BANK, SB, et al.,

Defendants.

Case No. 1:22-cv-05277

VIDEOCONFERENCE DEPOSITION OF
CRAIG MATTSON

May 7, 2025
9:23 a.m.
ZOOM VIDEOCONFERENCE DEPOSITION

REPORTED BY: RICHAEL M. SILVIA, RMR, CRR, CRCR
Arizona CR No. 51017
New Mexico CR No. 554

The Videoconference Deposition of CRAIG MATTSON, noticed by Defendant, was taken on May 7, 2025, from 9:23 a.m. to 10:37 a.m., via ZOOM VIDEOCONFERENCE DEPOSITION, before Richael M. Silvia, Registered Merit Reporter, Certified Realtime Reporter, Colorado Realtime Certified Reporter and Arizona Certified Reporter No. 51017.

APPEARANCES OF COUNSEL

For the Plaintiffs:

PARONICH LAW
BY: ANTHONY I. PARONICH, ESQ.
350 Lincoln Street
Suite 2400
Hingham, Massachusetts 02043
(617) 485-0018
anthony@paronichlaw.com

For the Defendants:

NELSON MULLINS RILEY & SCARBOROUGH LLP
BY: KEVIN POLANSKY, ESQ.
One Financial Center
Suite 3500
Boston, Massachusetts 02111
(617) 217-4720
kevin.polansky@nelsonmullins.com

Also Present:

Lauren Mitchell



I N D E X


| | PAGE |
|---|---|
| EXAMINATION OF CRAIG MATTSON: May 7, 2025 | |
| By Mr. Polansky: | 4 |
| By Mr. Paronich: | 53 |

| DEPOSITION EXHIBITS | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | Notice of Deposition of Craig Mattson, 04/15/2025 | 4 |
| Exhibit 2 | Consumer Nsight Invoice (Allied_First_000574 through 000575) | 40 |
| Exhibit 3 | 01/27/2025 E-mails (Allied_First_000295 through 000299) | 43 |
| Exhibit 4 | 01/28/2025 E-mail; Subject: Invoice (Allied_First_000573) | 46 |
| Exhibit 5 | 02/03/2022 E-mails (Allied_First_000655 through 000661) | 47 |

(Attached to original and copy transcripts.)

| PREVIOUSLY MARKED DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| (None.) | |

INFORMATION REQUESTED:
(None.)

QUESTIONS INSTRUCTED NOT TO ANSWER:
(None.)




The following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

CRAIG MATTSON,

having been first duly sworn to state the whole truth, testified as follows:

MR. POLANSKY: All right. Anthony, usual stipulations?

MR. PARONICH: Yes, confirmed.

MR. POLANSKY: Okay. Great.

EXAMINATION

BY MR. POLANSKY:

Q. Good morning, Mr. Mattson. My name is Kevin Polansky, and I represent Allied First in a lawsuit filed by Samuel Katz. You've been subpoenaed here to give testimony; is that correct?

A. Yes.

Q. And the subpoena was served at 6820 East Valley Vista Lane, Paradise Valley, Arizona; is that right?

A. Correct.

Q. Is that your current home location?

A. It is.

Q. Okay. In the subpoena there was a request for documents. Did you do a search for the documents requested in the subpoena?



A. Yeah, I do not have any of those documents. They were -- all of that stuff would have been in my Allied First e-mail, and I do not have access for that -- to that stuff.

Q. Okay. When's the last time you had access to that e-mail account?

A. Really the day we were -- like a month after we were told Allied First is no longer.

Q. When was that?

A. So I don't -- gosh. I don't know that exact date. Sorry, Kevin, off the top of my head I don't know the exact date. But, I mean, it's been a good year and a half or so.

Q. Okay. Have you ever provided deposition testimony before?

A. I have.

Q. Okay. And so you're familiar with, sort of, how it plays out?

A. Yes.

Q. Okay. So I'll move along as quickly as I can, but just going to go through some background questions.

How long have you lived at the Arizona address we just went through?

A. About four and a half years, five years

Page 6

roughly.
Q. Okay. Who do you live with?
A. My wife, two kids.
Q. What's your wife's name?
A. Stacey Slick.
Q. Is that S-l-i-c-k?
A. Yes.
Q. Can you describe your educational background for us?
A. Two years of college.
Q. Which college?
A. I went to Kishwaukee College and Triton College in Illinois, both.
Q. Did you say Kishwaukee?
A. Kishwaukee.
Q. Kishwaukee?
A. Yes.
Q. Okay. And what year -- what years were those?
A. '92 and '93.
Q. Okay. Did you seek any other additional education after those two years?
A. No.
Q. Okay. Do you have any certifications, degrees?

Page 7

A. No.
Q. Where do you currently work?
A. Peoples Bank & Trust Company. They're based out of Hazard, Kentucky, and I have a couple other businesses as well.
Q. Okay. What -- what's your role at Peoples Bank?
A. Manager.
Q. Okay. And how long have you been a manager at Peoples Bank?
A. I have been here roughly a year.
Q. Okay. And are you a -- are you in a brick and mortar, or are you virtual?
A. We have an office in Phoenix.
Q. Okay. And so you're the manager of that office?
A. Yes.
Q. Okay. Is that a branch manager position?
A. Yes. Yes, sir.
Q. Okay. Prior to being a branch manager at Peoples Bank & Trust, where did you work?
A. Well, I was at Allied for a while.
Q. Yeah, I'm going to ask about Allied in a little bit.
A. Okay.

Page 8

Q. Was there any job between Allied and Peoples First -- or Peoples Bank?
A. Yeah, just like a month I went to a place called Texana Bank, but that was not a good fit. So I moved on quickly to Peoples Bank & Trust Company.
Q. Okay. In preparation for today's deposition, did you review any documents?
A. No.
Q. Speak to anybody?
A. No.
Q. Okay. How long did you work at Allied First for?
A. I want to say five years or so.
Q. Okay. And what was your -- what was the job you -- you started at Allied First?
A. Same thing, branch manager.
Q. And where was that branch located?
A. Scottsdale, Arizona.
Q. And were you a branch manager for the entire duration of your five years there?
A. Yes.
Q. And just generally, what were some of your job responsibilities as the branch manager?
A. Manage the loan officers, manage processors, did a lot of marketing for the loan officers, provided

Page 9

leads.
Q. How many loan officers did you have in the Scottsdale, Arizona, branch?
A. The most we had was probably 80, 81 officers.
Q. Okay. Was that the only location where there are loan officers?
A. Yes.
Q. Okay. When you said you helped provide leads, what does that mean?
A. Generate leads through various different outlets, third parties, direct mail. We did some telemarketing when I was there.
Q. Okay. Who did -- who did you report to?
A. I would say it was Jeff Hutchison.
Q. The last name got cut off. Say it again?
A. Hutchison.
Q. Jeff Hutchison.
A. Jeff, Jeff, yes.
Q. And what was his role at the bank?
A. I'm not really sure. I'm not sure what his actual position was, but he was, I believe, the person that managed or was supposed to manage the branch managers of the offices.
Q. Okay. Do you know how many branch offices there were?

