CONTAINS CONFIDENTIAL INFORMATION

Page 1

1                              VOLUME: I
                               PAGES:  1 to 80
2                              EXHIBITS:  1 to 8
3
            IN THE UNITED STATES DISTRICT COURT
4
         FOR THE NORTHERN DISTRICT OF ILLINOIS
5
                      EASTERN DIVISION
6
7
      Civil Action No. 1:22-cv-05277
8
9
      SAMUEL KATZ, individually      )
10    and on behalf of all others    )
      similarly situated,            )
11                  Plaintiff,       )
                                     )
12    vs.                            )
                                     )
13    ALLIED FIRST BANK, SB, et      )
      al,                            )
14                  Defendants.      )
15                  CONFIDENTIAL
16          ZOOM DEPOSITION OF SAMUEL KATZ,
17     called as a witness on behalf of the
18     Defendants, pursuant to the applicable
19     provisions of the Federal Rules of Civil
20     Procedure, before Jeanette N. Maracas,
21     Registered Professional Reporter and Notary
22     Public in and for the Commonwealth of
23     Massachusetts, on Thursday, March 27, 2025,
24     commencing at 10:04 a.m.
25

CONTAINS CONFIDENTIAL INFORMATION

Page 2

1  APPEARANCES:

2

3  PERRONG LAW, LLC
   By: Andrew Perrong, Esq.
4  2657 Mt. Carmel Avenue
   Glenside, PA 19038
5  For the Plaintiff.
   A@perronglaw.com
6
7  NELSON MULLINS RILEY & SCARBOROUGH, LLP
   By: Kevin P. Polansky, Esq.
8  One Financial Center
   Boston, Mass. 02111
9  For the Defendant Allied First Bank, SB
   Kevin.polansky@nelsonmullins.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       I N D E X
2  Testimony of:        Direct   Cross
3  Samuel Katz
4  (by Mr. Polansky)       4
   (by Mr. Perrong)              73
5
6
7       E X H I B I T S
8  No.      Description         Page
9
   Exhibit 1   Samuel Katz answers to
10             interrogatories.    12
11 Exhibit 2   Confidential Settlement
               and Release Agreement.   25
12
   Exhibit 3   Complaint.          26
13
   Exhibit 4   3/16/23 demand letter.   44
14
   Exhibit 5   E-mail from Samuel Katz.  48
15
   Exhibit 6   Bates 16 Confidential.    66
16
   Exhibit 7   Audio file.         77
17
   Exhibit 8   Deposition notice.   77
18
19
20
21
22
23
24
25

Page 4

1       P R O C E E D I N G S
2       SAMUEL KATZ
3       A witness called for examination
4  by counsel for the Defendants, having been
5  first duly sworn, was examined and testified
6  as follows:
7       DIRECT EXAMINATION
8  BY MR. POLANSKY:
9  Q. Good morning, Mr. Katz. Could you please
10    state your full name for the record.
11 A. Samuel Katz.
12 Q. Mr. Katz, my name is Kevin Polansky. I
13    represent Allied First in a case you brought
14    against them. I'll be asking some questions
15    today. I don't anticipate that it's going
16    to go a whole long day, but in the event you
17    need any breaks, I'd just ask you to answer
18    any question pending at that time, okay?
19 A. Okay.
20 Q. Have you provided deposition testimony
21    before?
22 A. Yes.
23 Q. When was the last time?
24 A. I don't remember.
25 Q. Let me just go through the groundrules in

Page 5

1  case you forgot. So somewhere on your
2  screen is the court stenographer. She's
3  taking down everything that both of us say,
4  so it's important that only one of us
5  speaks at a time, okay?
6  A. Yes, understood.
7  Q. On a similar vein, you can't use head
8  nods or shoulder shrugs because she can't
9  really take that down, so you've got to use
10 verbal responses, "yes," "no," "I don't
11 know," okay?
12 A. Yes, understood.
13 Q. If you don't understand one of my questions,
14 just let me know, I'm happy to rephrase it.
15 Otherwise, I'll understand that you
16 understood my question, okay?
17 A. Okay.
18 Q. I think that's just about it. How many
19 times have you testified at a deposition?
20 A. I don't know.
21 Q. More than five?
22 A. I don't think so.
23 Q. Okay. Were these in connection with a
24 lawsuit that you had filed?
25 A. Yes.

2 (Pages 2 - 5)

CONTAINS CONFIDENTIAL INFORMATION

Page 6

1  Q.  Approximately how many lawsuits have you
2      filed in the TCPA context?
3              MR. PERRONG:  Objection to form.
4  A.  I don't know.
5  Q.  More than one?
6  A.  Yes.
7  Q.  More than five?
8  A.  Yes.
9  Q.  More than ten?
10 A.  I'm not sure.  I'm not sure.
11 Q.  So maybe somewhere between five and ten?
12 A.  I wouldn't put an amount on it because I
13     don't know offhand the entire history.  I
14     don't have it in front of me.
15 Q.  Was there a more recent period of time
16     that you filed more lawsuits or has it
17     spanned a certain period of time?
18             MR. PERRONG:  Objection.
19 A.  Over the last ten years.
20 Q.  What's your date of birth?
21 A.  April 26, 1988.
22             MR. PERRONG:  And we'll designate
23     that confidential.
24             MR. POLANSKY:  Okay.
25 Q.  With respect to the deposition testimony

Page 7

1      that you previously provided, have they
2      all been in the context of a TCPA suit?
3              MR. PERRONG:  Objection to form.
4  A.  Yes.
5  Q.  Mr. Katz, where do you live?
6  A.  Arkansas.
7  Q.  Where in Arkansas?
8  A.  Bella Vista.
9  Q.  More specifically, do you have an address,
10     street address?
11             MR. PERRONG:  Objection to form.
12     We'll designate any responses confidential.
13             MR. POLANSKY:  Okay.
14 A.  14 Little Drive.
15 Q.  How long have you lived there?
16 A.  A little under two years.
17 Q.  So maybe since 2023?
18 A.  Yes.
19 Q.  And before that, where did you live?
20 A.  Arkansas.
21 Q.  And what is the address?
22 A.  209 White Oak Street in Gentry.
23 Q.  When did you move to the Gentry address?
24 A.  In 2021.
25             MR. POLANSKY:  And, Andrew, just

Page 8

1      for our benefit, we'll mark anything
2      confidential relating to any sort of personal
3      address or telephone number, e-mail address,
4      okay?
5              MR. PERRONG:  Okay.
6  Q.  Prior to moving to the Gentry address in
7      2021, where did you live?
8  A.  Maine.
9  Q.  Where in Maine?
10 A.  Dover-Foxcroft.
11 Q.  What was the address?
12 A.  92 Lincoln Street.
13 Q.  Did you ever live at 43 Lincoln Street,
14     Dover-Foxcroft?
15 A.  Yes.
16 Q.  When was that?
17 A.  That was for a few months when I first
18     moved to Maine.
19 Q.  And then you moved to -- what did you say?
20     92 Lincoln Street?
21 A.  Correct.
22 Q.  And how long were you at the 92 Lincoln
23     Street address for?
24 A.  From late 2017 until early 2021.
25 Q.  So you were at that address until you moved

Page 9

1      to Arkansas?
2  A.  Correct.
3  Q.  Do you currently work?
4  A.  Yes.
5  Q.  Where do you work?
6  A.  Wal-Mart.
7  Q.  What do you do at Wal-Mart?
8  A.  Can we designate this as confidential,
9      please?
10 Q.  Yes, of course.  Anything relating to
11     your employment or anything not related to
12     the phone calls, your telephone numbers,
13     e-mails we'll mark all as confidential.
14 A.  Okay.  I worked in merchandising operations.
15 Q.  What does that entail?
16             MR. PERRONG:  Objection.
17 A.  It involves providing analytical support
18     to merchandising.
19 Q.  How long have you had that role?
20 A.  This role specifically since August of
21     last year.
22 Q.  And how long have you been working for
23     Wal-Mart?
24 A.  Since February of 2023.
25 Q.  Where did you work before that?

3 (Pages 6 - 9)

CONTAINS CONFIDENTIAL INFORMATION

Page 10

1  A.  IRI.
2  Q.  What is IRI?
3  A.  They're a syndicated data provider.
4  Q.  What's a syndicated data provider?
5  A.  They aggregate data and engage in statistical
6      projections and then sell that along with
7      custom databases of retail and consumer
8      sales of product.
9  Q.  So is your job function, or at least the
10     ones you've had most recently, data
11     analytics?  Is that fair?
12 A.  That's fair.
13 Q.  Is the IRI employment what drew you to
14     Arkansas?
15 A.  No.
16 Q.  How long were you at IRI?
17 A.  About seven years, a little over seven
18     years.
19 Q.  So you were working for IRI when you
20     were both in Maine and Arkansas?
21 A.  Correct.
22 Q.  Did the IRI employer provide you with any
23     sort of phone number, any sort of phone to
24     use in your job?
25         MR. PERRONG:  Objection to form.

