**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-05277 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| ALLIED FIRST BANK, SB et al. | |
| Defendants. | |

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

INTRODUCTION ...................................................................................................................... 1

LEGAL STANDARD................................................................................................................. 3

ARGUMENT .............................................................................................................................. 4

   1.   Allied First's Vicarious Liability arguments do not entitle it to summary judgment. ........ 4

      a.   Actual Authority .................................................................................................... 5

         i.   Mattson and Consumer Nsight Were Allied First's Agents ...................... 6

         ii.   Iconic Results Was Allied First's SubAgent ........................................... 14

      b.   Ratification............................................................................................................ 16

         i.   Allied First Had Knowledge of Material Facts......................................... 17

         ii.   Allied First Maintained Willful Ignorance .............................................. 19

   2.   The calls violated the TCPA's Do Not Call provisions. Plaintiff does not assert an ATDS claim.................................................................................................................................. 22

   3.   Plaintiff did not consent, which is a jury question............................................................ 23

   4.   Plaintiff has not recovered all available damages. .......................................................... 25

CONCLUSION ......................................................................................................................... 25

## Table of Authorities

**Cases**

*1-800 Contacts, Inc., v. Lens.Com, Inc.*, 722 F.3d 1229 (10th Cir. 2013)...................................... 6

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 3707283 (N.D. Cal. Aug. 3, 2018).......................................................................................................... 22

*Am. Broad. Companies, Inc. v. Climate Control Corp.*, 524 F. Supp. 1014 (N.D. Ill. 1981) ...... 14

*Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817 (N.D. Ill. 2016) ................. 5, 10, 22

*Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 6699188 (N.D. Ill. Dec. 9, 2019) ............................................................................................................................. passim

*Bilek v. Fed. Ins. Co.*, 8 F.4th 581 (7th Cir. 2021)...................................................................... 4, 5

*Bradley v. DentalPlans.com.*, 617 F. Supp. 3d 326 (D. Md. 2022)........................................ 10, 25

*Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 WL 3208651 (W.D. Okla. July 16, 2019)........................................................................................................................... 10

*Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016) ............................. 8

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 25

*Dana Container, Inc. v. Sec'y of Lab.*, 847 F.3d 495 (7th Cir. 2017) ........................................ 18

*Desai v. ADT Security Systems., Inc.*, 78 F. Supp. 3d 896 (N.D. Ill. 2015)................................ 16

*Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389 (7th Cir. 2014)......................................... 5

*Giannoble v. P & M Heating & Air Conditioning, Inc.*, 599 N.E.2d 1183 (Ill. App. 1992) .......... 6

*Griffin v. Safeguard Props. Mgmt., LLC*, No. 18 C 5755, 2020 WL 6118572 (N.D. Ill. Oct. 16, 2020) ............................................................................................................................ 15

*Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020) ...................................... 14

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068 (9th Cir. March 22, 2019) ........... 17

*Hills v. Bridgeview Little League Ass'n*, 45 N.E.2d 1166 (Ill. 2000) ............................................ 6

*Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852 (N.D. Ill. 2024) ..................................... passim

*Hossfeld v. Lifewatch, Inc.*, No. 1:13-CV-9305, 2021 WL 1422785 (N.D. Ill. Feb. 5, 2021) .. 3, 5, 10

*In re Dish Network, LLC*, 28 FCC Rcd. 6574 (2013) ..................................................................... 4

*Jones v. Mutal of Omaha Ins. Co.*, 639 F. Supp. 3d 537 (D. Md. 2022) .................................... 11

*Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024) ........................................ 24

*Mantha v. QuoteWizard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919 (D. Mass. Dec. 13, 2021) ................................................................................................................................. 25

*Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771 (N.D.W. Va. 2017) ................................... 14, 22

*Moore v. Club Exploria, LLC*, No. 1:19-CV-02504, 2025 WL 2755076 (N.D. Ill. Sept. 26, 2025) ................................................................................................................................. 5, 9, 12, 14

*Paldo Sign and Display Company v. Wagener Equities, Incorporated*, 825 F.3d 793 (7th Cir. 2016) ........................................................................................................................................ 8

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ....................................................................... 3, 4

*Sapan v. LendingTree, LLC*, No. 8:23-CV-00071-JWH-DFM, 2025 WL 1148281 (C.D. Cal. Mar. 18, 2025) ...................................................................................................................... 22

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664 (7th Cir. 2004) ....................... 16

*Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724 (7th Cir. 2014) .......................................... 3

*United States v. Dish Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020) .................................... 10, 11

*Williams v. PillPack LLC*, 343 F.R.D. 201 (W.D. Wash. 2022) .......................................... 13, 24

**Statutes**

47 C.F.R. § 64.1200 ............................................................................................................. 13, 22

47 U.S.C. § 227 ...................................................................................................................... 1, 22

**Other Authorities**

Defendant's Motion for Summary Judgment ("MSJ") ...................................................... passim

Defendant's Statement of Material Facts ("Def's. SOMF") ............................................. 6, 17, 19

Deposition of Adam Skeffington ("Skeffington Dep.") ........................................................ 19, 20

Deposition of Craig Mattson "Mattson Dep." ...................................................................... 7, 9, 18

Discovery Documents ("Docs.") ..................................................................................... passim

Plaintiff's Amended Complaint ("Am. Compl.") ....................................................................... 22

Plaintiff's Statement of Material Facts ("Pl's. SOMF") ............................................................ 11

Restatement (Third) of Agency .................................................................................. 5, 6, 16, 17

## INTRODUCTION

This Court should deny Defendant Allied First Bank, SB a/k/a Servbank, SB's ("Allied First" or "Defendant")'s motion for summary judgment. Aimed at preventing unwanted intrusions into American's daily lives, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, affords substantial protections against unwanted telemarketing. Significantly, the TCPA imposes liability on companies, like Allied First, who direct or otherwise authorize illegal telemarketing conduct to occur. That's exactly what occurred here. Allied First now seeks summary judgment by attempting to distance itself from the very telemarketing operation it created, controlled, and profited from. This motion should be denied because it is not merely possible that a reasonable jury could enter a verdict in Plaintiff's favor on the issue of vicarious liability; no reasonable jury could do otherwise.