Page 10

A. I do not.
Q. Okay.
A. There were quite a few, though.
Q. Did you maintain the -- the role of branch manager throughout your time working there, or were there any promotions to something else?
A. No -- no. I mean I did a little bit of recruiting initially, but that was it. But I just got busy running our branch.
Q. Was the -- was the position salaried or was it based on any --
A. No. 100 percent commission.
Q. Commission. Okay.
A. Yes.
Q. And how were your commissions structured?
A. Whatever I want it to be. Depending on how much -- the funds available in the operating account. I was running my own profit and loss so as -- sometimes there was money in there, most of the time there was. And then if I chose to draw something, I would just request it.
Q. And who did you have to request it from?
A. I think ultimately it was Ken Bertrand's decision. We would send the request to him, and then he would approve it.

Page 11

Q. And who is Ken Bertrand?
A. Ken was the president of the bank.
Q. Did you have a formal employment contract?
A. Yes.
Q. And were your commission -- was your commission structure outlined in that -- in that agreement?
A. I don't remember -- I don't recall exactly how it read, but it was similar to what I just said as the money was available in the operating account, I could pull -- pull it, request it.
Q. So the commissions weren't tied to how many loans you closed or the volume of --
A. No, no.
Q. It was just tied to profit?
A. Yes.
Q. And how often would you -- would you take a commission?
A. Usually on payroll dates, which were biweekly, I would request something.
Q. Was there a minimum salary that you received in addition to commissions?
A. No, not that I -- no, not that I recall.
Q. Did you receive benefits?
A. Yes.

Page 12

Q. Okay. How often would you meet with Jeff Hutchison with respect to, you know, loans and loan closings?
A. Never.
Q. Did you ever have to provide him with any of your reports?
A. No.
Q. Okay. Did you ever regularly meet with the loan officers?
A. Yes.
Q. How often did you meet with the loan officers?
A. At least two or three times a week.
Q. Okay. And what was the purpose of those -- those meetings?
A. Just to go over production numbers, marketing, things of that nature.
Q. In the two or three time per week, would that be with all 80, 80 or so loan officers?
A. Yes.
Q. Were those meetings in person or virtual?
A. In person.
Q. Were there any agendas for those meetings or just ad hoc?
A. No real agenda, no.

Page 13

Q. Okay. Without -- you mentioned earlier that while working for Allied First, you said you had some side businesses?
A. When I worked at Allied First, yes.
Q. Was one of those called Suncovia?
A. No.
Q. Have you ever heard of Suncovia?
A. Yeah, I started Suncovia after I left Allied.
Q. And when did you start Suncovia?
A. December of 2022.
Q. Okay. And what is Suncovia?
A. It's a solar company.
Q. Okay. As part of that solar company, did you purchase leads from sources?
A. Yes, we -- yes.
Q. Was there any mix between Suncovia and Allied First with respect to leads?
A. No.
Q. So the loads -- the leads that you purchased for Suncovia were distinct from those you purchased for Allied First?
A. Yes. It's a solar lead not a mortgage lead. So they're never, never the same.
Q. Have you heard of Diamond Select Lead Group?
A. Yes.

Page 14

Q. What is that?
A. It was a telemarketing company that I had that generated leads for mortgage.
Q. And who owned that company?
A. I did.
Q. And it was specifically for mortgage leads?
A. Yes.
Q. And when did you start that company?
A. I'm not sure. Seven or eight years ago, maybe.
Q. Is it still in business?
A. No. It's no longer in business as of, I don't know -- I want to say 12 months ago or so.
Q. Twelve months? Okay.
A. Or longer, maybe 12 or 15 months ago.
Q. Okay. And when -- when you were working at Allied First, was there any -- any mix between Allied First and Diamond Select?
A. No. We were not really using it, no.
Q. Did Allied First ever purchase leads from Diamond Select?
A. Yes.
Q. And was there any sort of contract relationship between the parties?
A. No.

Page 15

Q. Were you the only employee of Diamond Select?
A. Yes -- was I the only employee?
Q. Yeah.
A. No, no. I had telemarketers.
Q. Okay. So how many employees did Diamond Select have?
A. Probably 30 to 35 at its peak.
Q. Okay. And how would Diamond Select generate leads?
A. Purchase aged form fills, online form fills, and then dial them.
Q. Okay. And when you say "purchase," purchase from who? Affiliates?
A. Yes.
Q. Partners?
A. Yes.
Q. And how many partners or affiliates did you purchase leads from for Diamond Select?
A. There were several.
Q. Okay. Was Consumer Nsight one of them?
A. Yes.
Q. Was Iconic Results another one?
A. Yes.
Q. Okay. So to understand correctly --
A. Iconic -- Iconic, I'm sorry, I'll correct

Page 16

that. Iconic just sends warm transfers from their call center. So I never bought data from them, but I bought live transfers from them.
Q. Do you know how the -- strike that.
For the leads at Diamond Select sold to Allied First, how would Diamond Select be compensated?
A. Diamond Select would be -- I would submit an invoice to Allied. They knew I had the call center too. They knew it was my business and we would pay, I believe, it was a hundred dollars per transfer. And then I would pay for a bundle of those that, I don't know, 200 or 300 transfers. And then when we got through those, then I would submit the invoice for it.
Q. And did you -- did you discuss with anyone at Allied First that you were selling leads for a company you owned to Allied First?
A. Yes.
Q. And who did you discuss that with?
A. Hutchison, Jeff Hutchison.
Q. Okay.
A. And Ken Bertrand.
Q. Okay. Do you recall any of those communications being in writing?
A. I don't recall.
Q. Okay.