Page 11

1  A.  I think at one point they did.
2  Q.  Do you recall when that was?
3  A.  I don't know.  We went through a bunch of
4      private equity flips and stuff got taken
5      away and I don't remember.
6  Q.  Were you working remote for IRI when you
7      were in Maine?
8          MR. PERRONG:  Objection to form.
9  A.  Yes.
10 Q.  What number did you use to contact people
11     either inside work, outside work when you
12     were working at IRI?
13         MR. PERRONG:  Objection to form.
14 A.  Can you please clarify the question?
15 Q.  Sure.  So you were working remote from your
16     house, I assume?
17 A.  Correct.
18 Q.  Did you ever have to speak to anyone outside
19     of the IRI business as part of your job?
20 A.  Yes.
21 Q.  And how would they contact you?
22 A.  Microsoft Teams or e-mail.
23 Q.  Would anyone call you via phone?
24         MR. PERRONG:  Objection to form.
25 A.  Maybe, but that was extremely rarely used.

Page 12

1  Q.  What phone would they call, what phone
2      number?
3  A.  My IRI phone.
4  Q.  What was the number of that?
5  A.  I don't remember.
6  Q.  And if you were placing calls, what number
7      would you use?
8          MR. PERRONG:  Objection to form.
9      You can answer.
10 A.  Can you please clarify the question?
11 Q.  Sure.  If you were going to call somebody
12     as part of your employment, what telephone
13     number would you use to make an outgoing
14     call?
15 A.  I don't think that I ever -- I don't have
16     any recollection of ever calling anyone.
17 Q.  I'll try to make this a little easier.
18     I'm going to pull up your answers to
19     interrogatories.  I'll mark this as
20     Exhibit 1.  I'm going to put it on my screen.
21     Just give me a second.
22         (Exhibit 1 marked for
23         identification.)
24 Q.  Can you see my screen okay?
25 A.  Yes, I can.

Page 13

1  Q.  Okay.  This is a ten-page document.  Have
2      you seen this document before?
3  A.  Yes.
4  Q.  I'm going to flip to the very last page.
5      Do you recall signing this document?
6  A.  If I was asked to sign it, I would have
7      signed it.  It just looks like this could
8      be a version control issue if you don't
9      have a signature on it.
10 Q.  Yeah, I think you're probably right because
11     I did see a signature.  In any event, do
12     you recall having signed this document?
13         MR. PERRONG:  Objection to form.
14 Q.  You can answer.
15 A.  Can you clarify the question, please?
16 Q.  Sure.  In front of you I have answers to
17     interrogatories.  Do you know what those are?
18 A.  Yes.
19 Q.  You've seen those in this case and other
20     cases?
21 A.  Yes.
22 Q.  Do you understand that you're required to
23     sign them under the pains and penalties of
24     perjury?
25 A.  Yes.

4 (Pages 10 - 13)

CONTAINS CONFIDENTIAL INFORMATION

Page 14

1 Q. Do you recall whether you signed these
2   answers to interrogatories?
3       MR. PERRONG: Objection to form.
4 A. I don't have a specific memory of signing
5   them, but if I needed to sign them, I
6   would have signed them.
7 Q. In other words, you're not withholding your
8   signature from them, is that fair?
9 A. That's correct.
10 Q. In No. 5 it asks, "identify by phone number
11   and provider any landline, cell phone or
12   VoIP use by you to send or receive
13   communications and whether such landline,
14   cell phone or VoIP number or provider account
15   was registered in your name or the name of
16   another person." And then you identify a
17   number of numbers. Do you see that?
18 A. I do.
19 Q. I'm just going to go through that list
20   quickly with you, okay?
21 A. Okay.
22 Q. (207) 802-1001. Do you see that number?
23 A. Yes.
24 Q. Who does that number belong to?
25 A. Me.

Page 15

1 Q. And is that registered in your name?
2 A. Yes.
3 Q. Is that associated with a landline or
4   cell a phone or something else?
5 A. Something else.
6 Q. What is it registered to or associated
7   with, I should say?
8 A. It was a landline and I switched it to
9   Voice over IP protocol.
10 Q. Okay. Is it still in use?
11 A. It's still active, yes.
12 Q. Do you know, was that number registered to
13   the Federal Do Not Call list?
14       MR. PERRONG: Objection to form.
15 A. I don't have my registration information
16   in front of me, but I believe that I
17   registered all my phone numbers on there.
18 Q. You registered more than one?
19 A. Yes.
20 Q. Do you know when this particular number,
21   the (207)802-1001 number was registered?
22       MR. PERRONG: Objection to form.
23 A. I don't know.
24 Q. Was that number used for business purposes
25   of any sort?

Page 16

1 A. No.
2       MR. PERRONG: I'll just -- I was
3   going to object to form.
4       MR. POLANSKY: Okay.
5 Q. Was this number used when you were working
6   at IRI?
7       MR. PERRONG: Objection to form.
8 A. Can you please clarify the question?
9 Q. Sure. Would you receive phone calls to
10   that number while working at IRI?
11       MR. PERRONG: Objection to form.
12 Q. If you answered, I didn't hear it.
13 A. My answer is no.
14 Q. Moving on to the (207) 349-8213 number,
15   whose number is that?
16 A. My phone number.
17 Q. And what is that? Is that associated with a
18   landline, cell phone, Voice over IP?
19 A. That's a cell phone.
20 Q. Is that active?
21 A. Yes.
22 Q. How long have you had that number for?
23 A. I don't know.
24 Q. More than five years?
25 A. I think approximately five years.

Page 17

1 Q. Okay. How long have you had the number
2   just above it, the 1001 number?
3 A. I think that that was activated when we
4   moved into our house on 92 Lincoln Street.
5 Q. So that would have been 2017, if my memory
6   serves correct?
7 A. I believe so.
8 Q. Is the 8213 number, is that on the DNC?
9 A. I believe so.
10 Q. You don't have a memory as to when that
11   was registered?
12 A. No.
13 Q. Moving on to the (978) 877-9112 number,
14   what's that number associated with?
15 A. Voice over IP.
16 Q. What do you use that number for?
17       MR. PERRONG: Objection to form.
18 A. Can you please clarify the question?
19 Q. Sure. That's not associated with a cell
20   phone or anything?
21 A. That was a cell phone. That was my first
22   cell phone number.
23 Q. Do you still use that number?
24 A. It's still active.
25 Q. Do you still receive phone calls on it?

5 (Pages 14 - 17)

CONTAINS CONFIDENTIAL INFORMATION

Page 18

1  A. Can you please clarify the question?
2  Q. Sure. Do you still receive wanted phone
3     calls on it?
4         MR. PERRONG: Objection to form.
5  A. This number and some of the others here,
6     the reason that I have them is because
7     they're used for two-factor authentication,
8     and that's the primary reason that I have
9     them at this point.
10 Q. You saved me a lot of questions.
11 A. Okay.
12 Q. I was just trying to figure that out. So
13    you don't have a primary use for these
14    other than the two-factor authentication,
15    is that fair? Specifically I'm referring
16    to 978, 617, 857 and 305 numbers.
17 A. Correct. The 9112 and 6565 are former
18    cell phone numbers of mine that are used
19    for two-factor authentication, and 9493 is
20    my wife's old cell phone number and she
21    asked me to retain it because she had
22    two-factor authentication set up on it.
23 Q. Got it. There's one more number that you
24    listed. What's the 499 number used for?
25 A. Scroll down, please.

Page 19

1  Q. I'm sorry.
2  A. That's used for two-factor authentication.
3  Q. Okay. Was that another number used by
4     your wife?
5  A. No.
6  Q. Okay. Now, in here you write, "all of
7     these telephone numbers are in the
8     plaintiff's name." Is the 857 number that
9     was associated with your wife's old cell
10    phone in your name or her name?
11 A. That's in my name. That was imported over
12    to my NumberBarn account.
13 Q. Got it. The phone number associated with
14    the calls at issue in this litigation, what
15    phone number is that?
16 A. I don't remember offhand.
17 Q. Have you ever filed a lawsuit based on
18    calls to any one of these numbers or are
19    they all associated with one particular
20    phone number?
21        MR. PERRONG: Objection to form.
22 A. I believe that they're -- I don't have a
23    document in front of me that would spell out
24    which cases were linked to which phone
25    numbers.

Page 20

1  Q. Do you recall filing lawsuits related to
2     more than one number?
3  A. Yes.
4  Q. In 2022, what number did you primarily use
5     for personal household purposes?
6         MR. PERRONG: Objection to form.
7  Q. Early 2022.
8  A. Well, I think the two-factor authentication
9     would be for household and personal purposes
10    so that would include any of the numbers
11    that I have listed here because I think some
12    of them are used for -- it's a little -- in
13    my efforts to be efficient with not having
14    to have a cell phone, I ended up creating a
15    mess of two factors, so all of them are used
16    for personal purposes.
17 Q. Understood. But let's say you had friends
18    call. Would they primarily call your cell
19    phone?
20 A. Yes.
21 Q. And the cell phone that you primarily used
22    in early 2022 would have been the 8213
23    number, is that fair?
24        MR. PERRONG: Objection to form.
25 A. Yes.