Allied First's business model was carefully structured to generate telemarketing leads while creating layers of purported distance from the actual callers. In essence, how Allied First's strategy worked is this: Allied First has employee loan officers who originate loans. The loan officers are organized into teams, each of which has an employee manager, who was responsible for generating leads. One such manager was Craig Mattson, who managed around 80 loan officers and represented Allied First's largest team. To generate leads for his team, Mr. Mattson subcontracted former Defendant Consumer Nsight to place calls, who then further subcontracted with former Defendant Iconic Results, who physically placed the calls. Mr. Mattson then submitted "Expense Reimbursement Requests" to Allied First, together with a copy of Consumer Nsight's invoice, and Allied First then *directly* wired the funds to Consumer Nsight.

Allied First then accepted these leads, benefited from the resulting business, and *paid Consumer Nsight* for this lead generation activity. Despite Allied First's protestations to the

contrary, Allied First knew *exactly* what it was getting as a result of paying Consumer Nsight, "Prescreened Refinance Live Transfers," i.e. call transfers that would first be screened during the initial cold call and then transferred to Allied First. That Consumer Nsight then subcontracted out its calling conduct to Iconic is no matter: Allied First still got *exactly* what it bargained for and controlled: live transfer calls. Allied First's claims of ignorance ring hollow. It knew it was purchasing telemarketing leads from Consumer Nsight. It knew consumers were being called and transferred to its employees. It knew it was paying for this service. Allied First cannot structure its business to benefit from telemarketing in such a manner while insulating itself from liability by hiring intermediaries or relying on those intermediaries' subcontracting as a basis to avoid liability. Allied First cannot escape liability by pointing to Consumer Nsight and Iconic Results as intermediaries because *who* it contracted with does not matter; *what* Allied First paid for does, and it is clear that Allied First paid for telemarketing calls to be made, with full knowledge of the same. It doesn't get much clearer than this for vicarious liability under the TCPA.

The undisputed facts demonstrate that Allied First exercised substantial control over this operation. Mr. Mattson, Allied First's employee manager, had "full decision-making authority and oversight" over lead purchasing. MSJ at 6. And, despite purportedly requiring it, Allied First did not undertake its right to approve Consumer Nsight as a vendor, or require Consumer Nsight to use a copy of its internal Do Not Call List, but paid Consumer Nsight anyway. And, when Consumer Nsight transferred qualifying leads to Allied First, including those of individuals, like Plaintiff, who should have been on Allied First's internal Do Not Call List, the bank's loan officers, like Jason Aldridge, immediately took over the calls to discuss Allied First's mortgage products and services. Under federal common law principles of agency, a seller may be held

vicariously liable for TCPA violations committed by third-party telemarketers under theories of actual authority, apparent authority, and ratification. All three theories support liability here.

Allied First's other defenses fail, too. The supposed "consent" came from a web form at a random website that Plaintiff denies visiting or completing. Allied First has proffered no admissible evidence, only hearsay testimony, that the website visit occurred as an initial matter. This is not to mention the fact that the website does not even name Allied First as an entity to which consent is being provided. At minimum, these disputed factual questions are for a jury to decide. In other cases, as with vicarious liability, they have supported the entry of summary judgment *in favor of plaintiffs.* Finally, Allied First's argument that Plaintiff has been "fully compensated" by settlements with Consumer Nsight and Iconic Results is legally wrong and factually unsupported. Allied First provides no evidence that the settlements covered Plaintiff's total recovery, and certainly not the treble damages, costs, and fees he seeks from Allied First.

Summary judgment ought to be denied.

## **LEGAL STANDARD**

"Agency is a notoriously fact-bound question." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014). In the agency context, summary judgment must be denied where the relevant relationship "is not so clear as to be undisputed." *Hossfeld v. Lifewatch, Inc.*, No. 1:13-CV-9305, 2021 WL 1422785, at *7 (N.D. Ill. Feb. 5, 2021). In resolving the motion, the Court must "constru[e] the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*

3

"[T]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

## ARGUMENT

### 1. Allied First's Vicarious Liability arguments do not entitle it to summary judgment.

In *In re Dish Network, LLC*, 28 FCC Rcd. 6574 (2013), the Federal Communications Commission (FCC) confirmed a seller[1] may be vicariously liable for calls placed on its behalf by third-party telemarketers. As the FCC explained, "the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers[.]" *Id.* at 6588. Seller liability "give[s] the seller appropriate incentives to ensure that their telemarketers comply with [the FCC's] rules." *Id.* And allowing a seller "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties," would leave consumers "in many cases without an effective remedy for telemarketing intrusions" particularly "if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case." *Id.* As the FCC put it:

> [W]e see no reason that a seller should not be liable under [section 227(b)] for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.

*Id.* at 6593. Following the FCC's Order, the Seventh Circuit has ruled a TCPA defendant may be vicariously liable for its "lead generator's unauthorized robocalling under actual authority, apparent authority, and ratification principles of agency liability." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021). Each of these three theories offers "an independent basis" for vicarious liability. *Id.* (citing *In re Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6584 (2013)).

---

[1] "The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 CFR § 64.1200(f)(9). It is undisputed that Allied First is the "seller" in this case.