Page 17

A. I'm not sure.
Q. Do you -- do you specifically have a recollection that you told either Hutchison or Bertrand than you owned Diamond Select?
A. Yes.
Q. Okay. So it's your position that they were both aware that Allied First was purchasing leads from a company that you owned?
A. Yes.
Q. Okay. Did you ever have to get approval from Allied First in order to buy leads from a specific source?
A. Yeah, we had to submit, at times, I believe, all the vendors that we were using.
Q. Okay.
A. It wasn't all the time, but I believe we had to do that a few different times throughout the years that I was there.
Q. Okay. When Diamond Select purchased a lead, you said you had a call center that would call the lead?
A. Yes. An employee at Diamond Select would call the leads, yes.
Q. And would they then have a warm transfer to Allied First?

A. Yes.
Q. Would Allied First make any outgoing calls?
A. We made outbound calls all the time, yes, to loan officers.
Q. Okay. And who were those outbound calls to?
A. Customers, potential customers.
Q. Okay. Were they for leads that were purchased?
A. Yes.
Q. Okay. So I guess what I'm getting at, were they both warm transfers in just hard leads that were sold to Allied First from Diamond Select?
A. Not just Diamond Select, probably ten -- ten different vendors.
Q. Yep, I'm going to get into different vendors.
A. Okay.
Q. But with respect to Diamond Select, Diamond Select would sell hard leads --
A. No. Diamond Select would just do warm transfers.
Q. Okay. So the only leads that Allied First purchased from Diamond Select were warm transfers?
A. Yes.
Q. Okay. And on those warm transfers, Allied First would not be making outbound calls, is that fair?



A. That's fair.
MR. PARONICH: Form.
A. Say someone received a live transfer, they talked to the person, the person doesn't decide to move forward today. The loan officer would still follow up on that lead.
Q. (BY MR. POLANSKY) Okay. So let me specify that. So they would not make the initial call, but they would sometimes make follow-up calls. Is that fair?
A. Yes.
Q. Okay. Did -- do you know how many warm transfers Diamond Select made to Allied First over the years?
A. A lot. I have no idea what the number was. A lot, though.
Q. And for every warm transfer you said you got a hundred dollars per lead?
A. I think it was a hundred, yeah. That's what I remember.
Q. And does Diamond Select still have those records?
A. Of -- no. No, I would not.
Q. Okay. What was the reason Diamond Select went out of business?



A. Just no real need for it anymore.
Q. Okay.
A. Mortgages have slowed way down.
Q. And what was your job title at Diamond Select?
A. Owner.
Q. Okay. So you received all the profits?
A. Yes.
Q. And how long was the period of time that Diamond Select would sell warm transfers to Allied First?
A. I'm sorry, what was that again?
Q. How long was the period of time that Diamond Select would sell warm transfers to Allied First?
A. How long?
Q. Yeah, was it for a year, three months?
A. No, it was for -- it was for a while. I don't recall.
Q. Okay.
A. It was a big part of the volume when we were doing a lot of loans.
Q. Did Diamond Select generate their own leads or just purchasing leads from third parties?
A. Purchase the data and then call the data.
Q. Okay. And do you recall who they purchased



the data from?
A. There were several -- several vendors.
Q. Any vendors that come to mind?
A. I don't remember some of the names of them these days. I'm not sure.
Q. Okay. Would Diamond Select still have records of the vendors they would purchase leads from?
A. Possibly some, maybe some.
Q. Okay. Would Diamond Select keep call records for the leads they called on?
A. Going back that far, no.
Q. Would they keep call records for the warm transfers?
A. No.
Q. Okay. Do you recall who specifically approved Diamond Select as a vendor by Allied First?
A. Allied did. I don't know, Jeff. I mean, I told them when we first started that I had a call center.
Q. Okay.
A. And I told them it was Diamond Select Lead Group and they approved it.
Q. And did they raise any concerns being the owner of that company while being paid commissions at Allied First?

Page 22

A. Not at all.
Q. Other than the warm transfers, was there any other scope of work that -- that Diamond Select engaged with Allied First in?
A. No. No.
Q. Did Diamond Select ever use a different call center for its leads other than its own?
A. No.
Q. So they would call their own leads?
A. Call the leads that I purchased, yes.
Q. Okay. Would anyone other than you at Allied First communicate with Diamond Select?
A. No.
Q. When you were at Allied First, putting aside Diamond Select, did you purchase leads from any other vendors?
A. Yes.
Q. Okay. And you mentioned one of those vendors was Consumer Nsight?
A. Yes.
Q. And how did you come to meet Consumer Nsight?
A. I don't recall. Some -- someone introduced me to them. I don't remember who it was years ago.
Q. Okay.
A. I was working with them for years, have been

Page 23

working with them for years.
Q. And was there a specific individual at Consumer Nsight that you would work with?
A. His name is Rick Sabatino, I believe.
Q. Okay. And so you knew Rick Sabatino prior to being employed at Allied First?
A. Yes.
Q. Okay. When it came to purchasing leads from vendors, did you have full decision-making authority and oversight?
A. Yes.
Q. And were you involved in supervising that whole entire process?
A. Supervising what process?
Q. The purchasing of leads and then the warm transfers?
A. Yeah, I would say so.
Q. And so you knew Rick Sabatino prior to being hired by Allied First; is that right?
A. I would say probably yes. I've known him for a while. I don't remember if it was right at the beginning of Allied or before Allied, but I've known him for a while.
Q. Did he have other companies other than Consumer Nsight?

Page 24

A. I have no idea.
Q. Okay. So the only company you worked with him at was Consumer Nsight?
A. Yes.
Q. Did you at some point while working at Allied First, negotiate the purchase of leads from Consumer Nsight?
A. Yes.
Q. Okay. And was the purchase of those leads for warm transfers?
A. No. It would -- yeah, I guess. He was getting like a -- he was getting, I guess, a cut because he introduced me to Iconic Results, so I think he was getting cut out of them, but I'm not sure. But I also purchased data from him.
Q. Okay. So you purchased both data and warm transfers?
A. Yes.
Q. Okay. And do you know how Consumer Nsight purchased leads from Iconic Results?
A. No, I wasn't familiar with their process.
Q. Were you involved at all in the negotiating between Consumer Nsight and Iconic Results with respect to leads being purchased?
A. No.