Page 21

1  Q. In 2022, if my math is correct, or I guess
2     if my notes are correct, you were living
3     in Arkansas?
4  A. Correct.
5  Q. Did you have any sort of landline associated
6     with the home?
7         MR. PERRONG: Objection to form.
8  A. No.
9  Q. You would just rely on the phone numbers
10    listed here?
11 A. Correct.
12 Q. Does anyone other than you use the 1001
13    number?
14 A. No.
15 Q. What about the 8213 number?
16 A. No.
17 Q. Do you receive any sort of work reimbursement
18    for your cell phone?
19 A. No.
20 Q. Remind me, were you working at Wal-Mart in
21    2022?
22 A. No.
23 Q. Did IRI provide any sort of cell phone
24    reimbursement?
25 A. I don't remember, but like I said before,

CONTAINS CONFIDENTIAL INFORMATION

Page 22

1    they went through several private equity
2    flips so it's highly unlikely.
3  Q. Okay. In early 2022, who were you living
4    with, if anybody?
5  A. My family.
6  Q. And I'm only concerned about adults. Any
7    adults?
8  A. My wife.
9  Q. What's her name?
10 A. Shelby.
11 Q. Same last name?
12 A. In some cases, yes.
13 Q. Okay. What are the names she goes by?
14 A. Shelby Katz or Shelby Hinckley.
15 Q. And, again, we can mark all this part
16    confidential.
17        Is Hinckley her maiden name?
18 A. Correct.
19 Q. Any other adults that were living with you
20    in early 2022?
21 A. No.
22 Q. Can you describe your educational background.
23 A. I have a Bachelor's degree and a Master's
24    degree.
25 Q. And where is the Bachelor's from?

Page 23

1  A. Elmira College.
2  Q. What year did you graduate?
3  A. 2010.
4  Q. Is that Upstate New York?
5  A. Correct, yup.
6  Q. My buddy went there. Do they have a good
7    soccer program?
8  A. Soccer and hockey as well. Lacrosse, too.
9  Q. And your Master's program, where did you
10    graduate from?
11 A. University of Arkansas.
12 Q. Are you rooting for Arkansas tonight? I
13    think there's a seven o'clock game.
14 A. Yeah.
15 Q. Me, too. One of the few outside Arkansas
16    probably picked in my bracket.
17        When did you graduate from Arkansas?
18 A. Last year.
19 Q. And what was -- Master's of what?
20 A. Business administration.
21 Q. In preparation for today's deposition,
22    did you speak to anyone? And if you spoke
23    to attorneys, I don't want to know what
24    you spoke about.
25 A. I spoke to my attorney.

Page 24

1  Q. Which one?
2  A. Andrew.
3  Q. Did you speak to anyone else?
4  A. No.
5  Q. Did you review any documents?
6  A. No.
7  Q. Have you reviewed the complaint in this
8    lawsuit?
9        MR. PERRONG: Objection to form.
10 A. Are you referring to proceeding preparation
11    for the deposition or ever?
12 Q. Good question. Ever.
13 A. Yes.
14 Q. And then you already said that you had
15    reviewed your discovery responses, is that
16    fair?
17 A. Yes.
18 Q. Now, you were involved in one other lawsuit
19    with Allied First, is that correct?
20        MR. PERRONG: Objection to form.
21 A. I don't believe that it was a lawsuit.
22 Q. Was it just like a claim?
23 A. I think it was a demand letter, but if you
24    have documents that would say it actually
25    was, I would accept that as well. I don't

Page 25

1    remember.
2  Q. Frankly, I don't either. I was hoping
3    you'd tell. I do have a document. I'll
4    show it to you.
5        I'm going to mark as Exhibit 2
6    the confidential settlement agreement, so
7    I'll mark this as confidential, obviously,
8    with the two relevant parties who signed it.
9    Let me just put that on the screen.
10       (Exhibit 2 marked for
11    identification.)
12 Q. Do you remember seeing this document? And
13    I'll scroll down. It's a five-page document
14    that's Exhibit 2.
15 A. Yes.
16 Q. Was John Fink your counsel for that matter?
17 A. Yes.
18 Q. And just going back to the date, this was
19    entered into on or about June of 2016, is
20    that right?
21 A. That sounds about right.
22 Q. These related to calls that Allied First
23    had allegedly made to you, is that right?
24 A. Correct.
25 Q. And I think you're right. I don't know if

CONTAINS CONFIDENTIAL INFORMATION

Page 26

1   this did end up in a lawsuit. It looks
2   like it might have just been a demand. Is
3   that your memory as well?
4 A. That's my memory as well.
5 Q. After this agreement was entered into and
6   prior to the calls at issue in this case
7   that you received in early 2022, did you
8   ever receive any other calls from Allied
9   First?
10 A. I don't know.
11 Q. Anything that you're aware of?
12 A. The calls that I'm aware of for Allied
13   First are in the complaint.
14 Q. Okay. And those stem from approximately
15   January 2022 to, I believe it's March 2022?
16 A. I don't have the complaint in front of me,
17   but if that's what the complaint says, I
18   would defer to that.
19 Q. Let me pull that up just so we're not
20   guessing. I'll mark the complaint in this
21   case as Exhibit 3.
22      (Exhibit 3 marked for
23   identification.)
24 Q. This is an eleven-page document I'll scroll
25   through and just ask if you've seen it

Page 27

1   before.
2 A. Yes, I believe I have.
3 Q. Okay. I'm going to go to the factual
4   allegation section which starts on Page 4
5   of 11. Are you with me?
6 A. Yes, I see that.
7 Q. Paragraph 21 says, "Consumer Nsight placed
8   telemarketing calls for Allied First to Mr.
9   Katz on January 8th, 14th, 22nd, 28th,
10   February 9, 16 and 23 and March 4th and 7th."
11   Do you see that?
12 A. I see that.
13 Q. Going back to my earlier question, so is
14   the scope of the calls from January to March
15   of 2022?
16 A. It would appear that way, yes.
17 Q. These are calls that you allege came from
18   Consumer Nsight on behalf of Allied First,
19   is that fair?
20 A. That's what it says, yes.
21 Q. Have you ever had any involvement with
22   Consumer First (sic) prior to January of
23   2022?
24      MR. PERRONG: Objection to form.
25 A. With Consumer Nsight?

Page 28

1 Q. Oh, is that how you say it?
2 A. I think so. I'm not sure. Sorry, I was
3   agreeing with the pronunciation, not your
4   question. Can you please repeat the
5   question?
6 Q. Sure. Prior to January of 2022, have you
7   ever had any other communications with
8   Consumer Nsight.
9 A. I don't know.
10 Q. None that you're aware of?
11 A. I don't know.
12 Q. You don't know if you're aware of any
13   others?
14      MR. PERRONG: Objection to form.
15 A. I don't know if there were any other calls
16   from Consumer Nsight.
17 Q. Okay. Did you send any demand letters to
18   Consumer Nsight prior to January of 2022?
19 A. I think that -- I'm not going to speculate,
20   so I don't believe that I have sent them
21   any demand letters directly.
22 Q. When you say "directly," are you saying by
23   yourself or through counsel?
24 A. Both.
25 Q. So you're not aware of any demand letters

Page 29

1   having been sent to Consumer Nsight?
2 A. I think that this is getting to what we're,
3   what the issue is here, which is that
4   there are third parties that contract with
5   the telemarketing firms, so it is entirely
6   possible that I received other calls from
7   them.
8 Q. Sure. No, I understand that part, but I'm
9   asking about demand letters. Are you aware
10   of any demand letters having been sent to
11   Consumer Nsight at any point in time?
12      MR. PERRONG: Objection to form.
13   Objection as asked and answered.
14 Q. You can answer.
15 A. I don't remember. I don't know.
16 Q. Okay. With respect to other TCPA actions
17   you filed, and I understand you don't recall
18   the exact number, have any of those gone to
19   trial?
20      MR. PERRONG: Objection to form.
21 A. I'm not -- I don't have a law degree so
22   I'm not sure what would constitute going to
23   trial.
24 Q. Do you know what a trial is?
25 A. I do.