Both before and after the Seventh Circuit decided *Bilek*, numerous judges in this district have held not only that denial of summary judgment on the issue of vicarious liability is appropriate, but also that, in some cases, summary judgment is actually warranted *for plaintiffs* in manifestly similar circumstances to those here, where sellers authorized unsupervised marketing conduct. *E.g.*, *Moore v. Club Exploria, LLC*, No. 1:19-CV-02504, 2025 WL 2755076, at *11 (N.D. Ill. Sept. 26, 2025) (granting summary judgment *to plaintiff* on an actual authority theory); *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 879 (N.D. Ill. 2024) (same); *Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 6699188, at *6 (N.D. Ill. Dec. 9, 2019) (same); *Lifewatch*, 2021 WL 1422785 (denying defendant's motion for summary judgment and holding agency was a disputed factual question); *Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 829 (N.D. Ill. 2016) (denying summary judgment and holding that "[V]icarious liability, like any other issue of fact, may be adjudicated summarily only where the evidence would not permit a reasonable jury to find for the nonmoving party."). In this case, liability as against Allied First is clear under both actual authority and ratification theories.

    a.  <u>Actual Authority</u>

A reasonable jury could find that Allied First had an agency relationship with Mattson, Consumer Nsight, and Iconic Results, and provided them the actual authority to place the unlawful calls. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Edelman v. Belco Title & Escrow, LLC*, 754 F.3d 389, 396 (7th Cir. 2014) (quoting Restatement (Third) of Agency § 1.01). "[A]n independent contractor can be an agent. An agent need not be an employee." *1-800 Contacts, Inc., v. Lens.Com, Inc.*, 722 F.3d 1229, 1251 (10th

Cir. 2013). Under Illinois law, employees like Mattson are considered a specific type of agent known as "servants" under traditional agency law principles. *Hills v. Bridgeview Little League Ass'n*, 45 N.E.2d 1166, 1179 (Ill. 2000). Upon a showing that an employer controlled an employee's conduct, the plaintiff shows a *prima facie* case of agency that shifts the burden to the employer of demonstrating nonagency at the time of the occurrence. *Giannoble v. P & M Heating & Air Conditioning, Inc.,* 599 N.E.2d 1183, 1187 (Ill. App. 1992).

"Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms. Additionally, a principal has the right to give interim instructions or directions to the agent once their relationship is established." Restatement (Third) of Agency, § 1.01 (Comment f(1)). "The principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." *Id.*

i.     *Mattson and Consumer Nsight Were Allied First's Agents*

Here, Allied First hired Mattson as its employee to manage a team of approximately 80 loan officers. *Def's. SOMF* ¶ 10. Part of Mr. Mattson's job responsibilities included arranging for lead generation for his team's members. *Id.* As part of that responsibility, Mr. Mattson arranged for Consumer Nsight to provide advertising services to Allied First, which consisted of "live contact telephone transfers from a call center to Allied First representatives." *Id.* ¶ 13. Consumer Nsight agreed and Allied First directly paid Consumer Nsight for these transfers, which reflected specific criteria set by Mattson. (Docs. 901-903, 812-814).

Allied First's policies mandated significant control over its employees, whom it entrusted for maintaining Allied First's compliance responsibilities, control, and oversight regarding

marketing and lead generation, but over which it retained ultimate approval. Specifically, Allied First's own policies provided that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management" and have Allied First's Compliance Officer approve the telephone script or outline. (Docs. 743). Moreover, Allied First also expressly retained control over its vendors, like Consumer Nsight, to provide opt in documentation upon demand, as evidenced through its requests directly to Consumer Nsight to produce documents and other information related to this litigation. (Docs. 208-211, 004-5). Allied First's own Manager Handbook further obligated managers, like Mattson, to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied First Bank, sb initially and on an annual basis." (Docs. 923-924). Allied First also required its vendors be provided its internal Do Not Call List.

And, when contracting with Consumer Nsight for the live transfers that it would provide to Allied First, Mr. Mattson testified that he controlled Consumer Nsight's targeting for these call transfers, including FHA, VA, and conventional cashout loans, as well as through other criteria, including minimum loan to value and credit score. (Mattson Dep. 43:8-25, 44:1-25). In essence, Mattson, Allied First's employee, told Consumer Nsight the "types of consumers [he was] looking to refinance a loan with." (Mattson Dep. 45:2-5). As such, there can be no question that Allied First's policies imposed a comprehensive set of compliance requirements concerning scripts, DNC checks, marketing approval, and expectations over its managerial employees and the vendors they hired. These elements are strong indicators of the existence of actual authority.

The aforementioned direction to Mattson and Consumer Nsight is by itself sufficient to create an agency relationship. For example, in *Bakov*, this Court found "the contract between Defendant and VVT," the alleged agent, "determinative" of actual authority. 2019 WL 6699188,

7

at *5 (N.D. Ill. Dec. 9, 2019). There, the defendant, as here, was made "solely responsible for . . . compliance with applicable laws," and defendant controlled the telemarketing script and criteria for the live transfer calls it would accept, as well as retained the ability to terminate the relationship. As the Court summarized, "Defendant had sole control over the script and could provide interim instructions in the form of a script update, provided VVT weekly performance updates, and could terminate the agency relationship and revoke VVT's authority to make calls on its behalf." *Id.* The *Bakov* court also helpfully summarized two Seventh Circuit cases in which vicarious liability on an actual authority theory was not appropriate, and which such cases bear little resemblance to the cases at bar. In *Bridgeview Health Care Center, Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016), the owner of a small company instructed a fax broadcaster to send 100 faxes to local businesses within a 20-mile radius, but the broadcaster instead sent almost 5,000 faxes across three states. *Id.* at 937, 939. And in *Paldo Sign and Display Company v. Wagener Equities, Incorporated*, 825 F.3d 793 (7th Cir. 2016), the owner of a company directed a fax broadcaster not to send the ads until he approved them but instead sent the messages without approval to almost 10,000 recipients. *Id.* at 795.

That is not the case here; this case is more like *Bakov* and less like *Bridgeview* or *Paldo*. Throughout the course of the Allied First-Mattson-Consumer Nsight relationship, Mattson, Allied First's employee, and as authorized by Allied First's managerial handbook, directed Consumer Nsight to send live transfer leads matching specific criteria, including credit score, loan balance, and type of loan, via a live transfer process (i.e. with the purportedly interested customer still on the line), to his loan officers, who would then proceed to sell Allied First's loan products, just as occurred with Plaintiff. This evidence overwhelmingly established that both Mattson and Consumer Nsight agreed to act on Allied First's behalf, that Mattson acted pursuant

to Allied First's express instructions in its employee handbook, and that Mattson's control over Consumer Nsight dictated who would be called, the criteria necessary for the transfer, to where the calls would be transferred (Mattson's team), as well as the volume of the calling conduct.