Page 25

Q. Okay. Did you ever offer up -- strike that.
Did Diamond Select ever make calls on behalf of Consumer Nsight?
A. No.
Q. Okay. Did you -- when you were negotiating a deal to purchase leads from Consumer Nsight, did you ever offer up Diamond Select as being a call center?
A. No, no.
Q. Okay. Did they say they had their own call center?
A. Consumer Nsight?
Q. Yeah.
A. No.
Q. What did they tell you about where they purchased the leads?
A. They get them directly from, I believe, a couple different publishers.
Q. Okay. And would Consumer Nsight make any of the calls, or were they just a broker?
A. They did not make calls.
Q. Okay.
A. Not that I'm aware of.
Q. So they would -- they would broker getting you leads from their vendors or partners?
A. Yes, yes.

Q. Okay. Who negotiated how much Diamond Select would receive from Allied First? Did you just come up with a number, or did somebody approve it?
A. They approved it. I sent them the invoices. They knew it was my company.
Q. With respect to Diamond Select, what steps did you take as the owner to ensure that Diamond Select was in compliance with the TCPA?
A. We would make sure that every lead came with an IP address, all the typical stuff that is required to be considered a legal lead to work.
Q. Would you require that the consumer received or provided their consent to be contacted?
A. It was opt-in data. They opted in, yes. We made sure that that was the case.
Q. Was Diamond Select provided that opt-in data prior to calling the consumer?
A. Yes.
Q. And do you still have that opt-in data that was received from the vendors you purchased them from?
A. I possibly would have some of it.
Q. Okay. When you were in your capacity -- strike that.
In your capacity at Allied First as the bank manager -- or branch manager, I should say, what steps



did you take to ensure that the leads you were purchasing for Allied First were TCPA compliant?
A. Made sure that -- like I just said, I don't know all the -- all the jargon. But we made sure that it was opted in, that the person actually filled out a form and there's -- I forgot what the heck it's called but when someone does fill it out, they -- they're -- there's part of the data that shows -- that proves they opted in.
Q. Okay.
A. Like the IP address -- go ahead.
Q. Would it be fair that there would be a consent disclosure that they agreed to receive telemarketing calls?
MR. PARONICH: Object to form.
Q. (BY MR. POLANSKY) Do you understand my question?
A. No.
Q. Okay. When you say "opt-in data," can you specify what you mean by that?
A. Sure, when we purchased the data, there's a lot of different pieces that come with that data, their name, their address, their IP address, the -- I forgot what the -- the most important piece is to verify that it's definitely them that filled out the form. And



then we would purchase that data and call it.
Q. And when you say "the form," are you talking about a website form?
A. Yes, form fills. That's all we used to purchase, 30-, 60-, 90-day aged form filled data like Lending Tree. Could have been several other sources where people go on and fill out a form fill.
Q. In the form that they filled in, would you require that those forms contain a TCPA disclosure statement?
A. That's part of, I believe, the field -- one of the fields that we get from the vendor.
Q. Okay. When you started talking to Rick about Consumer Nsight selling leads, can you describe those communications you had?
A. He had just introduced me to this guy from Iconic. Those were the only transfers that I purchased from him and like I said, I think he was getting a little cut off every transfer that was sent over. I don't know his exact relationship with the owner of Iconic, but he just said, "Hey, I can get you some warm transfers, it's all opt-in." Showed me what forms they were filling -- you know, what the form looked like before they called it. Made sure they were -- it was opt-in data and we did some transfers with them.



Q. And do you recall, was it one bundle of transfers or more?
A. No. We did a -- did a few, I think, not a -- not a lot. Maybe a couple runs with them. I don't remember how many.
Q. Okay. Do you know how Iconic Results was obtaining this data, the opt-in data?
A. Yeah, the same stuff that I think we call it -- that we were calling at Diamond Select. I think it was all -- it's just all opt-in data from different sources where they fill out a form on, like, a lead form on form fill and...
Q. Did you maintain any control over Iconic Results with respect to how they obtained leads?
A. No.
Q. Did you maintain any control over how they called leads?
A. No.
Q. Do you recall what the pricing was for each lead sold by Iconic Results?
A. It was between, I think, a hundred to $130 per transfer, somewhere in that ballpark.
Q. When you say "transfer," are you only talking about warm transfers or data as well?
A. Just warm transfers, no data.

Page 30

Q. So if I understand your testimony correctly, Allied First didn't purchase any data from Iconic Results. It was just warm transfers?
A. Just warm transfers.
Q. And similar to the questions I asked you about Diamond Select, is it fair to say that Allied First didn't initially call the consumers but would only call on follow-ups after the warm transfer?
A. Yes, yes.
Q. When was the last time you've spoken to Rick Sabatino?
A. Maybe like once in the last week or so.
Q. Have you discussed this lawsuit with him?
A. No.
Q. Okay. Is he still with Consumer Nsight?
A. Yes.
Q. Are you -- do you still have any companies that are purchasing leads from him?
A. Suncovia does.
Q. And, again, those are just solar leads?
A. Yes.
Q. Okay. Was anyone else involved in the discussions with Consumer Nsight when you were negotiating the purchase of leads?
A. No.

Page 31

Q. And you had full autonomy to enter into that relationship on behalf of Allied First?
A. Yes.
Q. Did you have to get approval from Hutchison or Bertrand?
A. Yes. Like I said, several times throughout the time there, we would have to submit what vendors we were working with. Maybe we did that a few -- I don't know how many times we ended up doing that, but we would have to notify them and get approval to work with a company.
Q. Okay. Did you -- did you have to get approval on the prices that you would pay per lead?
A. No.
Q. That you had discretion on?
A. Yes.
Q. Do you recall having some written communications with Mr. Sabatino regarding the purchase of leads for Allied First?
A. I do not recall if it was -- if there was anything in writing.
Q. Okay.
A. If it was, it would have been in the Allied e-mail.
Q. Was there any formal contract entered into

Page 32

between Allied First and Consumer Nsight?
A. No.
Q. Was there any formal contract entered into between Allied First and Iconic Results?
A. They would have just sent over a form, like an order form. And then I paid them whatever that amount was.
Q. Okay.
A. But no contract.
Q. Would that order form come from Consumer Nsight or Iconic Results?
A. It would have came from Iconic.
Q. Okay. But no written agreement?
A. No.
Q. Okay. And the deal you negotiated, if I understand correctly was with Consumer Nsight? In other words, they brokered the deal for leads with Iconic Results?
A. They brokered the deal, and I ended up talking with the guy at Iconic and worked with him directly. But my understanding was -- my understanding of their relationship was -- and I knew it, I think Rick was getting a little bit of an override off of every transfer. But I don't know what that -- I don't know what their arrangement was.