8 (Pages 26 - 29)

CONTAINS CONFIDENTIAL INFORMATION

Page 30

1 Q. And, to your knowledge, have any of the
2    lawsuits you filed gone to trial?
3        MR. PERRONG: Objection to form.
4 A. I don't know if it was going to trial or
5    if it was settled or if it was a bench
6    trial or if it was a jury trial.
7 Q. When you say you don't know if, are you
8    suggesting that you did have one case go
9    to trial?
10 A. I can't differentiate between if something
11    went to trial or if it was settled before
12    trial or if there was a trial and then we
13    had settlement.
14 Q. Understood. Let me break it down a little
15    bit, then. Have you ever testified in court,
16    not like a deposition like this?
17        MR. PERRONG: Objection to form.
18 A. I don't think so.
19 Q. Have you ever had a judge issue a ruling
20    entering judgment on your behalf against a
21    defendant in a TCPA case?
22        MR. PERRONG: Objection to form.
23    You can answer.
24 A. Again, I don't -- I'm not able to
25    differentiate on the conclusions of other

Page 31

1    cases.
2 Q. Say that one more time.
3 A. I'm not able to differentiate on the
4    conclusions of other class actions so I
5    don't know whether it was a class action,
6    whether there was a settlement agreement
7    reached by my attorneys or whether it had
8    gone to a bench trial with a motion for
9    summary judgment or any of those other
10    things. I'm not into the details of the
11    legal logistics.
12 Q. Are you aware of any juries having found
13    or made a decision in any of your cases?
14 A. I don't think so, but I'm not 100 percent
15    sure.
16 Q. Do you recall any of the other defendants
17    that you have filed in TCPA lawsuits?
18        MR. PERRONG: Objection to form.
19 A. Yes.
20 Q. What are the names?
21        MR. PERRONG: Objection to form.
22 A. I think Liberty Power, Honda, Sun Run. Did
23    you want all cases or just TCPA cases?
24 Q. TCPA cases.
25 A. I think there are probably other cases, but

Page 32

1    I don't remember.
2 Q. Okay. Are there other non-TCPA cases that
3    you filed?
4 A. Yes.
5 Q. Any other class actions?
6        MR. PERRONG: Objection to form.
7 A. I don't remember whether it was a class
8    action or not.
9 Q. What case are you referring to?
10 A. The lawsuit against the State of Maine.
11 Q. Is that still pending?
12 A. No.
13 Q. Did you prevail?
14 A. No.
15 Q. That was not a TCPA case?
16 A. No. That was related to expropriation
17    of about $28 million in taxpayer assets with
18    no compensation for the taxpayers.
19 Q. You might have more success nowadays.
20 A. Yeah, Maine's a crazy place.
21 Q. It is, it really is.
22        With respect to the TCPA lawsuits
23    that you filed, are they all related to
24    allegations that you signed up on a web form
25    to receive calls?

Page 33

1 A. At times that's been the defendant's
2    position, and in my experience that's
3    related to, I believe it's called lead
4    laundering where an unscrupulous third
5    party will take data lists and put
6    them into web forms and amass to manufacture
7    consent where none exists.
8 Q. With respect to consent, so would you agree
9    that -- strike that.
10        Have you ever entered your name
11    into a web browser to receive information or
12    services from a company?
13        MR. PERRONG: Objection to form.
14 A. Not specific to this lawsuit. Just in
15    general.
16 Q. Can you please clarify the question?
17 A. Sure. I'll give you an example. Have you
18    ever purchased clothing online?
19 A. Yes.
20 Q. And have you ever consented to receiving
21    telemarketing calls by consenting to, on
22    those websites at the time making the
23    purchase?
24 A. No, because the consent to receive
25    telemarketing calls is separate from the

9 (Pages 30 - 33)

CONTAINS CONFIDENTIAL INFORMATION

Page 34

1    consent related to the transaction.
2  Q.  And do you ever provide your consent to
3    receive telemarketing calls?
4  A.  No.
5  Q.  Have you ever wondered why you're getting
6    so many telemarketing calls?
7        MR. PERRONG:  Objection to form.
8  A.  I have, yes.
9  Q.  Have you ever looked into it?  Like was
10    your number ever associated with like some
11    sort of data leak or anything like that?
12        MR. PERRONG:  Objection to form.
13  A.  I have looked into it.  I don't believe
14    it's been from data leaks.
15  Q.  What have you found with respect to your
16    phone number being used in these sort of
17    lists?
18        MR. PERRONG:  Objection to form.
19  A.  There are third parties that will manufacture
20    consent by taking large lists of phone
21    numbers and running them through web forms
22    in a script.
23  Q.  Do you know who these third-party
24    manufacturers are?
25        MR. PERRONG:  Objection to form.

Page 35

1  A.  I don't know offhand, but I do believe
2    they've been identified in other lawsuits.
3  Q.  Do you know the names of any of them?
4  A.  Not offhand.
5  Q.  Do you know the other lawsuits they've
6    been identified in?
7  A.  I don't.  Actually, I remember one of them.
8    Mezzi Marketing.
9  Q.  How do you spell "Mezzi"?
10  A.  M E Z Z I.
11  Q.  Okay.  Are you aware of whether your phone
12    number has ever been associated with those
13    big third-party manufacturers?
14        MR. PERRONG:  Objection to form.
15  A.  I don't have specific knowledge, but I
16    would strongly suspect it.
17  Q.  Do you believe that's what happened here
18    in this case?
19  A.  I don't know what happened here.
20  Q.  In the complaint I just showed you, it
21    identified nine telephone calls, is that
22    right?  I can bring it up again.
23  A.  If that is what's in the complaint, I'll
24    agree to that.
25  Q.  Okay.  I don't want you to take my word for

Page 36

1    it.  I want to show you.
2        So I'm just -- all I did was count
3    the number of calls here.  479.
4  A.  That would appear to be correct.
5  Q.  And all the calls came from the same caller
6    ID, is that right?
7  A.  That's what it says, yes.
8  Q.  Do you know who was using that phone number
9    at this period of time?
10        MR. PERRONG:  Objection to form.
11  A.  The complaint says Consumer Nsight, but
12    again, as I'm sure you're more than well
13    aware, this specific issue has been litigated
14    at length about ownership and vicarious
15    liability and so on and so forth.
16  Q.  Sure, that's all right.  I still have to ask
17    the question, unfortunately.  You get it,
18    right?
19  A.  Yeah, I do.
20  Q.  Do you know what type of calls these were?
21        MR. PERRONG:  Objection to form.
22  A.  It would appear they're telemarketing calls.
23  Q.  Did you answer any of the nine phone calls?
24        MR. PERRONG:  Objection to form.
25  A.  Is that in the complaint?

Page 37

1  Q.  Let me give you a chance to read the
2    complaint.  So this is Page 5 and this is
3    the extent of the factual allegations after
4    Page 4.  So tell me when to flip the page,
5    okay?
6  A.  Go ahead.  Looks like I answered the ninth
7    call.
8  Q.  And so on the first eight calls, you did
9    not answer?
10  A.  That's what it says, yes.
11  Q.  Is that your memory as well?
12  A.  I don't remember, but if it's in the
13    complaint, then that's what happened.
14  Q.  And do you know if you received a voice
15    message on any of the first eight calls?
16        MR. PERRONG:  Objection to form.
17  A.  I don't know.
18  Q.  If you did receive a voice message, would
19    you still have it?
20        MR. PERRONG:  Objection to form.
21  A.  I might.  I would have to look.
22  Q.  I'd just ask you to preserve that if you
23    do have it.  I haven't seen it.  Do you know
24    the purpose of those first eight calls?
25        MR. PERRONG:  Objection to form.

10 (Pages 34 - 37)

CONTAINS CONFIDENTIAL INFORMATION

Page 38

1 A. I don't know the purpose of the eight
2  calls, but it's my understanding that in
3  contracted situations like this, in some
4  instances a consistent phone number will
5  be used by a party that they're contracting
6  on behalf of so that they can keep track
7  of things like this.
8 Q. Have you ever seen any documentation showing
9  the purpose of the first eight calls?
10 A. I don't know.
11 Q. Nothing that comes to mind at the moment?
12 A. No.
13 Q. When you receive unwanted calls like this,
14  do you make a log or a note?
15     MR. PERRONG: Objection to form.
16 A. Can you please clarify the question?
17 Q. Sure. So we've already talked about you
18  filed a number of different lawsuits, right?
19 A. Correct.
20 Q. And in each lawsuit you allege the illegal
21  calls that are made to you, is that fair?
22 A. That's fair.
23 Q. Do you keep a running note, like a log or
24  diary on calls that you receive that you
25  believe were unwanted?

Page 39

1     MR. PERRONG: Object to form.
2 A. I did, but not anymore.
3 Q. When did you stop doing that?
4 A. I don't remember.
5 Q. Prior to 2024, did you stop doing it?
6 A. Yes.
7 Q. Prior to 2023?
8 A. I don't remember when I stopped.
9 Q. Do you think you had notes for the calls
10  at issue in this case?
11     MR. PERRONG: Objection to form.
12 A. I might have. I don't know.
13 Q. Do you still have those notes or a diary?
14     MR. PERRONG: Objection to form.
15 A. I don't know where -- I might. I don't know.
16 Q. You haven't looked for them?
17     MR. PERRONG: Objection to form.
18 A. I would have provided everything that's
19  relevant to the case.
20 Q. Who determined relevancy?
21     MR. PERRONG: Objection to form,
22  and to the extent that it asks for
23  attorney-client information, I'm instructing
24  the witness not to answer.
25 Q. You said you would provide everything

Page 40

1  relevant. Did you make a relevant
2  determination as to what to provide your
3  counsel?
4     MR. PERRONG: Same objection.
5 Q. You can answer.
6 A. Everything that was relevant would have
7  been provided.
8 Q. I understand, but how did you determine
9  what was relevant?
10     MR. PERRONG: Objection, same
11  objection.
12 A. The court order provided by my attorneys.
13 Q. Did you ever look for notes relating to
14  these phone calls at issue?
15 A. If I had notes, I would have looked for
16  them, found them and provided them.
17 Q. So if no notes were produced, then they
18  don't exist, is that fair?
19 A. That's fair.
20 Q. That's all I'm getting at. Same for voice
21  messages, if no voice messages were produced,
22  they don't exist, is that fair?
23 A. That's fair.
24 Q. Do you know anything about the eight calls,
25  whether they were prerecorded or live,

Page 41

1  anything like that?
2     MR. PERRONG: Objection to form.
3 A. Can you please clarify the question?
4 Q. Sure. Do you have any personal knowledge
5  as to how the calls were made, whether they
6  were prerecorded, by a live human? Do you
7  know anything about how they were made?
8     MR. PERRONG: Objection to form.
9 A. I don't, but it would be highly surprising
10  if they were made by a person manually typing
11  in the numbers.
12 Q. But that statement is based on speculation,
13  right?
14     MR. PERRONG: Objection to form.
15 A. I think logic would dictate that if you
16  have a firm making thousands or hundreds
17  of thousands of outbound calls a day,
18  they're probably not having somebody manually
19  enter a number for every single call.
20 Q. Fair enough, but putting aside logic or
21  reason, do you know how these calls are made?
22     MR. PERRONG: Objection to form.
23 A. No.
24 Q. With respect to the ninth call, do you have
25  a memory of that ninth call?