Moreover, the evidence adduced shows that Mattson and Allied First retained the right to control and give interim instructions to Consumer Nsight, including operational control and compliance oversight over the calling campaign and the ability to dictate when services started and stopped. Mattson testified that he hired Consumer Nsight "with the approval of the bank" and "managed the scope of [the] relationship with Consumer Nsight." (Mattson Dep. 50:14-20). The parties integrated their systems so that loan officers could "get notified of the calls coming in and to receive the post as the transfers are handed off." (Docs. 606). Mattson even provided Consumer Nsight with Allied First's loan officer roster, demonstrating control over his own loan officer team members to which Consumer Nsight was directing transfers. (Docs. 666, 580). Indeed, Consumer Nsight expressly requested that Mattson review an attached roster to "add/remove any [Loan Officers]" before beginning transfers. (Docs. 598). Indeed, Mattson exercised this control by refusing another delivery from Consumer Nsight in April, stating that he was "done with transfers," thus controlling the call volume and whether or not calls would be placed. (Docs. 705); *Cf. Moore*, 2025 WL 2755076, at *12.

This evidence of control is beyond sufficient for any reasonable jury to find evidence of an agency relationship. *See id.* ("Exploria controlled the script, volume, and the target demographics and states for both Yodel and Prospects during the campaign. Exploria also required weekly reports from the vendors and had the contractual right to conduct performance reviews. Given the evidence, no reasonable jury could find that Exploria did not control Yodel and Prospects."); *Allstate*, 726 F. Supp. 3d at 877 ("Allstate's Agency Standards also dictate

9

what an agent must do when retaining a vendor to place calls to sell Allstate products and services."); *Bakov*, 2019 WL 6699188, at *6; *Braver v. NorthStar Alarm Servs., LLC*, No. CIV-17-0383-F, 2019 WL 3208651, at *8-*11 (W.D. Okla. July 16, 2019); *Lifewatch*, 2021 WL 1422785, at *6 (denying defendant's motion for summary judgment in holding such evidence as providing scripts, giving interim instructions, generalized information about products and services, and payment authorizations, all buttressed a finding of an agency relationship, but precluding summary judgment in plaintiff's favor because the level of control was a jury question); *Aranda*, 179 F. Supp. 3d at 832-33 (holding evidence of control was sufficient to make actual authority or ratification a jury question); *Bradley v. DentalPlans.com.*, 617 F. Supp. 3d 326, 339 (D. Md. 2022) (citing *Bakov*, *Braver*, and the Restatement and holding at pleading stage that the right to assess, instruct, and terminate business at will provides "strong evidence of an agency relationship."). Notably, Consumer Nsight's transfer of the Plaintiff, who himself should have been on Allied First's internal DNC, to Allied First, is further evidence of liability. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 975 (7th Cir. 2020) (holding DISH was liable as a principal for failing to ensure that its agents shared its internal do not call list).

Allied First will likely parry by contending that neither itself nor Mattson provided Consumer Nsight (or Iconic) the numbers to be called or the scripts that were to be used prior to the live transfers to Team Mattson. But that's irrelevant. Although those facts may further be indicative of control under an actual authority theory, they are by no means necessary to proving such a theory. For example, in *Braver*, the Court held that, although the defendant did not provide the telemarketer it hired the telephone numbers to be used, it was sufficient that it hired the third party to "generate qualified leads" for it, dictated the qualification criteria, understood how the calling conduct operated, and determined the telephone numbers to be called by

instructing the third party what ZIP codes it wanted to target. 2019 WL 3208651, at *8-*11. Just as with scripts, geographic targeting and call volume specifications represent another category of control factors that courts have found sufficient to establish an agency relationship under an actual authority theory. *Jones v. Mutal of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 551 (D. Md. 2022) (denying motion to dismiss). Regardless, Allied First was still also required to provide Consumer Nsight a copy of its internal Do Not Call list, which it did not do. *Pl's. SOMF* ¶ 11, 15; *United States*, 954 F.3d at 975.

This Court's decision in *Allstate* shows that, if summary judgment as to agency is appropriate for anyone here on that issue, it is the Plaintiff. As relevant here, Allied First's managerial handbook, under which Mattson was authorized to hire Consumer Nsight, tasked Mattson with the management and oversight of Consumer Nsight and authorized him to hire Consumer Nsight pursuant to his express authorization from Allied First. Mattson never obtained approval, but Allied First paid anyway. *Pl's. SOMF* ¶ 13, 17. Notably, in *Allstate*, the relationship with the parties was similar to that here, with Allstate agents hiring a marketing company, who then subcontracted with another marketing company, who placed the calls to plaintiff. *Allstate*, 726 F. Supp. 3d at 877-78. The Court held as sufficient for an agency relationship the fact that the Allstate agents "paid for a certain number of leads, that they specified the target market (Texas), that they had the right to approve the script used, and that they specified the criteria used to screen (referred to as filters) callers, e.g., age, number of drivers in the family, and no accidents in the past three years." *Id.* at 879. The record here demonstrates that Mattson provided similar criteria to Consumer Nsight, and that Consumer Nsight likewise required advertising language and script approval. (Docs. 930-931). And, like in *Allstate*, Allied First paid "a fixed price for each 'live transfer' of a lead interested in purchasing"

11

and used "filters" to "screen leads that would not be transferred." (Docs. 901-903, 812-814). *Allstate*, 726 F. Supp. 3d at 866.