Page 33

Q. Okay. Do you know if any of your team -- team members ever communicated directly with Consumer Nsight or Iconic Results?
A. No. They wouldn't have. It would have just been me.
Q. Okay. And how did you come to decide to purchase leads from Consumer Nsight?
A. Not sure. Someone else, I don't remember who introduced me to them. But someone introduced them to me, and then I started using them.
Q. Did you do any sort of vetting of their leads or just started using them?
A. No. I would ask them to send me a sample and I would review it to make sure that it was a true opt-in, and usually you can tell whether it's good data or not. So I would have --
Q. How can you tell?
A. We would do a test.
Q. What would you look for?
A. We would do a test with them and test the numbers. Make sure they're good quality numbers. The dialer that we would put it in would essentially do a scrub of the data for us to say here's how many bad numbers, here's how many good numbers. Usually you could tell if data is good by how many numbers are good

when you purchase it.
Q. And what dialer did you use?
A. Used a couple over the years. One call ZenCall, it's now called Readymode.
Q. Okay.
A. That was a primary one that we used for years.
Q. And that would tell you if they were legitimate numbers or not?
A. Yes.
Q. And by legitimate, I mean working numbers?
A. Yes.
Q. How many other lead vendors did you purchase leads for at Allied First over the years?
A. I don't know, maybe eight, ten to a dozen.
Q. Okay. And did you have any -- any oversight over those lead vendors, or you'd just purchase leads?
A. I mean, now I would -- when you say "oversight," what do you mean. I don't know what you mean.
Q. Sure. In other words, you didn't control how they came up with leads or made calls, did you?
A. No, no.
Q. I understand that you would -- you would require opt-in information for all of them, right?



A. Yes.
Q. Do you know if Iconic Results was selling leads to a number of different sources?
A. I'm sure they do.
Q. Okay. They weren't exclusive to Allied First; is that fair?
A. No, no.
Q. No, they weren't exclusive, right?
A. They were not exclusive to Allied First.
Q. Did there come a time when Allied First stopped purchasing leads from Consumer Nsight?
A. I don't recall. Maybe at certain times. We used to go with whatever was working at the time, and sometimes we weren't always doing that. We would do more, say, direct mail than telemarketing, or we would just switch gears whenever depending on market conditions, I guess.
Q. Okay.
A. Certain things worked better than others.
Q. And to confirm with respect to the leads purchased from Consumer Nsight, Allied First would only call the consumer as a follow-up call; is that fair?
A. Yes.
Q. Can you explain the process of receiving the leads from Consumer Nsight? How would a lead come into



Allied First?
A. From Consumer Nsight, he would -- Rick would just send me a big batch of data when I would purchase it. Maybe it's 30,000 records, 20,000, 10,000, 5,000. It would vary on how many we would purchase, and then he would send it over in an Excel file, usually. And I'd open it up. I'd look at it. Look at all the fields and make sure all the fields were there and then we would load it up into the dialer and started calling it.
Q. Well, I thought you only purchased warm transfers from Consumer Nsight for Allied First.
Let me back up. So I'm only asking about the Allied First purchase of leads from Consumer Insight/Iconic Results. Were those only warm transfers?
A. Got it. Yes.
Q. Explain that process to me.
A. I would just pay -- I would pay for the -- pay for the transfers and they would start sending them. I never -- never saw the data or anything like that.
Q. But how would the transfer get from Iconic Results to Allied First?
A. It was just a warm transfer. We would set



our phone system up so that it would say Iconic on our phone. So everyone in the office knew that that lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic Results.
Q. Okay. So would Iconic make the call?
A. Yes.
Q. And then --
A. Or, when you say Iconic would not -- I don't know if Iconic -- no, it wasn't Iconic, it was -- yes, no, I'm sorry. I'm getting the two confused. It was Iconic would make the call. They have their own telemarketing call center in the Phoenix area. They would make the calls, and we would just receive the transfer from them.
Q. Okay. And when they received the transfer, it would show up as Iconic on the number so they knew who it was coming from?
A. Yes, they knew it was a warm transfer, the loan officer did.
Q. Do you know anything about Iconic Results' call center and their processes?
A. No, I do not.
Q. Did a loan officer at Allied First have to accept a warm transfer from Iconic Results?

A. They didn't have to, no.
Q. Okay. Do you know how many callers Iconic Results has in its call center?
A. I do not.
Q. Do you know what script they would use when they -- when they called a lead?
A. We -- no, I -- no, I never actually saw their script, no.
Q. Okay. Had you ever been to their call center?
A. No.
Q. Did you have any control over their scripts?
A. No.
Q. Would -- would the call center keep records of the transfers that were sent over to them from Consumer Insight/Iconic Results?
A. We would have probably had a record of it at one point in time but no longer.
Hello?
Q. Yep. No, just looking at my notes.
A. Okay.
Q. Are you familiar with a gentleman by the named Samuel Katz, the plaintiff in this case?
A. Yes.
Q. Okay. And what do you know about him?



A. The guy's a scumbag, that's what I know.
Q. Okay. Who called Samuel Katz with respect to the calls at issue in this case?
A. That would have been Iconic, they transferred him over.
Q. Did you -- have you listened to any of the voice recordings?
A. We had to pull some. I think we pulled them for Allied and the guy -- if this is the guy that I recall used several different aliases when he called back in, said he was not Sam Katz but someone else.
Q. James Weim, do you recall that name?
A. Yeah, I think -- yes, possibly.
Q. And when you say he was a scumbag, what do you mean by that?
A. I just -- it's someone that filled out a form. It was him. We had all the information. I ended up seeing all the information on him. Meaning the form fill, his IP address. It was definitely him, definitely his phone number, his address. And I don't remember all the specifics now, but I just know that when we started listening to the calls, he was saying he was someone else trying to obviously get to this point where he is today. Trying to sue somebody. But he used a couple different aliases. I remember that.