11 (Pages 38 - 41)

CONTAINS CONFIDENTIAL INFORMATION

Page 42

1  A. No.
2  Q. So fair to say you don't know how that
3     call was made?
4        MR. PERRONG: Objection to form.
5  A. If you have a recording, then we can
6     listen to it.
7  Q. That wasn't my question.
8  A. If there's a recording, that would help
9     to answer whether it was how the call was
10    made.
11 Q. Fair enough. But at the moment,
12    unfortunately, you just have to answer the
13    questions posed. Do you have a memory
14    of how the calls were made, as you sit
15    here today?
16       MR. PERRONG: Objection to form.
17 A. No.
18 Q. And we will listen to the recording that I
19    have, but it's not a full recording because
20    it wasn't the recording from the caller.
21    It was the transcript portion of it. That's
22    why I'm asking about the actual first part
23    of the call. Do you have a memory as to
24    whether the caller was a man or a woman?
25 A. No.

Page 43

1  Q. Do you have a memory as to what they said
2     to you in the call?
3  A. I don't. That's in the complaint. The
4     reason that we're here is because it was
5     my understanding on the first settlement
6     agreement that Allied First had a, I think
7     what was referred to as a bad apple or
8     someone who has gone rogue and was involved
9     in this behavior, and my attorney and I
10    were led to believe that it wouldn't happen
11    again.
12 Q. With respect to the first one?
13 A. Correct, with respect to the illegal
14    telemarketing calls.
15 Q. Right, but I'm just trying to clarify when
16    you said the first one. Is that the 2016
17    settlement agreement we looked at?
18 A. Correct.
19 Q. I'm going to come back to these calls, but
20    I want to ask you since you brought it up
21    about your attorney. I saw in your
22    production a demand letter from Fink Law
23    Office. I'm going to mark this next document
24    as the next exhibit. We're on Exhibit 4.
25

Page 44

1        (Exhibit 4 marked for
2     identification.)
3  Q. Have you seen this demand letter before?
4  A. Yes.
5  Q. You see the date of it, it's March 16, 2023?
6  A. I see the date, yes.
7  Q. It says "In Re: Samuel Katz of 26 Porter
8     Drive, Bellingham, Mass." Have you ever
9     lived there?
10 A. He had called it Porter Drive, but it was a
11    typo. It was actually Potter Drive.
12 Q. Okay. And did you live in Bellingham, Mass.?
13 A. I did, yes.
14 Q. In 2023?
15 A. No. I think that the date on there is
16    probably an auto date and then the Word
17    document was converted to PDF on that date
18    and that fixed in that date. This would
19    have been substantially before 2023.
20 Q. Okay. That's helpful because I had no
21    idea because if you see -- this is what I'm
22    going to ask you about. Do you see these
23    numbers? These are all from the earlier
24    case, right?
25 A. Yes.

Page 45

1  Q. Okay. But I saw this in the production, and
2     you think that was just auto-populated?
3  A. Yeah. Did I produce this or did the
4     defendants produce this? It must have been
5     me.
6  Q. Yeah, see, "Katz"?
7  A. Yes, that must have been auto-populated.
8  Q. Got it. We can put that away. Thank you
9     for clearing that up.
10 A. Sure.
11 Q. Going back to these calls at issue -- give
12    me a second. I'm sorry.
13 A. Sure.
14 Q. Going back to the calls at issue, the
15    allegation is that Consumer Nsight made the
16    calls on behalf of Allied First, is that
17    fair?
18 A. Yes, I believe that's what's in the
19    complaint.
20 Q. Do you know anything -- do you personally
21    know anything about the relationship between
22    Consumer Nsight and Allied First?
23       MR. PERRONG: Objection to form.
24 A. I don't.
25 Q. What about the caller, Iconic Results, do

CONTAINS CONFIDENTIAL INFORMATION

Page 46

1    you know anything about them?
2         MR. PERRONG: Objection to form.
3  A. I don't know anything about them.
4  Q. Do you know anything about a relationship
5    between Iconic Results and Allied First?
6         MR. PERRONG: Objection to form.
7  A. They placed the calls.
8  Q. Who did?
9  A. Iconic Results and Consumer Nsight.
10 Q. Right, but do you know of any contractual
11    relationship between Allied First and Iconic
12    Results?
13         MR. PERRONG: Objection to form,
14    and to the extent that it's based on
15    attorney-client information that we
16    discussed, I'm instructing the witness not
17    to answer.
18 A. I'm not going to answer that.
19 Q. Do you have any personal knowledge as to
20    any contractual relationship between Allied
21    First and Iconic Results?
22         MR. PERRONG: Same objection.
23 A. If I was live transferred to Allied First
24    or my information was sold to Allied First,
25    then that would explain the connection with

Page 47

1    them.
2  Q. But that's the entirety of your knowledge?
3  A. It's my understanding that's how vicarious
4    liability works, is that the company that
5    is ultimately paying for the calls to be
6    made is liable.
7  Q. Putting aside vicarious liability and your
8    knowledge of it, other than the fact that
9    the call was transferred, do you have any
10    other knowledge as to any contractual
11    relationship between the companies?
12         MR. PERRONG: Same objection.
13 A. I don't believe I know anything other than
14    material from attorney-client privilege.
15 Q. Okay. So your knowledge is limited to
16    the fact that you received a call and were
17    transferred to Allied First?
18 A. That's fair.
19 Q. With respect to the first eight calls, why
20    didn't you just answer and tell them not
21    to call you?
22         MR. PERRONG: Objection to form.
23 A. I don't know what I was doing for those
24    first eight calls.
25 Q. What was it about the ninth call that made

Page 48

1    you answer it?
2  A. I don't remember.
3  Q. Again, we can mark this confidential.
4    What's your e-mail address?
5  A. SK47110@GMAIL.COM.
6  Q. Oky. I'm going to mark as the next exhibit,
7    Exhibit 5, an e-mail that you produced.
8         (Exhibit 5 marked for
9    identification.)
10 Q. Do you see this relates to the earlier calls,
11    March 22nd, 2016?
12 A. Yes, I see that.
13 Q. When you received a call from a known entity,
14    would you transfer it to your e-mail address
15    to save it?
16         MR. PERRONG: Objection to form.
17 A. Are you asking how I received this
18    notification?
19 Q. Well, I guess I can now, but that wasn't my
20    question. But how did you receive this
21    notification?
22 A. It was sent to me automatically.
23 Q. Did you set up automatic notifications on
24    your phone?
25         MR. PERRONG: Objection to form.

Page 49

1  A. I don't remember if it was automatic from
2    Verizon or if I had to change that setting.
3  Q. Did you have that set up in 2022?
4  A. No. I didn't have a Verizon phone at
5    that time.
6  Q. Did you have any notification set up in
7    2022 that alerted you to calls made to your
8    phone?
9         MR. PERRONG: Objection to form.
10 A. The phone would ring.
11 Q. Sure.
12 A. That would be notification.
13 Q. Other than the phone ring -- so I
14    specifically want to focus on Exhibit 5.
15    This is a notification you received back
16    in 2016, right?
17 A. Correct.
18 Q. And this would be sent to your G-mail account
19    that you just identified, right?
20 A. Correct.
21 Q. And then you would save these e-mails, right?
22 A. I wouldn't. There's no auto-delete so they
23    would be retained automatically. I didn't
24    go out of my way to save them.
25 Q. Okay. I mean, the reason I ask is you

CONTAINS CONFIDENTIAL INFORMATION

Page 50

1    produced them in this lawsuit, so that's
2    going on like six, seven years.
3 A. I would have produced anything related to
4    Allied First in this lawsuit.
5 Q. You don't have anything like this or at
6    least it wasn't produced relating to the
7    calls in early 2022, so that's why I'm asking
8    about the notifications. Were they shut
9    off or did you not have them in 2022?
10 A. The phone number in 2022 would have been a
11    NumberBarn phone number which doesn't have
12    a notification.
13 Q. What is NumberBarn?
14 A. The Voice over IP provider.
15 Q. Okay.
16        MR. PERRONG: Kevin, I don't want
17    to stop your flow here, but we've been at
18    this for an hour. Any idea how long we're
19    going to be or if we want to take a short
20    break?
21        MR. POLANSKY: Yeah, let's take
22    a short break. I don't know, we're in a
23    groove so I couldn't see us going more
24    than another hour, but I could see us taking
25    up the next hour.