Likewise, and as will be addressed when exploring purported consent, Allied First insists that it cannot be liable for the calls at issue, which violated the TCPA, because it expressly required Mattson, and Mattson attempted to ensure, that the vendors he hired were providing TCPA compliant calls. Allied First and Mattson did no such thing. As an initial matter, and as will be explored in the foregoing section on ratification, Allied First accepted the benefits of the illegal calls, and *paid for them*, contrary to its own employee handbook, without so much as having Consumer Nsight go through its standard vendor approval process. As such, Allied First cannot even claim that it contracted with Consumer Nsight for approved compliant leads, as required by the employee handbook, *because it paid Consumer Nsight* without insisting on compliance with its own express terms. Given that TCPA compliance was part of the vendor approval process, and Consumer Nsight did not go through the approval process, Allied First cannot now claim that it contracted with Consumer Nsight to provide purportedly "consented" calls. This is to say nothing of the additional failure to provide its internal DNC to them. Notwithstanding what the handbook says or if it directed Consumer Nsight to comply with the TCPA, the parties' course of dealing shows that it didn't even insist on compliance with those requirements as an initial matter. That alone is enough to dispense with Allied First's argument. *See Bakov*, 2019 WL 6699188, at *6*. And this is particularly the case because this Court may imply actual authority in the absence of express contractual terms that generally shows that Consumer Nsight chose not to exercise the control it had. *Moore*, 2025 WL 2755076, at *11-*12. Shockingly, Allied First *admits* that it provided its employee Mattson "full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight." (MSJ at 6).

What's more, even the employee handbook itself (the only quasi-contractual[2] provision applicable here) doesn't even contain the criteria necessary to make TCPA compliant calls when it comes to the issue of consent. The website visit upon which Iconic relied for purported "consent" to contact the plaintiff, LenderConsultant.com, isn't even a website that anybody involved in this case owns or controls, and in any event doesn't even disclose a connection to anybody involved in this case. The "opt-in" disclosure at this website does not provide for "prior express written consent," which the FCC defines, in part, as a signed writing "that *clearly authorizes the seller* to deliver or cause to be delivered to the person called advertisements or telemarketing messages[.]" 47 C.F.R. § 64.1200(f)(9) (emphasis added). Given the disclosure on the website does not even mention Allied First, it does not clearly authorize calls on Allied First's behalf and does not comply with the law. *Williams v. PillPack LLC*, 343 F.R.D. 201, 209 (W.D. Wash. 2022). Indeed, Allied First admits as much and shoots itself in the foot by arguing that it had *no* "contract, arrangement, or otherwise any relationship with Iconic Results." (MSJ at 7.) It cannot simultaneously claim that it obtained legally sufficient consent from a website with which Iconic allegedly had a relationship, given that it already has disclaimed any relationship with Iconic and the website. Put differently, the website could be used to claim "consent" for any old telemarketing call for mortgages that could just as easily been made for Bank of America. And, despite having the opportunity to review that website language or other aspects of TCPA compliance, Allied First simply sat on those rights and decided to pay Consumer Nsight anyway.

---

[2] Allied First may argue it did not control Mattson, Consumer Nsight, or Iconic because it did not have a formal contract with any of them (other than the managerial handbook). But agency may be implied, and there exists no evidence showing that Iconic (or anyone else) acted contrary to what little explicit instructions and criteria existed. *Moore*, 2025 WL 2755076, at *12 ("Exploria seems to argue that it could not have controlled Prospects because it did not have a contract with the company itself. But the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent 'to perform functions assigned to the agent by the principal.' . . . Prospects relied on Exploria's directions on when to make calls, which states to call into, and whom to target. Even when viewed in Exploria's favor, this is definitive evidence that Exploria controlled Prospects, even without a contractual provision explicitly establishing the control.")

For these reasons, a jury could conclude that Allied First exerted control over Mattson and Consumer Nsight sufficient to give rise to an agency relationship, and summary judgment is therefore unwarranted. *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 788 (N.D.W. Va. 2017). Mattson did not familiarize himself "with Consumer Nsight's processes for effectuating these leads," (MSJ at 7) despite Allied First entrusting him to do so. (MSJ at 6). And the *power* to supervise need not be *exercised* to support finding an agency relationship. *Am. Broad. Companies, Inc. v. Climate Control Corp.*, 524 F. Supp. 1014, 1018 (N.D. Ill. 1981) ("It is the ability to control, whether exercised or unexercised, that indicates an agency relationship.") As such, a reasonable jury could find that Mattson and Consumer Nsight both acted pursuant to Allied First's instructions, including calling numbers from sites that did not list any of their names "for consent[,] after having an opportunity to review the consent form for TCPA compliance." *Moore*, 2025 WL 2755076, at *13. More to the point, a reasonable jury could conceivably find that Mattson and Consumer Nsight were both acting within the scope of what Allied First expressly authorized its manager to do when Iconic placed the calls which violated the TCPA. *Id.* Taken in the light most favorable to Plaintiff, the evidence of actual authority here is overwhelming, but even so, there is sufficient evidence that would permit a reasonable jury to find that Allied First is vicariously liable for the calls here because it retained the right to control and did in fact exercise control over the conduct at issue, including through geographic targeting, call transfer criteria, and lead qualification standards. *See Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1131-32 (W.D. Mo. 2020) (citing *Aranda*).

ii.    *Iconic Results Was Allied First's SubAgent*

Allied First also had an agency relationship with Iconic Results, who was its subagent that the parties do not dispute physically placed the calls at issue. "A person or entity that is

14

appointed by an agent to perform functions assigned to the agent by the principal is known as a 'subagent.'" *Griffin v. Safeguard Props. Mgmt., LLC*, No. 18 C 5755, 2020 WL 6118572, at *3 (N.D. Ill. Oct. 16, 2020). Agents authorized to do so may "appoint subagents to perform those tasks or functions the agent has undertaken to perform for the principal." *Id.* Consequently, "an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent." *Id.* Under Illinois law, that question is improper for summary judgment "unless the relationship is so clear as to be undisputed." *Id.*

Here, too, the undisputed evidence does not definitively establish that Allied First clearly prohibited Mattson or Consumer Nsight from appointing a subagent, and a reasonable jury could find that Mattson, Consumer, and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions. *See id.* Again, *Allstate* proves instructive:

> A similar telemarketing subagency problem arose in *Desai*, a case involving ADT, which sells home security services. ADT hired the Elephant Group, Inc. ("EG"), to generate leads and engage in contractually limited telemarketing. EG subsequently subcontracted with a company referred to as PMG to provide sales leads, and PMG bought leads from a fourth party company called EMI. EMI, in turn, engaged in a robocalling campaign of millions of robocalls offering to sell ADT's services ADT did not learn of the existence of some of the subcontracting relationships until a TCPA lawsuit was filed.