Q. Okay.
A. And lied about who he was -- kept -- we would follow up with him. I believe we followed up with him. I don't recall all the specifics of that.
Q. Okay.
A. But I just know that we had talked to him once. He said he's maybe this person and then he calls back in -- he called back in and said he's another person. And, sorry, I don't remember all the specifics.
Q. No, that's okay.
A. That's what I recall.
Q. Yep, I don't want you to guess, just recall what you recall.
A. Yep, yep.
Q. The was -- was Mr. Katz or Mr. Weim or whatever we want to call him, was he part of the batch of leads that were purchased through Consumer Nsight?
A. Yes.
Q. Okay. And you said you had received an invoice. I'm going to show you -- I'm going to mark as Exhibit 2 -- I'll mark Exhibit 1 the subpoena, and I'll mark Exhibit 2 the invoice.
(Deposition Exhibit 1 & 2 were marked.)
MR. POLANSKY: Let me share my screen with



you. Mr. Mattson, can you see my screen okay.
A. Yeah, sorry I'm on my phone.
Q. (BY MR. POLANSKY) That's all right.
A. I do see that. Yes. Yeah, I see it.
Q. And do you see who the invoice is from?
A. I do.
Q. Okay. Does that refresh your memory as to who would send the invoice?
A. It does. Yep. Yes.
Q. Okay. And who --
A. Sorry, I apologize. I thought I paid -- I thought I paid Iconic directly on those, but I did pay Rick, and now it's coming back to me, yes.
Q. So you would -- if I understand your testimony correctly, you would pay Consumer Nsight directly; is that fair?
A. Yes.
Q. As the broker for purchasing leads from Iconic Results?
A. Yes.
Q. Okay. And now, it says -- "Prepared for Craig Mattson, Allied First Bank. Proposal date 1/28/22. And then it has a rate of 145 for 500 leads."
Do you see that?
A. I do.

Q. Is that -- is that rate 145 per lead?
A. Yes.
Q. And these were for -- you were purchasing warm transfers; is that right?
A. Yes.
Q. Did you ever receive 500 warm transfers from Iconic Results or Consumer Nsight?
A. I'm not sure if we received all of them. I know that I was not happy with them. I don't remember. I think we did get all 500 possibly. I'm sure they ended up sending that many.
Q. Okay. And, again, I don't want you to guess, so if you have a memory, great, if you don't, don't.
A. I do not recall, no. I do not recall if we received all of those.
Q. Okay. You said you weren't happy with them, what weren't you happy about?
A. Just, I would say, the quality. They were just shoving over some people that were not very interested. We didn't have a very high success rate on it. I know we didn't recover what we paid for this batch. I remember that.
Q. Okay. Now, these -- the description is Prescreened Refinance Live Transfers.
A. Yes.



Q. What is -- what were you looking for to purchase, what types of leads?
A. People that were looking to refinance or pull cash out of their home to pay off debt.
Q. Okay. I'm going mark as the next exhibit, Exhibit 3.
(Deposition Exhibit 3 was marked.)
Q. (BY MR. POLANSKY) And I'm going zoom in if I can. This is an e-mail chain between you and Rick at Consumer Nsight.
A. Okay.
Q. And he says, at the very bottom here on June 25, 2022, "Craig, are there loans types/programs you're trying to target more? I know interest rates are on the rise, we can tailor and adjust."
Do you see that?
A. Yes.
Q. And you responded with, "We are targeting FHA, VA and Conventional cashout for the most part."
Can you explain the types of leads that you were looking to purchase from that description?
A. It could have been an FHA customer, VA or someone sending conventional loans.
Q. Okay. But these were refinances?
A. Yes.



Q. Okay. And then he responded, "What's your max LTV % for VA, FHA, and CONV?" C-O-N-V, I think conventional. "Also, minimum credit score?"
Do you see that?
A. Yes.
Q. Can you explain what he's asking you?
A. Yeah, just like -- maybe just to make sure that the leads they're sending fit our criteria as far as what Allied First is able to do as far as what our, maybe, guidelines are in order to approve a loan.
Q. Okay. And then you responded with, "100% cashout for VA with a 640 score."
What does that mean?
A. That means on a VA loan, vets can pull out a hundred percent of their equity, if they have that 640 credit score at that time.
Q. And what does it mean "80% cashout on FHA with a 580"?
A. That means that we can go up to 80 percent cashout, or we could at that time. 80 percent cashout on an FHA cashout refi with a 580 credit score.
Q. Okay. And then lastly, what is "95% cashout on conventional with a 700 score" mean?
A. Same thing, that we can go up to 95 -- we can pull up to 95 percent of their loan to value at that



time with a 700 credit score on a refinance.
Q. Okay. So if I understand from these e-mails, you're telling him the types of consumers you're looking to -- to refinance a loan with, is that fair?
A. Yes.
Q. Are you telling him how to go about and obtain leads for you?
A. No.
Q. Okay. And he responds back with "Refinance Transfers. Aged Internet Refinance Leads."
Do you see the -- the e-mail he sends on January 25th?
A. Yes.
Q. He provides the time frames that he's going to send, right?
A. Yes.
Q. What does it mean, "Posting Lead Assignment to Loan Officers that answer the phone"?
A. I'm not sure.
Q. Okay. He says, "Price point $145 to you, as long as the order commitment is for a minimum of 25 calls per day for 1 month, 500 calls in total."
Is that the proposed cost?
A. Yes.
Q. Okay. What is an updated suppression file?

A. So he's talking about a different -- he would maybe sell us some leads for -- for my call center.
Q. Okay.
A. That's what he's talking about there.
Q. Okay. And I understand you didn't purchase any data for your call center, is that fair?
A. No.
Q. Okay. So you just purchased the first category of the refinance transfers; is that right?
A. That's correct.
Q. Okay. So this is -- this e-mail chain is dated January 25th [sic]. And then on January 28th -- I'm going to mark this Exhibit 4.
(Deposition Exhibit 4 was marked.)
Q. (BY MR. POLANSKY) He sends you his banking information; is that right?
A. Yes.
Q. And then on the same day, he sent you the proposal, right?
A. Yes.
Q. Now, the campaign went live on February 3rd; is that correct?
A. Yes. That's what it looks like, yes.
MR. POLANSKY: I'm going to mark this Exhibit 5.