Page 51

1        MR. PERRONG: Okay. Can we do five
2    minutes or so?
3        MR. POLANSKY: Yeah, five or ten.
4    What's better for everyone?
5        MR. PERRONG: I think five.
6        MR. POLANSKY: Mr. Katz, does that
7    work for you?
8        THE WITNESS: That works for me.
9        MR. POLANSKY: Why don't we come
10    back at 11:10.
11        THE WITNESS: Okay.
12        (Break taken)
13 BY MR. POLANSKY:
14 Q. In early 2022, do you recall receiving any
15    other calls around this period soliciting
16    loans from any other entity?
17        MR. PERRONG: Objection to form.
18 A. I don't remember offhand.
19 Q. Do you know in 2022 whether you were taking
20    any steps to refinance?
21        MR. PERRONG: Objection to form.
22 A. I was not taking any steps to refinance my
23    mortgage at that time.
24 Q. Do you own the home in Arkansas?
25 A. Which one?

Page 52

1        MR. PERRONG: Objection to form.
2 Q. Let me see. At that period of time you
3    were at -- was it the 209 address?
4 A. Yes. I own that house.
5 Q. You had a mortgage on the home?
6 A. Yes.
7 Q. Do you recall whether you were looking for
8    finance options in early 2022?
9        MR. PERRONG: Objection to form.
10 A. I was not looking to refinance my home at
11    that time.
12 Q. Okay. Is the home in both yours and your
13    wife's name?
14 A. I think it is, but I don't know.
15 Q. The reason I ask is if she was on the
16    mortgage, do you know if she was looking
17    for options for financing at that time?
18 A. No. She doesn't manage anything to do
19    with our finances.
20 Q. Okay. I'm going to go back to the complaint
21    again which I think is Exhibit 3. In your
22    complaint under Count, or I guess under
23    Allied First liability for Consumer Nsight's
24    conduct, it says, "Allied First maintained
25    interim control of our Consumer Nsight." Do

Page 53

1    you have any personal knowledge, nothing
2    coming from your counsel, of course,
3    regarding any sort of control that Allied
4    First might have used over Consumer Nsight?
5        MR. PERRONG: Objection to form
6    and objection in terms of counsel like we
7    discussed.
8 A. I don't think there's anything I could
9    answer on that that would not have been
10    provided by counsel.
11 Q. Fair enough. Just as we go forward, you're
12    aware that all my questions, I'm not asking
13    for anything you discussed with counsel,
14    right?
15 A. Yes.
16 Q. I just want to make that clear. Now, have
17    you ever used the name James Weim before?
18        MR. PERRONG: Objection to form.
19 A. Was that on the lead form?
20 Q. What's that?
21 A. Was that name on the lead form?
22 Q. I'm just asking if you used that before.
23 A. It is possible.
24 Q. Okay. If we go back to your answers to
25    interrogatories, in No. 13 you state --

CONTAINS CONFIDENTIAL INFORMATION

Page 54

1 strike that.
2     Looking at your answer to
3 interrogatories, you were asked, "identify
4 each and every instance in which you or
5 someone on your behalf has provided the alias
6 or name, James Weim, including, but not
7 limited to, through website forms, e-mail
8 telephone or text." It says, "subject to
9 the foregoing, the plaintiff has only used
10 that name when answering an illegal
11 telemarketing call." Do you see that?
12 A. Yes.
13 Q. Is it fair to say that you have used that
14 name before?
15     MR. PERRONG: Objection to form.
16 A. I think it's fair to say that I have in the
17 context of an illegal telemarketing call.
18 Q. So you've used the name with respect to
19 illegal telemarketing calls, is that fair?
20     MR. PERRONG: Objection.
21 A. Yes.
22 Q. Have you used any outside of illegal
23 telemarketing calls?
24     MR. PERRONG: Objection to form.
25 A. No.

Page 55

1 Q. Where did you come up with that name?
2     MR. PERRONG: Objection to form.
3 A. Weim, it would have been "Weim" because of
4 the dog breed, but I don't -- James would
5 have been a generic name.
6 Q. How long have you been using that name with
7 illegal telemarketing calls?
8     MR. PERRONG: Objection to form.
9 A. I don't know.
10 Q. Going back over five years?
11     MR. PERRONG: Objection.
12 A. I don't know.
13 Q. Do you recall using that name on the ninth
14 call at issue here?
15     MR. PERRONG: Objection.
16 A. I don't remember anything about the ninth
17 call.
18 Q. Okay. Are you aware that the ninth call
19 was transferred to Allied?
20 A. Yes, I'm aware of that.
21 Q. And you're aware that Allied didn't make
22 the call, but it was transferred to them?
23     MR. PERRONG: Objection to form.
24 A. I think this is splitting hairs here where
25 Allied would appear was involved in buying

Page 56

1 live transfers from a third party.
2 Q. Right. And the third party that made the
3 call was Consumer Nsight, is that right?
4     MR. PERRONG: Objection to form.
5 A. It would appear that way.
6 Q. Have you listened to the voice recording
7 for that call?
8     MR. PERRONG: Objection to form.
9 A. Yes.
10     MR. POLANSKY: I don't think I've
11 asked a single question that you haven't
12 objected to. This could be a record for me.
13 Q. When was the last time you listened to it?
14 A. I don't know.
15 Q. Have you ever gone onto the website
16 LENDERCONSULTANT.COM?
17 A. No.
18 Q. Did you ever look through your browser to
19 see if you've used that site?
20     MR. PERRONG: Objection to form.
21 A. I'm sure that I probably did, but I don't
22 randomly fill out my information online.
23 Q. During the scope of this lawsuit, did you
24 ever review any sort of Internet browser
25 of yours to see if you have visited that

Page 57

1 site?
2     MR. PERRONG: Objection.
3 A. I would have, yes.
4 Q. Have you ever used the alias James Weim
5 when entering any information on an online
6 website?
7     MR. PERRONG: Objection to form,
8 asked and answered.
9 A. No.
10 Q. Did you answer that question?
11 A. My answer is no.
12 Q. Okay. I'm going to try to play this audio.
13 I usually don't have success, but let me
14 know if you can hear this.
15     (Playing audio)
16 Q. Can you hear this?
17 A. No.
18 Q. Can you hear this?
19     (Playing audio)
20 A. No.
21 Q. Anything now?
22     (Playing audio)
23 A. No.
24 Q. This is like the end of my exam. I can't
25 get this to play.

CONTAINS CONFIDENTIAL INFORMATION

Page 58

1        MR. PERRONG:  I think maybe if you
2    share your screen with your audio player,
3    that might --
4        MR. POLANSKY:  Love it, good
5    suggestion.
6 Q.  You can't see my e-mail, can you?
7        MR. PERRONG:  We can.
8 A.  Yeah.
9 Q.  Okay.  Let's move this to a different screen.
10    Can you hear that?
11        (Playing audio)
12        MR. PERRONG:  I heard a little
13    snippet, but it's very faint.
14 A.  Very faint.
15 Q.  Can you hear it?
16        MR. PERRONG:  No.  We can hear it,
17    but it was cut off.  So whatever you did, we
18    can hear it now.
19        (Playing audio)
20 Q.  Could you hear any of that?
21 A.  Yes.
22 Q.  Does that refresh your memory as to whether
23    you used the name James Weim on that call?
24 A.  Without the first part of the call, I don't
25    know that I could answer that.

Page 59

1 Q.  Okay.  You just don't have a memory of it?
2 A.  It could be that they had a database entry
3    they're calling based on the name and the
4    phone number and then they say a name and
5    then go along and then, again, you know,
6    if I had the recording of the first part
7    handy, we could probably go through it a
8    little bit easier, but if we don't have
9    that, it's probably that they could have
10    prompted me or I could have said it.  I
11    don't remember which one.
12 Q.  Yeah, I don't have the beginning of the
13    call.  I just have the transcript piece of
14    it.  You don't have a memory one way or
15    the other?
16 A.  No.
17 Q.  Okay.  Let's assume the former, which is
18    that they said the name to you and you agreed
19    with it.  Would you ever have a situation
20    where you would tell them "that's not my
21    name, you have the wrong person"?
22        MR. PERRONG:  Objection to form.
23 A.  I don't remember.
24 Q.  Would you ever play along with them and
25    use that name?

Page 60

1        MR. PERRONG:  Objection to form.
2 A.  Yes.
3 Q.  Why would you do that?
4 A.  To track down who was making the illegal
5    calls.
6 Q.  Were you able to do that in this case?
7 A.  Yes.
8 Q.  Who ultimately were you able to track down?
9 A.  The defendant in this case.
10 Q.  There are a few defendants.  Who are you
11    referring to?
12 A.  Allied First Bank.
13 Q.  And at any point in time, did you tell
14    Allied First not to contact you?
15        MR. PERRONG:  Objection to form.
16 A.  I think the first interaction with Allied
17    First should have made that pretty clear.
18 Q.  I'm going to play the rest of that call
19    because I have to put my headset next to
20    the speaker.  I'm not going to speak, so
21    just listen and then I'll have some
22    questions, okay?
23 A.  Okay.
24        (Playing audio)
25 Q.  Did you hear that all the way through?