> On cross summary judgment motions, the *Desai* court concluded that a subagency relationship existed. Under the contracts, "PMG paid in advance for a specific number of leads and approved the script for EG's calls. PMG could also specify the target markets from which it wanted to receive leads, the content of any messages EMI was supposed to leave, and how EMI should screen callers before transferring them." Together these contractual terms demonstrated sufficient control the principal to show a subagent relationship.

> The summary judgment evidence in the instant case is similar. Undisputed evidence in the record shows that Fleming and Gilmond paid for a certain number of leads, that they specified the target market (Texas), that they had the right to approve the script used, and that they specified the criteria used to screen (referred to as filters) callers, *e.g.*, age, number of drivers in the family, and no accidents in the past three years. These undisputed facts demonstrate sufficient control by Gilmond to find a subagency relationship as a matter of law.

15

726 F. Supp. 3d at 878-79 (cleaned up) (citing *Desai v. ADT Security Systems., Inc.*, 78 F. Supp. 3d 896 (N.D. Ill. 2015)). That is almost identical to the case here. Allied First authorized its managers, like Mattson, to arrange for marketing activities, including making calls using "auto dialers," (Docs. 931), using vendors, and permitted them to specify criteria for the types of leads that would be best suited for their teams. Mattson went off and hired Consumer Nsight to do exactly what Allied First authorized him to, use vendors to send out telephone calls and then transfer them to his team. And, just as in *Desai* and *Allstate*, there exists no evidence that Consumer Nsight acted contrary to any instruction of Allied First or Mattson by hiring Iconic Results to conduct the actual calling, using the *exact same* criteria that Allied First and Mattson authorized all along. As such, it is no matter that Iconic (as opposed to Consumer Nsight or Mattson) actually placed the calls; Iconic was acting within the same scope of authority that Allied First gave Mattson, and which Mattson in turn provided to Consumer Nsight.

    b.  Ratification

       Even if this Court were to disregard the clear manifestations of agency under an actual authority theory here, it is likewise clear that Allied First is liable for Iconic's calling conduct under a ratification theory. "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." Restatement (Third) of Agency § 4.01. Thus, "[a] principal can ratify his agent's actions *either* by not repudiating them *or* by accepting their benefit." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004) (emphasis added); Restatement (Third) of Agency § 4.01, comment f ("A principal may ratify an act by failing to object to it or to repudiate it.")

"A person is not bound by a ratification made without knowledge of material facts involved in the original act *when the person was unaware of such lack of knowledge*." Restatement (Third) of Agency § 4.06 (emphasis added). Thus, ratification requires either "knowledge of material facts" or "willful ignorance," i.e, where the principal is "aware that it does not know the material facts and ratif[ies] anyway." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. March 22, 2019) (reversing summary judgment for defendant on ratification in a TCPA case). Ratification through willful ignorance occurs "when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation." *Id.* at 1075 (citing Restatement (Third) of Agency § 4.06 cmt. d.).

   i.  *Allied First Had Knowledge of Material Facts*

Here, Allied First had knowledge that Mattson had hired Consumer Nsight to send his team members "live call" transfers, which were subject to certain criteria. It knew this because not only did it approve reimbursement requests from Mattson for such conduct, but it also *had a copy of Consumer Nsight's invoice* showing *exactly* what it was paying for. (Docs. 901-903, 812-814). Not only that but Allied First wired Consumer Nsight's money to Consumer Nsight directly. (Docs. 903, 814). And, perhaps most significantly, Allied First *knew* that Plaintiff should have been on its own internal Do Not Call list owing to having previously settled with Plaintiff for sending Plaintiff illegal calls, *Def's. SOMF* ¶ 35, but it accepted Consumer Nsight's transfer *anyway*, despite having full knowledge that the Plaintiff's number should have been on *its very own* Do Not Call list and should not have been called by anyone here.

It bears repeating that Allied First has admitted that it entrusted its employee and manager, Mattson, with "full decision-making authority and oversight" when it came to the

purchase and use of telemarketing leads. (MSJ at 6). For this reason, Mattson's knowledge of Consumer Nsight and Inconic's conduct, whom he hired at Allied First's direction, can be imputed to Allied First. *Dana Container, Inc. v. Sec'y of Lab.*, 847 F.3d 495, 499 (7th Cir. 2017) ("When an employee is acting within the scope of her employment, her knowledge is typically imputed to the employer."). To that end, Mattson himself testified that he was "not happy" with the quality of the leads he received and recalled that Consumer Nsight and Iconic were "just shoving over some people that were not very interested" and that he "didn't have a very high success rate" with the leads. (Mattson Dep. 42:9, 42:18-22). He stated that the leads were so bad that he "didn't recover what we paid for [them.]" (Mattson Dep. 42:21-22). Mattson communicated his dissatisfaction with the leads directly to Iconic itself by stating that the leads were "not good" and that he "wasn't very happy about that." (Mattson Dep. 48:21-25; 49:1-11).

Email correspondence confirms Mattson's testimony. On several occasions, Mattson or his team members communicated with Consumer Nsight regarding returning multiple leads, including a combative borrower who was not interested, multiple borrowers who hung up, and a borrower who was headed into surgery. (Docs. 677-686.) These are not the actions of people who enthusiastically and legitimately fill out web forms asking to be contacted. Although receiving bad leads is not itself probative of the fact that they were generated illegally, it shows cracks in the conduction of the marketing campaign that would cause a reasonably prudent business to investigate further into why the leads being provided are so bad, including, for example, by listening to the calls or otherwise auditing or reviewing TCPA compliance.

But even putting that aside, in addition to Plaintiff himself, who was on Allied First's internal Do Not Call List, there were also leads that should never have been called, for example, a borrower who "asked why we were calling him and what we wanted" and who stated that he

18

"was not interested because he wasn't even looking for anything." (Docs. 682). At deposition,

Allied First's Chief Compliance Officer, Adam Skeffington, testified that he should have been

notified of that call and the number listed as a DNC, but was not. (Skeffington Dep. 55:3-24).