(Deposition Exhibit 5 was marked.)
Q. (BY MR. POLANSKY) What is a DID number?
A. That is just a number that we would give them so they can route the numbers to us.
Q. Okay.
A. So like a -- a ring-to number.
Q. So that's the number they were transferring them all to?
A. Yes.
Q. Okay. And then he says, "Good morning brother, keep me posted on the DID. Also, please make sure Velocify has all the LOs."
What's an LO?
A. Loan officer.
Q. And that's added to the ICON campaign. What was the ICON campaign?
A. That was just the warm transfer campaign that we would have pop up on their phone so our loan officer knew where the lead was coming from.
Q. Okay. You confirmed that they had the correct DID. And then he says on February 3, "I'll get an ETA as to when you'll be in the rotation for transfers."
Do you see that?
A. Yes.



Q. And what did he mean by the rotation for transfers?
A. I think what he means there is we're not the only person that was purchasing transfers from them, so they would add us into the rotation with the other brokers or other relationships that they have to make sure that we're getting some of the calls.
Q. Okay. And then on the same date he says, "Do you see these caller IDs?" And he lists three of them. And then he further sends the spreadsheet of four posts. "Here are the posts."
What do these posts mean? Is that the first batch of leads?
A. They were test -- they were test leads to make sure that they were hitting our CRM.
Q. Okay. Okay. You wrote, "They all came through. Going live!"
And this just confirms that's when the live transfer campaign went forward; is that right?
A. Yes.
Q. Okay. Have you ever spoken to anyone at Iconic Results about the warm transfer lead campaign?
A. I did, yes.
Q. Okay. And it was at -- before the campaign got started or after it got started?



A. I don't recall.
Q. Okay. Do you recall anything about those conversations?
A. Yeah, I mean, I know that there was a couple conversations where I -- I think this was my first time ever doing business with them, and I said, "Hey, these -- these leads are not good." Like, you're just -- some of them -- some of them were just -- we weren't taking many applications, I remember that. It wasn't a very high-quality lead, I wasn't very happy about that. I remember that at the time but that's it.
Q. Okay. And what was your role at Allied First during the campaign? Was it to generate the leads for the loan officers?
A. Yes.
Q. Okay. You personally didn't initiate any calls, did you?
A. No.
Q. Okay. What about did you follow up on any calls to consumers?
A. If there was a consumer complaint or something, I would -- I would get involved.
Q. Okay. For this warm transfer campaign from Consumer Nsight, did DSLG assist in tracking any of the calls?

A. No. I don't believe so, no.
Q. Was DSLG compensated for tracking any of the calls?
A. No.
Q. Okay. Did DSLG make any follow-up calls with respect to any warm transfers from Consumer Nsight?
A. I don't believe so, no.
Q. Okay. Did you ever personally speak to Mr. Katz himself or --
A. I don't believe I did, no.
Q. Okay. Did anyone from Allied First ever call Mr. Katz directly?
A. Not that I'm aware of.
Q. Okay. Just a couple more follow-up questions. So to confirm, you hired Consumer Nsight yourself; is that right?
A. Yes, with approval of the bank, yes.
Q. And you managed the scope of that relationship with Consumer Nsight?
A. I did, yes.
Q. You did not direct Consumer Nsight on how to provide leads; is that right?
A. Correct.
Q. And you did not control how Consumer Nsight procured those leads, right?



A. No.
Q. And you never initiated a phone call to generate leads, right?
A. No. Correct.
Q. And you never initiated a phone call with Mr. Katz; is that right?
A. Correct.
Q. Okay.
MR. POLANSKY: I may be done. Can you give me three minutes to just look through my notes? And then Mr. Paronich will have a few questions.
MR. PARONICH: That's right. And just so you can plan your day, Mr. Mattson, I'll be far less time than Mr. Polansky. But I will have a handful of questions, okay?
THE DEPONENT: Okay.
MR. POLANSKY: So just let's take a three-minute break.
(Recess taken from 10:24 a.m. to 10:27 a.m.)
Q. (BY MR. POLANSKY) So, Mr. Mattson, I had asked you earlier about some side businesses you had while working at Allied First, and I know you said that Suncovia was not in operation at the time that you worked at Allied First; is that right?
A. I don't believe it was, no.



Q. Okay. Diamond Select was, and we know about that relationship. We talked about it.
A. Yeah.
Q. Was there any other side businesses that you had that you were working on at the time you worked at Allied First?
A. No, I don't -- no, I do not believe so.
Q. Okay. Do you have any additional side businesses other than the ones we've mentioned today?
A. Nothing -- Suncovia is the main one, that's it.
Q. Okay. Are there any others that you haven't mentioned?
A. I mean, I have -- my wife and I do some Airbnbs, and there's business names for that --
Q. Okay.
A. -- related to that, but nothing else.
Q. Okay. With respect to your commissions, would you send e-mails confirming how much you believed you were entitled to in commissions when you would get paid every biweekly payroll cycle?
A. It's just whatever I chose to request.
Q. Okay. And then would they approve that in writing or just approve it by issuing a payroll check?
A. Someone there was reviewing it, I don't know



if it was Ken Bertrand, whoever would review it, they would review it before they definitely sent it out.
Q. Okay.
MR. POLANSKY: I think that's all I have. I thank you for your time, and Mr. Paronich will have some questions for you. Thank you.
THE DEPONENT: Okay. Yes.
MR. PARONICH: Mr. Mattson, would you like to dive right in or take a quick break?
THE DEPONENT: No. I don't have much time here so hopefully -- I'm sorry, because I've got to catch a flight.
MR. PARONICH: Okay. We'll dive right in, and I'll be as quick as I can.

EXAMINATION

BY MR. PARONICH:
Q. So, Mr. Mattson, if I understand your testimony correctly today, was Diamond Select the only side business that generated leads for Allied First?
A. Yes. That would be correct.
Q. I'm sorry, I just didn't hear what you said?
A. No, that would be correct. That's a correct statement.
Q. And I heard testimony earlier that you had utilized the ZenCall dialer, is that -- is that for

Page 54

Diamond Select?
A. That's what we would have been using for Diamond Select at that time, yes.
Q. And there was -- the data that you purchased for Diamond Select, did that come from Consumer Nsight only, or were there sources other than Consumer Nsight?
A. I don't recall.
Q. Okay. Do you still have an account with ZenCall, who I also understand is currently referred to as Readymode?
A. We -- we just started back up with them. We weren't working with them for the last couple years. We just started back up with them recently. But not for -- not for mortgage.
Q. Understood.
A. And not for Diamond Select.
Q. So I was just going to ask and I'll get a clear record on it, the account owner previously for ZenCall was Diamond Select, but now it's a different company; is that right?
A. Correct.
Q. Okay.
A. That's correct.
Q. Was any other dialer used by ZenCall to make calls -- excuse me.