Page 61

1 A.  I did.
2 Q.  Is it your position that that was an
3    unwanted telemarketing call?
4 A.  That's an incomplete recording which omits
5    the outbound call which was placed to me,
6    but it sounded like there was some type
7    of data connection between Allied First
8    and the party who made the call which would
9    show that there's a pretty significant
10    relationship between them.
11 Q.  Did you understand my question?
12 A.  Yes.
13        MR. PERRONG:  Objection to form.
14 Q.  Was that an unwanted telemarketing call?
15        MR. PERRONG:  Objection to form.
16 A.  It was the second part of an unwanted
17    telemarketing call.
18 Q.  In that call, did you ever ask Allied First
19    not to contact you?
20        MR. PERRONG:  Objection to form.
21 A.  Once I realized it was the defendant or
22    potential defendant that I had already dealt
23    with before and that it was going to go
24    through litigation, I didn't want to continue
25    the call.

16 (Pages 58 - 61)

CONTAINS CONFIDENTIAL INFORMATION

Page 62

1 Q. Understood. I guess my question is a little
2 different. Did you ever tell Allied First
3 not to contact you during that call?
4 MR. PERRONG: Objection to form.
5 A. Well, my phone number was on the National
6 Do Not Call Registry.
7 Q. Sure. I'll ask it again. Did you ever
8 tell Allied First during that call not to
9 contact you again?
10 MR. PERRONG: Objection to form,
11 asked and answered and the recording speaks
12 for itself.
13 Q. Do you understand the question?
14 A. I do.
15 Q. Can you answer it?
16 A. The effort to avoid the calls that have
17 already been made twice before on the
18 National Do Not Call Registry and the
19 previous litigation in which Allied First
20 had led me to believe that the previous
21 actions from 2016 were a result of a bad
22 apple and not a result of an enterprise-wide
23 effort to encourage illegal telemarketing
24 calls.
25 Q. During that call you just listened to, did

Page 63

1 you ever ask Allied First not to contact
2 you again?
3 MR. PERRONG: Objection. This is
4 the fourth time you've asked the question.
5 Asked and answered.
6 MR. POLANSKY: He hasn't answered
7 it yet.
8 MR. PERRONG: I'm asking the witness
9 not to answer, and if you want, we can call
10 the court on that and we can --
11 MR. POLANSKY: We should because he
12 hasn't answered it.
13 A. I'm not going to answer it.
14 Q. So you're not going to answer that question?
15 A. Correct.
16 MR. PERRONG: We said, A, that
17 he's answered it four times. B, that the
18 recording speaks for itself and you're asking
19 for a question as to what he said on the
20 recording when the recording speaks for
21 itself. C, he's already answered the
22 question as to whether or not he's told
23 Allied First previously not to call. If
24 you want to continue down this road, we
25 can call the court.

Page 64

1 MR. POLANSKY: Okay. Let it be
2 known that he didn't answer the question
3 and I'm entitled to ask questions about a
4 recording or a document, for that matter.
5 The document doesn't just speak for itself.
6 He has to answer the questions. He has
7 not answered the question as to whether he
8 on that call told Allied First not to call
9 him. So if this is the road you want to
10 go down --
11 MR. PERRONG: To the extent you
12 provide an incomplete recording and you ask
13 him a question about an incomplete recording
14 that has a partial recording there, it's
15 our position that this is -- it's a trick
16 question, it's an incomplete question. He
17 provided a complete answer. To the extent
18 that you have a complete recording of the
19 call, you can ask about the complete
20 recording of the call. To the extent that
21 you can ask about his recollection of what
22 he had on the call, he can answer as to
23 his recollection on the call, but it's a
24 bogus question, it's an incomplete question.
25 If you want to rephrase it, you can rephrase

Page 65

1 it.
2 MR. POLANSKY: No, I'll keep it.
3 So you're instructing him not to answer?
4 MR. PERRONG: Why don't you ask
5 the question that you want. I'll provide
6 the witness one more opportunity to answer
7 and we can see where we go from there.
8 MR. POLANSKY: Okay.
9 Q. Mr. Katz, did you have any difficulty
10 listening to that recording?
11 A. No.
12 Q. Did you hear when Allied came onto the call?
13 A. I heard the recording from Allied's
14 perspective.
15 Q. And during that portion of the recording
16 when Allied was on the call, did you ever
17 ask the individual at Allied not to call you
18 again?
19 A. That is not on the recording. The request
20 had already been made twice. Additionally,
21 the 92A Lincoln Street would have been a
22 ficticious address that I probably provided
23 on another illegal telemarketing call.
24 Q. When you say 92A, that's an illegal address?
25 Is that what you said?

CONTAINS CONFIDENTIAL INFORMATION

Page 66

1  A.  The address was 92.  There was no such thing
2     as 92A.  92A more than likely would have
3     been provided on another illegal
4     telemarketing call.
5  Q.  And when you say "provided," provided by who?
6  A.  Myself.
7  Q.  That's an address that you would have
8     provided to somebody else?
9  A.  Correct.
10  Q.  After that call, do you have a memory of
11     receiving a text message from Allied First?
12        MR. PERRONG:  Objection to form.
13  A.  I don't remember.
14  Q.  I'm going to show you the next exhibit.
15     I'll represent to you that these are
16     documents that were produced by you or your
17     counsel, I should say, Katz number, Bates
18     stamp number 16 confidential.
19        (Exhibit 6 marked for
20     identification.)
21  Q.  Have you seen these messages before?
22  A.  Yes.
23  Q.  And do you see the first text, it's Jason
24     from Allied First bank?
25  A.  Yes.

Page 67

1  Q.  And then do you see your response that says,
2     "please send me a copy of your do not
3     call policy and stop calling me"?
4  A.  Yes.
5  Q.  And then do you see the response, "I have
6     not called you since we spoke, Mr. Weim.
7     I will add you to the Do Not Call, to our
8     record system.  Enjoy your day."  Do you
9     see that?
10  A.  I see that response, yes.
11  Q.  And then you asked him a question on March
12     9th, "who is the lead generator that provided
13     my info?"  Right?
14  A.  That's what it says, yes.
15  Q.  Is that a message that you sent?
16  A.  Yes.
17  Q.  And then they responded that they don't
18     have that information?
19  A.  They responded incorrectly that it was
20     public information since it was both a
21     fictitious address and a fictitious name.
22  Q.  Okay.  It says, "your call was transferred.
23     I assume the information was provided by
24     you to the person on the phone."  And that's
25     the end of the communications.  Do you see

Page 68

1     that?
2  A.  Yes.
3  Q.  Did you receive any further communications
4     from Allied First after that text string?
5  A.  I don't know if they ever provided a copy
6     of their Do Not Call policy.
7  Q.  Did you receive any more calls from them
8     or text messages after March 7, 2022?
9  A.  I don't know.
10  Q.  As you sit here today, are you aware of
11     any additional texts or calls from them?
12  A.  I don't know.  I'm not aware of any.
13  Q.  Okay.  That was your voice in the recording,
14     is that right?
15  A.  Correct.
16  Q.  And then on the recording, you mentioned
17     that you were interested in refinancing.
18     did you hear that?
19  A.  I think that that was prompted by what
20     the original illegal caller had said.
21  Q.  Okay.  Did you play along with that, with
22     Allied First?
23  A.  I played along with that to the extent I
24     needed to identify the party responsible
25     for the illegal calls.

Page 69

1        MR. POLANSKY:  I may be just about
2     done.  Give me a few seconds.  Why don't
3     we take another short three, four-minute
4     break so I can look through my notes and
5     see if we have anything else, okay?
6        MR. PERRONG:  Sounds good.
7        THE WITNESS:  Okay.
8        (Break taken)
9  BY MR. POLANSKY:
10  Q.  In June of 2021, where were you living?
11  A.  Arkansas.
12  Q.  In June of 2021, were you looking for
13     financing?
14  A.  No.
15  Q.  Going back to your answers to
16     interrogatories, just a few questions on
17     those.  It asks you to identify all
18     electronic devices that you used as of
19     June 5th, 2021 and you stated you had a
20     desktop computer which was disassembled
21     after it was upgraded prior to the filing
22     of the case.  How often did you use that
23     desktop computer before it was disassembled?
24  A.  Daily.
25  Q.  You said you had an old laptop in the garage.

18 (Pages 66 - 69)

CONTAINS CONFIDENTIAL INFORMATION

Page 70

1    Do you still use that laptop?
2  A.  I don't know which laptop that is referring
3    to.
4  Q.  I don't either.
5  A.  If it's the one I'm thinking of, no, I
6    don't use it anymore.
7  Q.  Did you use it in 2021 or 2022?
8  A.  Yes.
9  Q.  Did you look on that laptop to see
10    whether you ever had visited the website
11    LENDERCONSULTANT.COM?
12  A.  That laptop was compromised with spyware
13    and was not connected to the Internet or I
14    didn't connect it to the Internet.
15  Q.  When was it compromised?
16  A.  At some point years prior.
17  Q.  When you say "years," what years are you
18    referring to?
19  A.  I believe 2018.
20  Q.  What about the desktop, before it was
21    disassembled, did you look on that desktop
22    computer to see if you visited the Lender
23    Consultant website?
24  A.  I would have, yes, and the history is stored
25    on the cloud.

Page 71

1  Q.  And you reviewed the history on the cloud
2    as well?
3  A.  Yes.
4  Q.  And what about the work laptop that you
5    returned to your employer?  When was that
6    returned to the employer?
7  A.  When I joined Wal-Mart.
8  Q.  So you had that work laptop while you were
9    working for IRI?
10  A.  Correct.
11  Q.  And did you ever use that to browse the
12    Internet?
13  A.  Only for work-related content.
14  Q.  Did you ever look at that browser to
15    see whether you had visited the
16    LENDERCONSULTANT.COM website?
17  A.  I wouldn't have done any personal business
18    on that computer.
19  Q.  We talked about the personal cell phone.
20    Did you look at that browser history to see
21    if you had visited the LENDERCONSULTANT.COM
22    website?
23  A.  That would have been part of the overall
24    history search.
25  Q.  And then non-operational Samsung tablet,

Page 72

1    when did that stop being used?
2  A.  When I moved to Arkansas.
3  Q.  Did you view that tablet to see if
4    there was any search history for
5    LENDERCONSULTANT.COM?
6  A.  That history also would have been part of
7    my overall Google profile.
8  Q.  So you did search that?
9  A.  The history would have been part of the
10    overall Google profile because everyting is
11    linked under my e-mail address.
12  Q.  And I'm just confirming that that's part of
13    your search.
14  A.  Any activity on that device would have been
15    part of my search.
16  Q.  Okay.  And then I'm not familiar with
17    cryptocurrency mining machines.  I just
18    know they take a lot of energy to power.  I
19    assume you don't search the Internet using
20    these?
21  A.  They're connected to the Internet to do math.
22    There isn't even a UI for them.
23  Q.  Am I right that they take a lot of energy?
24  A.  Correct.
25  Q.  Do you use any sort of Internet or social

Page 73

1    media sites?
2  A.  Yes.
3  Q.  Which ones do you use?  We can mark this
4    confidential?
5  A.  Facebook, LinkedIn and YouTube.
6  Q.  And they're associated with your name?
7  A.  They would all be under my e-mail address,
8    yes.
9  Q.  In your name or any other pseudo name?
10  A.  I don't use my real name on Facebook.
11  Q.  What name do you use?
12  A.  I spell my last name incorrectly.
13  Q.  Do you use the name James Weim anywhere?
14  A.  No.
15  Q.  All right.  I think that will do it for me.
16    I appreciate your time today, Mr. Katz.
17  A.  Sure.
18        MR. PERRONG:  I have a few follow-up
19    questions.
20        CROSS EXAMINATION
21    BY MR. PERRONG:
22  Q.  Mr. Katz, if you recall earlier in your
23    deposition testimony you stated that you
24    didn't immediately recall the telephone
25    number that received the calls at issue in

19 (Pages 70 - 73)

CONTAINS CONFIDENTIAL INFORMATION

Page 74

1 this case. Is there anything that we
2 reviewed today that would jog your memory
3 as to the telephone number?
4 A. Yes. We looked at the complaint and the
5 complaint had (207) 802 and the last four
6 were marked out. I was fairly confident
7 that that was the phone number in the case,
8 but I didn't want to misstate anything for
9 the record.
10 Q. Thank you. You also mentioned that you
11 were able to connect the calls between the
12 nine calls that you mentioned because the
13 callback number was, or because the caller
14 ID was the same. Is it your understanding
15 that -- and you testified that companies
16 will maintain such numbers for the purposes
17 of a specific campaign to a specific company.
18 Is that your testimony?
19 MR. POLANSKY: Objection to form.
20 A. That's my testimony.
21 Q. Is it also your understanding that such
22 companies that engage in telemarketing
23 conduct such as this maintain telephone
24 numbers as a callback number specific to
25 that entity so that if there's a missed

Page 75

1 call, for example, that you would call
2 back on that number?
3 MR. POLANSKY: Objection to form.
4 A. Yes.
5 Q. And the purpose for that is so that the
6 marketer could get credit for selling the
7 lead to a specific company, correct?
8 MR. POLANSKY: Objection to form.
9 A. Correct.
10 Q. I also wanted to ask about the notification
11 function that you were using in 2016. If
12 I just understand your testimony correctly,
13 that notification function was a function
14 of your telephone provider at the time which
15 was Verizon, is that right?
16 A. That's correct.
17 Q. And at the time of the subject calls at
18 issue here, your telephone provider was not
19 Verizon, correct?
20 A. That's correct.
21 Q. To the extent that you recall between the
22 period of the last interaction that you had
23 with Allied First in 2016, or I should say
24 the last settlement that you had with Allied
25 First in 2016 and present, did Allied First

Page 76

1 ever send you a copy of their Do Not Call
2 policy?
3 A. I don't believe they did.
4 MR. POLANSKY: Objection.
5 Q. Did Allied First ever put you on their
6 internal Do Not Call list?
7 MR. POLANSKY: Objection to form.
8 A. I don't know if they did or not.
9 Q. In your experience just generally with
10 telemarketing calls in general, what will
11 happen if you don't play along with a
12 caller or play along with their script?
13 MR. POLANSKY: Objection to form.
14 A. It is impossible to identify them because
15 they're using fictitious names oftentimes,
16 and I don't know whether this is the case
17 here or not, but they will even spoof caller
18 ID numbers, then go back to a non-working
19 number. There's a number of other tactics
20 that they'll use to avoid being identified
21 and being held accountable.
22 Q. Is it fair to say that it's more or less
23 the pot calling the kettle black if they're
24 using a fake name?
25 MR. POLANSKY: Objection to form.

Page 77

1 A. That's correct.
2 MR. PERRONG: No further questions.
3 MR. POLANSKY: Nothing further from
4 me. Thanks for your time today, Mr. Katz.
5 I appreciate it.
6 THE WITNESS: Thank you.
7 (Exhibits 7 and 8 marked for
8 identification.)
9 (Whereupon the deposition was
10 concluded at 11:54 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONTAINS CONFIDENTIAL INFORMATION

Page 78

1        DEPONENT'S ERRATA SHEET
2        AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata Sheet has
5 been delivered to Veritext.
6        When the Errata Sheet has been
7 completed by the deponent and signed, a copy
8 thereof should be delivered to each party of
9 record and the ORIGINAL delivered to Kevin
10 Polansky, Esq., to whom the original
11 deposition was delivered.
12
13        INSTRUCTIONS TO DEPONENT
       After reading this volume of your
14 deposition, indicate any corrections or
changes to your testimony and reason therefor
15 on the Errata Sheet supplied to you and sign
it.   DO NOT make marks or notations on the
16 transcript volume itself.
17
18        REPLACE THIS PAGE OF THE TRANSCRIPT
       WITH THE COMPLETED AND SIGNED ERRATA
19        SHEET WHEN RECEIVED.
20
21
22
23
24
25

Page 79

1 ATTACH TO THE DEPOSITION OF: Samuel Katz
2
   CASE: Katz vs. Allied First Bank, et al
3
4
     ERRATA SHEET
5
6 INSTRUCTIONS: After reading the transcript
of your deposition, note any changes or
7 corrections to your testimony and the reason
therefor on this sheet. DO NOT make any
8 marks or notations on the transcript volume
itself. Sign and date this Errata Sheet
9 (before a Notary Public, if required).
Refer to Page 78 of the transcript for Errata
10 Sheet distribution instructions.
11 PAGE    LINE
        CHANGE:
12         REASON:
        CHANGE:
13         REASON:
        CHANGE:
14         REASON:
        CHANGE:
15         REASON:
        CHANGE:
16         REASON:
17
18       I have read the foregoing transcript
of my deposition and except for any
19 corrections or changes noted above, I hereby
subscribe to the transcript as an accurate
record of the statements made by me.
20
   Date
21
22
       Samuel Katz
23
24
25

Page 80

1 COMMONWEALTH OF MASSACHUSETTS)
2 SUFFOLK, SS. )
3
4
5       I, Jeanette Maracas, Registered
Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts,
6 do hereby certify that there came before me
on the 27th day of March, 2025, at 10:04
7 a.m., the person hereinbefore named, who was
by me duly sworn to testify to the truth and
8 nothing but the truth of his knowledge
touching and concerning the matters in
9 controversy in this cause; that he was
thereupon examined upon his oath, and his
10 examination reduced to typewriting under my
direction; and that the deposition is a true
11 record of the testimony given by the witness.
12
      I further certify that I am neither
13 attorney or counsel for, nor related to or
employed by, any attorney or counsel employed
14 by the parties hereto or financially
interested in the action.
15
16       In witness whereof, I have hereunto
set my hand this 9th day of April, 2025.
17
18
19
20
      Notary Public
      My commission expires 7/29/27
21
22
23
24
25