Allied First's policies also required team managers to send Allied First's internal DNC to

vendors like Consumer Nsight monthly. (Skeffington Dep. 29:8-14). Skeffington was "not aware

of any times" Mattson sent Allied First's internal DNC list, which the Plaintiff should already

have been on owing to his prior litigation with Allied First, to Consumer Nsight. *Def's. SOMF* ¶

35; (Skeffington Dep. 29:15-19). Allied First accepted Consumer Nsight's transfer anyway. This

lack of vetting and accountability for any degree of post- or pre- call enforcement, including for

such basic factors as presence on the internal DNC, let alone indicators that the leads were

illegitimate, strongly supports that Allied First knew exactly what was going on and that the calls

violated the TCPA. After all, what business does a vendor have calling an individual who is on

the internal DNC, particularly one with whom it has settled before?

> ii.    *Allied First Maintained Willful Ignorance*

Beyond simply having full knowledge of the calling conduct that Consumer Nsight was

conducting through Iconic, the evidence shows that Allied First maintained willful ignorance of

TCPA compliance, because, despite having policies and procedures in place to verify vendors'

compliance with the TCPA and approve them, Allied First did not. Consumer Nsight was an

"unapproved vendor" and Mattson "did not follow compliance" in using Consumer Nsight.

(Skeffington Dep. 16:8-19). Nevertheless, Allied First paid Consumer Nsight without Consumer

Nsight being an approved vendor, as it itself purported to require, and did so by willfully

pawning off compliance oversight responsibilities on Mattson and failing to exercise the final

approval and oversight required by the managerial handbook. It also never terminated or

disciplined Mattson for not following the compliance process. (Skeffington Dep. 16:17-24, 34:22:25, 58:16-19). Even as a result of this lawsuit, Allied First admitted that its revised policies would not have even prevented the calls that Plaintiff received because Allied First continues to work with unapproved vendors, showing that Allied First continues to wish to maintain its policy of willful ignorance instead of resolving TCPA violations. (Skeffington Dep. 58:3-15).

And beyond fully knowing that Consumer Nsight and Iconic were providing low quality leads which shows that Mattson knew the calls were likely being placed illegally, the aforementioned conduct shows that Allied First and Mattson had sufficient knowledge of issues to investigate further, not simply pay Consumer Nisght, especially not as an unapproved vendor. Indeed, the Plaintiff's call *alone* should have triggered a communist army's worth of red flags, owing to Plaintiff's previous settlement with Allied First. Despite this, Allied First never once refused to pay Consumer Nsight, directly one might add, for such calls. And as described above, the Plaintiff was not the first person that Consumer Nsight transferred to Allied First that claimed he did not consent. Skeffington himself testified that a borrower who "wasn't even looking at anything" when transferred from Consumer Nsight should be considered a "do not call request" under Allied First's policy (Skeffington Dep. 55:3-23). Skeffington admitted that this specific DNC request, which was documented internally in an email chain copied to Mattson, was not communicated to him as the Chief Compliance Officer. (Skeffington Dep. 55:21-23).

Despite all this knowledge, Allied First made no effort whatsoever to so much as approve Consumer Nsight as an approved vendor, let alone audit Consumer Nsight for the evidence of nonconsensual calls it was placing. It didn't investigate if Iconic was involved. It didn't investigate any of the website language or from where the calls were obtained, or anything about the opt in or TCPA compliance processes at all. It certainly did not investigate whether any

20

vendors maintained any fraud prevention measures or if Consumer Nsight was simply transferring fabricated leads. It didn't ask why it was transferred a call with someone whom it had previously settled with on the line. It didn't question why it was paying an unapproved vendor. It simply accepted the benefits of the calls by attempting to originate loans to the individuals transferred. And Allied First's payments to Consumer Nsight are evidence that it failed to repudiate and accepted the benefits of the conduct.

Nor is it true that there is there "absolutely no evidence in the record that Allied First ratified the conduct of Iconic Results." (MSJ at 15). As an initial matter, the evidence adduced shows that if Allied First had no *actual* knowledge of what Iconic was doing (a proposition which itself is questionable as there is no legitimate reason why it would be accepting call transfers from an individual it previously settled with and should be on the internal DNC), a jury question at the very least exists with regards to whether Allied First acted with willful ignorance. Moreover, Allied First's failure to approve Consumer Nsight as a vendor also undermines any theory that Allied First may adduce to show that it did not permit Iconic to act as Consumer Nsight's subagent. Given that it permitted Consumer Nsight to act as its agent without approval and ratified Consumer Nsight's conduct by paying it, it stretches the bounds of common sense to state that Allied First would have insisted on any degree of approval as to Iconic, either. Why would it insist on approving Iconic if it didn't even approve Consumer Nsight? Far from an "independent third party" as Allied First claims, Iconic did exactly what Allied First authorized Consumer Nsight to do and did not expressly prohibit Consumer Nsight from subcontracting out this work. It is on this basis that *Sapan v. LendingTree, LLC* is distinguishable. There, that case was not even decided on a subagency theory; rather, the Plaintiff adduced no evidence to show that an entity called "National Mortgage Advantage" was even involved with LendingTree at all,

21

instead simply making a bold and conclusory assertion at summary judgment that that "entity" was simply a "fake name used by one of the telemarketers hired by LendingTree." No. 8:23-CV-00071-JWH-DFM, 2025 WL 1148281, at *3 (C.D. Cal. Mar. 18, 2025).

The foregoing evidence at the very least raises a genuine dispute as to whether Allied First ratified the subject telemarketing conduct. *See, e.g.*, *Aranda*, 179 F.Supp.3d at 833 (holding sellers ratified telemarketers' conduct by accepting the benefits of the unlawful calls, even after being put on notice that the calling campaign may violate the TCPA); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314-YGR, 2018 WL 3707283, at *5 (N.D. Cal. Aug. 3, 2018) (holding a reasonable jury could find defendant liable on ratification theory where "Alarm.com knew of Alliance's allegedly illegal telemarketing conduct and accepted the benefits therefrom"); *Mey*, 245 F. Supp. 3d at 788 (finding support for ratification where defendant knew "exactly what equipment Venture data was using" to place the calls and accepted the benefits of the calls.).

**2. The calls violated the TCPA's Do Not Call provisions. Plaintiff does not assert an ATDS claim.**

Perplexingly, Defendant claims that the calls did not violate the TCPA's Automatic Telephone Dialing System (ATDS) provisions because Iconic affirmed that it did not place calls using an ATDS or an artificial or prerecorded voice. But the Plaintiff asserts no claims for violations of the TCPA's ATDS provisions, contained in 47 U.S.C. § 227(b). Rather, the Plaintiff asserts claims for the TCPA's *do not call registry* provisions contained in 47 U.S.C. § 227(c), and in 47 CFR § 64.1200(c)(2). (Am. Compl., ECF No. 26, ¶ 59-63). Defendant's motion for summary judgment in this regard conflates the evidentiary standard for a claim the Plaintiff does not even assert and thus should be disregarded.

### 3. Plaintiff did not consent, which is a jury question.

As an initial matter, Defendant's claims of consent, if any legally admissible evidence thereof even exists, should be adjudicated by a jury at jury trial. The Plaintiff here presents a declaration, and his uncontroverted testimony at his deposition, that he never visited the website LenderConsultant.com. That is a textbook disputed factual question. Defendant was given the opportunity to adduce evidence of the same from the Plaintiff but has not, because none exists: the simple fact of the matter, as will be proven at jury trial, is that the Plaintiff never visited the LenderConsultant website. But even so, like with the vicarious liability allegations, if anything, summary judgment should be granted to the *Plaintiff* on this issue for at least two reasons.

*First*, Defendant's consent narrative is insufficient because it provides *no evidence from the website operator*, i.e. the *actual owner* of LenderConsultant.com, who remains unknown, to substantiate the fact that a website visit even took place. That *alone* shows that the Defendant has not provided a *scintilla* of admissible evidence showing that the website visit even occurred as opposed to being completely fabricated, let alone the fact that the Plaintiff himself visited it and submitted his information. *Allstate* proves particularly instructive on this very point. There, this very court held that a declaration very similar to the Varma Declaration proffered here was simply multiple levels of inadmissible hearsay. There, Allstate relied on a spreadsheet containing the Plaintiff's information, which was purportedly obtained from an entity called KP Leads, who itself stated that it obtained the information from website submissions. *Allstate*, 726 F. Supp. 3d at 873. Just as in *Allstate*, Allied First has not laid an evidentiary predicate tracing the hearsay statements in the Varma Declaration "to their source, *i.e.*, the data and statements that underly them." And just as in *Allstate*, there is not just one, but multiple levels of hearsay. All the Varma Declaration states is that Iconic "acquired verified leads from lead generators." As an initial

matter, it doesn't even state that it has the purported "verified lead" data or who these "lead generators" are. Even if it did, without the lead generators providing evidence for the underlying data itself, the lead generators' statements to Varma and Iconic are themselves hearsay. As such, Allied First is not entitled to summary judgment because it has adduced no *admissible* evidence of any alleged website visit, let alone consent, as an initial matter.

*Second*, even if the website visit occurred and the Plaintiff submitted his information (which he most unequivocally did not), the very language on the website itself is insufficient to constitute legally sufficient TCPA consent. Allied First contends that the TCPA disclosure language of the LenderConsultant website constituted consent for Iconic to contact him to sell Allied First's services. It didn't. The *undisputed* language on the website confirms this fact:

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

Nowhere in this purported disclosure are Iconic, Consumer Nsight, Mattson, or Allied First mentioned. As explained above, this is significant because the TCPA requires consent to name a *specific seller* like Allied First, and the website does not. *Williams*, 343 F.R.D. at 209; *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 397 (D. Mass. 2024) ("Two examples illustrate the point. First, consent to receive texts from Chevrolet is not consent to receive texts from Mercedes. . . . Second, consent to a text from one auto manufacturer (or several)—which is akin to what occurred here, where many of the alleged consent forms purport to authorize calls by unidentified entities of a particular type (e.g., insurance companies)—is of no assistance. . . . [Defendant] cannot establish (without speculation or guesswork) that only the specified number

24

of companies relied on the form."). Moreover, even *if* the website listed Allied First (it does not), it is *still* legally insufficient because it does not comply with the E-SIGN Act's requirements, either. *Mantha v. QuoteWizard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass. Dec. 13, 2021); *Bradley*, 2024 WL 2865075, at *7 (D. Md. June 6, 2024).

Thus, not only is the issue of consent a factual issue, as a legal matter, the "consent" obtained flunks on the legal requirements of admissibility and adequacy under the TCPA and similarly provides no basis for granting summary judgment.

### 4. **Plaintiff has not recovered all available damages.**

The Plaintiff has *not* recovered his full measure of statutorily available damages and thus has not been fully compensated for any alleged harm. As an initial matter, Defendant has not adduced a *scintilla* of evidence for this wholly conclusory statement and thus not met its burden at summary judgment, which requires it to come up with *actual evidence* for why it's entitled to judgment as a matter of law on this issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) ("It is not enough to move for summary judgment without supporting the motion in any way.") (White, J., concurring). Notwithstanding the fact that Defendant plainly falls flat on the summary judgment standard, the Plaintiff has controverted and disputes Allied First's statement that he settled his claims with Consumer Nsight and Iconic Results. He has sworn to the same in a declaration. Given that a dispute plainly exists, the issue should likewise proceed to trial.

### CONCLUSION

Allied First's bid for summary judgment ought to be denied and a jury trial scheduled forthwith.

Date: November 12, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
*Perrong Law LLC*
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

/s/ Anthony Paronich
Anthony Paronich
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

We certify that we filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: November 12, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
*Perrong Law LLC*

/s/ Anthony Paronich
Anthony Paronich
PARONICH LAW, P.C.