Page 55

Was any other dialer other than ZenCall used by Diamond Select to make calls for Allied First?
A. No.
Q. I understand you testified earlier that some of the loan officers would make direct calls after the warm transfers; is that correct?
A. Correct.
Q. What dialing system would be used for those calls?
A. Just our regular phone system or it would have been through the -- directly through the CRM that we were using at the time.
Q. What CRM were you using at the time?
A. Oh, man. I don't know. We had a couple different ones, I'm not sure what one we were using at that time.
Q. Okay. Do you remember the phone system that you just referred to. What that was called?
A. I believe we were using Nextiva maybe.
Q. Okay. You had testified earlier that you had been deposed before, correct?
A. Correct.
Q. What kind of lawsuit was that prior deposition related to?
A. It was a previous bank, Goldwater Bank that I

Page 56

worked at.
Q. Understood. And in what context was the deposition? Was it a lawsuit brought by you or someone else?
A. It was a lawsuit brought by Goldwater Bank.
Q. And what type of lawsuit was it?
A. It was -- I don't know. It was something. Like -- I don't remember what it even was. They made something up to try to avoid paying me what they had owed me. I don't remember exactly what it was they filed. I had went to a different bank, and they sued me for going to the other bank.
Q. I see.
A. And then I countersued them.
Q. Understood. Do you assert that you're owed anything by Allied First?
A. There's definitely some invoices that I didn't get paid, but it's water under the bridge at this point. I'm not requesting anything.
Q. Understood. Okay. Was Diamond Select created for the purpose of generating leads for Allied First?
A. I had it prior to joining Allied First, and I used it at previous companies.
Q. Understood. When you were working for Allied

Page 57

First, did you use Diamond Select to work with any other companies?
A. No.
Q. So during the time of your employment for Allied First, Diamond Select was exclusive for Allied First?
A. Yes.
Q. Okay. And how long approximately did you work for Allied First?
A. I -- I don't recall. I think it was, like, five years.
Q. Okay. Did Diamond Select utilize the National Do Not Call Registry before making calls?
A. Yes.
Q. And how -- how did it utilize it did? Did it have an SAN number?
A. A SAN number, yes.
Q. And so did it utilize the SAN number before making all of its calls?
A. I don't recall.
Q. Do you recall any of the types of data that it would purchase that it would not use the SAN number for?
A. I don't -- I'm not -- not sure.
Q. So you know that Diamond Select had a SAN

Page 58

number, you just don't recall when and if it was utilized?

A. No. I said we utilized it.

Q. So can you remember any specifics of any instance where it was utilized?

A. Where it was?

Q. Where it was utilized, correct.

A. We would scrub the numbers. We would always scrub the numbers --

Q. Which numbers?

A. -- before we called them.

Any number that we called.

Q. Why did you -- why did Diamond Select scrub those numbers?

A. To make sure we were compliant.

Q. You had talked about securing opt-in data as part of your work with Diamond Select, correct?

A. Correct.

Q. Do you have any evidence or documents supporting any assertion that Allied First was listed specifically on any of those websites where the opt-ins were obtained?

A. I don't recall.

Q. For TCPA compliance purposes, did Diamond Select work with any lawyers?

Page 59

A. No.

Q. Do you have an approximation of how many calls Diamond Select made for Allied First when you had the company?

A. No, I have no idea.

Q. Do you believe it was more than 1,000?

A. I have no idea.

Q. Okay. Well, how this process works is that Mr. Polansky now has the opportunity to ask you some follow-up questions based on what I asked. If he doesn't have any questions then, I'm done. If he does, I may have a shorter follow-up based on that. Thank you.

THE DEPONENT: Okay. Thank you.

MR. POLANSKY: I have nothing further. Thank you, Mr. Mattson, I appreciate your time today. I will note, we will send you the depo transcript, and you do have 30 days to read and sign and change anything that might have been transcribed incorrectly. So I'll e-mail you that. And we can waive notary if that's good with Anthony.

MR. PARONICH: Yes, it is.

MR. POLANSKY: Okay. Great. Thanks for your time. Safe flight.

THE DEPONENT: Thank you. Thanks, guys.

Page 60

MR. POLANSKY: Richael, if you e-mail me, I will e-mail you the exhibits and copy Anthony so everyone has them.

MR. PARONICH: Yeah, that would be great and we'll -- we'll order the electronic with exhibits. I'm sure standard turnaround time is fine.

(Ending time: 10:37 a.m.)

Page 61

A C K N O W L E D G E M E N T

I, CRAIG MATTSON, certify that I have read the transcript of my testimony taken under oath on May 7, 2025, and that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.

________________________
CRAIG MATTSON

Signed and subscribed to before me, this day of , 20 .

________________________
Notary Public

CERTIFICATE OF REPORTERS

STATE OF ARIZONA )
) ss.
CITY AND COUNTY OF PIMA )

I, RICHAEL M. SILVIA, Registered Merit Reporter, Certified Realtime Reporter, and Certified Reporter in the State of Arizona, do hereby certify that the foregoing deposition was taken before me in the County of Pima, State of Arizona; that an oath or affirmation was duly administered by me to the witness, CRAIG MATTSON, pursuant to A.R.S. 41-324(B); that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting; that the transcript is a full, true and accurate record of the proceeding, all done to the best of my skill and ability; that the preparation, production and distribution of the transcript and copies of the transcript comply with the Arizona Revised Statutes and in ACJA 7-206(F)(3); ACJA 7-206 J(1)(g)(1) and (2); and ACJA 7-206 J(3)(b).

The witness herein, CRAIG MATTSON, requested review and signature.

I FURTHER CERTIFY that I am in no way related to any of the parties nor am I in any way interested in the outcome hereof.

IN WITNESS WHEREOF, I have set my hand in my office in the County of Pima, State of Arizona, this 21st day of May 2025.

Richael Silvia

Richael M. Silvia, RMR, CRR, CRCR
Arizona CR No. 51017



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Samuel Katz v. Allied First Bank, Sb, Et Al
DATE OF DEPOSITION: 5/7/2025
WITNESSES' NAME: Craig Mattson

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Craig Mattson

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ___________, 20__.

(NOTARY PUBLIC) MY COMMISSION EXPIRES: