Page 14

1  somebody puts in an application for a mortgage that
2  puts a hit on their credit report and their credit
3  report then -- or I guess the credit reporting
4  company then sells the fact that their credit's been
5  pulled by a mortgage company to other mortgage
6  companies for the purpose of marketing.
7          Does Allied First use search leads?
8       A.   They did for mailers.
9       Q.   Is Consumer Insight the only vendor that
10 Allied First used for live transfer leads?
11      A.   No.  We had Lending Tree, Endeavor,
12 auto-Nurture and Assurant.
13      Q.   After Endeavor you mentioned a company.
14 Could you spell that out?
15      A.   Assurant.  It is A-s-s-u-r-a-n-t.
16      Q.   Okay.  Was there any difference in the
17 scope of work between these vendors?  That is did,
18 for example, Lending Tree send a million leads and
19 did Consumer Insight send only a hundred or is their
20 scope of the work evenly distributed?
21          MS. THOMAS:  I'm going to object to
22 form, but you can answer.
23 BY THE WITNESS:
24      A.   That wasn't something we were aware of
25 on the corporate side so it would have been up to

Page 15

1  the individual team managers.
2  BY MR. PERRONG:
3       Q.   So how does Allied First onboard a
4  vendor?
5       A.   They would go through at the time myself
6  for compliance, for vendor management oversight.
7       Q.   And when you say "they," would that be
8  the individual team managers?
9       A.   Correct.
10      Q.   How many approximately loan officers are
11 under a team manager?
12      A.   It ranged at the time from three to 50.
13      Q.   How many loan officers at the time did
14 Allied First have?
15      A.   I believe around 200.
16      Q.   Were these loan officers paid on
17 commission or were they paid a salary?
18      A.   I believe it was both.  A salary and
19 then commission.
20      Q.   Once you obtained a vendor proposal from
21 the team managers, what criteria would you use to
22 evaluate the vendors?
23      A.   We used a software called Endeavor to
24 document it, asking questions what their scope of
25 work was and if they're a TCPA compliant.

Page 16

1       Q.   What was the scope of the TCPA compliant
2  questions that you asked these vendors?
3       A.   A validation that if they're making
4  calls that they're receiving opt-ins with opt-in
5  languages.
6       Q.   Was the same Endeavor questionnaire sent
7  to every vendor?
8       A.   To the four I listed, yes, but to
9  Consumer Insight, no, they were an unapproved
10 vendor.
11      Q.   Okay.  When you say that Consumer
12 Insight was not an approved vendor, why was Allied
13 First accepting transfer leads from Consumer
14 Insight?
15      A.   That team manager did not follow
16 compliance.
17      Q.   Who was the team manager that didn't
18 follow the compliance process?
19      A.   Craig Mattson.
20      Q.   Is Craig Mattson still with Allied
21 First?
22      A.   He is not.
23      Q.   What was the purpose of his termination?
24      A.   He was not terminated.
25          MS. THOMAS:  Object to form.  Vague.

Page 17

1  BY MR. PERRONG:
2       Q.   What was the purpose of his departing
3  from the company?
4           MS. THOMAS:  Object to the form, but go
5  ahead.
6  BY THE WITNESS:
7       A.   I am uncertain.  He left voluntarily.
8  BY MR. PERRONG:
9       Q.   Okay.  Is the Endeavor questionnaire
10 something you have access to?
11      A.   Yes.
12          MR. PERRONG:  Carmen, we'll follow-up
13 with getting that.  I think it's our position that
14 that should be produced.
15          MS. THOMAS:  We can follow-up about
16 that, but he testified he didn't do it for Consumer
17 Insight.
18          MR. PERRONG:  Understood.
19      Q.   Other than the in vendor process, are
20 there any other background checks or due diligence
21 that Consumer Insight performs on its vendors -- or
22 I'm sorry, that Allied First performs on its
23 vendors?
24      A.   It would have been myself and the
25 documentation provided for due diligence ranging



Page 26

1 vendor to do that?
2    A.   Not to my knowledge, no.
3    Q.   You say that at the time it would have
4 been to contact you. Who is -- I guess who are
5 employees directed to contact now?
6    A.   They have a reported email. It's
7 confidential.
8    Q.   Who does that email go to?
9    A.   Compliance.
10    Q.   Would that include you?
11    A.   Right now it's the BSA department.
12    Q.   BSA --
13    A.   Bank Secrecy Act, anti-money laundering
14 department. I do not receive them directly.
15    Q.   To your knowledge, in terms of either
16 back when your -- when you were the contact for
17 compliance or now under the reported email, have any
18 reports been made about illegal telemarketing
19 conduct?
20    A.   Not to my knowledge, no.
21    Q.   Do you undertake any continuous review
22 process of vendors monitoring -- of vendor's
23 marketing efforts?
24    A.   During that time period, yes. It would
25 be a review of the material.

Page 27

1    Q.   Could you talk me through what materials
2 you would review?
3    A.   Primarily back then it was mailers. So
4 I was reviewing mailing.
5    Q.   In terms of vendors that were obtaining
6 these leads and doing the live transfer leads, did
7 you monitor or audit performance in any way?
8    A.   I did not, no.
9    Q.   Would the team managers monitor and
10 audit their performance?
11    A.   Yes.
12    Q.   Would they also monitor for compliance
13 with applicable regulations?
14    A.   Not to my knowledge, no.
15    Q.   That would be you, correct?
16    A.   It would have been, yes.
17    Q.   To the best of your recollection, did
18 you ever conduct periodic audits of vendors'
19 compliance with the TCPA?
20    A.   I did not, no.
21    Q.   Did you review language that vendors
22 would use during calls for compliance with
23 applicable laws and regulations?
24    A.   Only at initial on-boarding.
25    Q.   And to be clear, you did not do that

Page 28

1 initial on-boarding with Consumer Insight; is that
2 correct?
3    A.   That is correct.
4    Q.   Does Allied First permit these vendors
5 to use sub-vendors; that is subcontract out their
6 work?
7    A.   Only if it's those initial on-boarding.
8    Q.   Does Allied First follow any industry
9 standards or best practices for selecting and using
10 vendors?
11        MS. THOMAS: Object to form.
12        But go ahead.
13 BY THE WITNESS:
14    A.   Yes. We use the FFIEC manual, IT
15 manual.
16    Q.   What is FFIEC?
17    A.   I've always called it FFIEC. I believe
18 it's a federal --
19    Q.   I'm sure I can find out.
20    A.   My apologies.
21    Q.   That's fine.
22        Did team leads provide parameters
23 on the types of individuals that they wanted their
24 vendors to target for opt-in leads?
25    A.   I believe so, yes.

Page 29

1    Q.   Could you give me examples of some of
2 those parameters?
3    A.   I believe it would have been by state,
4 LTV and glassary finance state.
5    Q.   Does Allied First have an internal do
6 not call list?
7    A.   Yes.
8    Q.   Did it -- does it send its internal do
9 not call list to vendors?
10    A.   To the team managers who then are
11 required to send it to vendors.
12    Q.   How often are they required to send that
13 list to vendors?
14    A.   It was monthly.
15    Q.   To your knowledge, did the team manager
16 at issue here ever send Allied First internal do not
17 call list to Consumer Insight?
18    A.   I am not aware of any times they sent it
19 out to the vendors.
20        MR. PERRONG: We've been at this for
21 close to an hour. I'd like to take a break for five
22 minutes, organize some of my thoughts for the next
23 line of questioning and we can be back.
24        (There was an intermission
25        from 9:42 to 9:48.)



Page 34

1 recognize that program?
2     A.    I do not, no.
3     Q.    Do you know what the Velocify program
4 looks like?
5     A.    No, I do not.
6     Q.    Staying on this document for a moment,
7 would -- looking at this email, it looks like it
8 came from Craig, so the screen shot presumably was
9 taken by him.
10          We've established that you don't
11 really have any knowledge as to what this program
12 is.  Do you know who would have typed this
13 information into this program?
14    A.    It would have been the loan officer.
15    Q.    To the extent you know, when a vendor
16 transfer a call to a loan officer, does the loan
17 officer need to obtain the customer's information
18 again or is there some way that the customer's
19 information is also transferred to the loan officer
20 at the same time that the call was transferred?
21    A.    That I am unaware of.
22    Q.    What disciplinary action, if any, did
23 Allied First take upon learning that one of its team
24 managers hired an unapproved vendor?
25    A.    I am unaware of any.

Page 35

1     Q.    I want to also provide a document that's
2 been marked as Bates Allied 672 and 673.  We'll mark
3 this as Exhibit C.
4               (Whereupon, Skeffington
5               Exhibit C marked.)
6 BY MR. PERRONG:
7     Q.    Just take a moment to familiarize
8 yourself with the email and then I have a few
9 questions about it.
10    A.    Okay.
11    Q.    It looks like this is some kind of
12 bizarre call on the Icon transfer phone number
13 asking to speak to somebody about an employee.
14          Let's start by saying, do you know
15 what's referenced when it says Icon transfer phone?
16    A.    I am not, no.
17    Q.    Do you know of an employee named Joanna
18 Ferguson?
19    A.    Not off the top of my head, no.
20    Q.    Did you have actual knowledge of this
21 email at or around the time it was sent?
22    A.    No.
23    Q.    In your role as chief compliance officer
24 at the time, would this be something that would be
25 within your job duties, for lack of a better term,

Page 36

1 to investigate?
2     A.    It would be -- it would go through HR
3 first.
4     Q.    And if HR had questions, they would
5 reach out to you?
6     A.    Correct.
7     Q.    To the extent you know, does Velocify
8 have the capability for vendors to send information
9 into the Velocify system upon call transfer?
10    A.    I am not aware of any.
11    Q.    Are you aware of any vendors that have
12 access to Encompass?
13    A.    Back then, I think only Velocify did.  I
14 believe Velocify was owned by Encompass.
15    Q.    Okay.  At the time of the calls, so
16 thinking back to 2022, did you hear at all about the
17 quality of the leads that were being purchased from
18 Consumer Insight?
19    A.    No.
20    Q.    What internal audits or controls, if
21 any, would have caught that Federal Savings Bank
22 (sic) was reimbursing one of its team leaders for an
23 unapproved vendor?
24    A.    Allied First Bank, we didn't do any
25 audits on invoicing.

Page 37

1     Q.    Are you familiar with a company called
2 Iconic Results?
3     A.    Yes.
4     Q.    How do you know Iconic Results?
5     A.    Initially through this complaint and
6 litigation.
7     Q.    What is your understanding of what
8 Iconic Results's role in this litigation is?
9     A.    To receive phone call transfers.
10    Q.    When you say "to receive phone call
11 transfers," what does that mean and how does that
12 fit in with what Consumer Insight did?
13    A.    From what I know, it would have been
14 from Consumer Insight if a loan officer wasn't
15 available.
16    Q.    So if a loan officer was not available,
17 Consumer Insight would transfer the call to Iconic
18 Results?
19    A.    I believe so, yes.
20    Q.    And what was Iconic Results supposed to
21 do with that information?
22    A.    I believe it was to take a message for
23 the loan officers; for the loan officers to call
24 back.
25    Q.    Do any other vendors now or back then



Page 54

```
 1            MS. THOMAS:  Object to form.
 2            Go ahead.
 3       BY THE WITNESS:
 4         A.   I did not, no.
 5       BY MR. PERRONG:
 6         Q.   Were those expectations that team
 7   managers were supposed to communicate do not call
 8   requests to you clearly communicated to them?
 9         A.   Yes.
10         Q.   In what form were they communicated?
11         A.   Via training.
12         Q.   The PowerPoints we mentioned?
13         A.   Yes.
14         Q.   I want to bring up a document I think
15   we're Exhibit E.
16            (Whereupon, Skeffington
17             Exhibit E marked.)
18       BY MR. PERRONG:
19         Q.   And this is Allied First Bates 677.
20            Take a second to familiarize
21   yourself with this document and I've got a few
22   questions.
23         A.   Okay.
24         Q.   I want you to go to Page 6 of the PDF.
25   It should have Allied First 682 at the bottom of the
```

Page 55

```
 1   page.
 2         A.   Okay.
 3         Q.   So this looks like an email from Trish
 4   Watson to Rick at Consumer Insight and also copying
 5   Eric and Craig at Allied First.
 6            There's a return to here that says
 7   that, "The borrower asked why we were calling him
 8   and what we wanted.  The buyer said that he was not
 9   interested because he wasn't even looking at
10   anything.  This call was returned by the loan
11   officer."
12            Let me ask you, based on your
13   understanding of Allied First's do not call policy
14   at the time, would it have been proper for a loan
15   officer to return a call when the borrower said that
16   he wasn't interested?
17         A.   It would not have been proper, no.
18         Q.   Would that be considered a do not call
19   request under Allied First's policy at the time?
20         A.   Yes.
21         Q.   That do not call request was not
22   communicated to you, correct?
23         A.   Correct.
24         Q.   I'm done with the document.
25            Can you describe for me the formal
```

Page 56

```
 1   process that was supposed to occur for handling do
 2   not call complaints?
 3         A.   We had a do not contact at Allied First
 4   email as well as my email that they were supposed to
 5   send those to.
 6         Q.   Was that process other than in the
 7   PowerPoints, was that documented in any other
 8   documents?
 9         A.   Email with the PowerPoint attached to
10   the team managers.
11         Q.   Was there an informal process for
12   handling these complaints?
13         A.   Could you clarify?
14         Q.   Was there sort of an understanding that
15   these complaints come in often and, you know, you
16   don't have to send them to us unless it really
17   becomes a problems, is there any sort of
18   understanding of that type?
19         A.   No.
20         Q.   If a complaint came in, what would be
21   the process that was outlined in this policy to
22   determine what vendor was involved and what remedial
23   action to take?
24         A.   We didn't capture the vendor.  We
25   captured the team manager.
```

Page 57

```
 1         Q.   So you would then go back to the team
 2   manager?
 3         A.   If it was a complaint with the
 4   regulatory body, yes.  Otherwise it would belong to
 5   the do not call list.
 6         Q.   And that was the end of it if it wasn't
 7   a complaint through a regulatory body, correct?
 8         A.   Correct.
 9         Q.   You didn't undertake to ascertain
10   whether or not vendors, which were the subject of
11   complaints -- I should say complaints to
12   non-regulatory bodies, whether or not those vendors
13   had prior express written consent?
14            MS. THOMAS:  Object to form.
15       BY MR. PERRONG:
16         Q.   I'm sorry, I didn't get your answer.
17         A.   Correct.
18         Q.   If a complaint came in from a regulatory
19   body, would you have obtained the prior express
20   written consent from the vendor in that case?
21         A.   Yes.
22         Q.   But you've never received such
23   complaints from regulatory bodies, correct?
24         A.   Not that I recall, no.
25         Q.   Is that still Allied First's policy or I
```



Page 58

1  suppose Servbank's policy?
2      A.  It is, yes.
3      Q.  Has Allied First or Servbank implemented
4  additional policies or procedures relating to the
5  TCPA or to do not call requests as a result of this
6  litigation?
7      A.  As a result of this litigation, yes.
8      Q.  What has Allied First done?
9      A.  We enhanced the end vendor/vendor
10 management questionnaire.
11     Q.  How would that have prevented the calls
12 that Mr. Katz received in this case given that the
13 vendor wasn't approved?
14     A.  I don't believe it would have in that
15 case since it wasn't approved.
16     Q.  Did Allied First engage in any
17 disciplinary action for -- as a result of hiring
18 this unapproved vendor?
19     A.  Not that I'm aware of, no.
20     Q.  Do you know if Allied First has ever
21 paid money to an individual who has complained about
22 receiving calls that they did not want?
23     A.  I believe so, yes.
24     Q.  Under what circumstances were those?
25     A.  I am not certain what the circumstances

Page 59

1  were.
2      Q.  But Allied First has previously paid
3  money to individuals who made do not call requests
4  and alleged violations of the Telephone Consumer
5  Protection Act, correct?
6      A.  Yes.
7      Q.  Approximately how many occasions was
8  that?
9      A.  From what I recall, two.
10     Q.  Do you recall anything about the vendors
11 that were involved in those two complaints?
12     A.  The first one was before my time so I am
13 not aware of the vendor.
14     Q.  Okay.
15     A.  The second one was Endeavor leads.
16     Q.  And what was Endeavor leads alleged to
17 have done?
18     A.  Called without retaining opt-in.
19     Q.  So Endeavor leads was a live transfer
20 vendor?
21     A.  Yes.
22     Q.  Do you recall what the category of the
23 other vendor that paid money was?
24     A.  I do not.
25     Q.  Did Allied First terminate Endeavor

Page 60

1  leads as a result of that?
2      A.  Yes.
3      Q.  Was the team manager reprimanded or
4  otherwise disciplined for hiring Endeavor leads?
5      A.  I am unaware of any reprimands for that.
6      Q.  To the extent you know, when a call
7  comes in from a vendor that's live transferring
8  calls, what would an agent see on their screen?
9      A.  I am not certain.
10     Q.  Do you know if customer -- Consumer
11 Insight had access to any APIs to send data to
12 Allied First?
13     A.  I am not certain.
14     Q.  Did Allied First get access -- does
15 rather -- and I'm only talking about vendors that do
16 live transfer calls.  Does Allied First get any
17 access to any of these vendors's internal system
18 databases that they have access to; for example, to
19 pull recordings, pull call logs, things of that
20 nature?
21     A.  The team manager would have.  I would
22 not have.
23     Q.  Okay.  Did team managers ever perform
24 any audits on the vendors that they hired?
25     A.  They would have done it without my

Page 61

1  knowledge.
2      Q.  If any of those audits involve
3  compliance, I take it that you would have been
4  notified of that?
5      A.  Yes.
6      Q.  We mentioned that Allied First had
7  previously paid an individual as a result of this
8  live transfer conduct.
9          How did, to the extent you recall,
10 how did you first learn of this situation?
11     A.  Through the CEO.
12     Q.  So the team lead did not provide the
13 information about the do not contact issue as they
14 were required to do so in their policies?
15     A.  I believe so, that's correct.
16     Q.  Do you know if Allied First has made an
17 insurance claim in this matter?
18     A.  Not that I'm aware of.
19     Q.  Is Allied First self-insured as a bank?
20     A.  No.
21     Q.  Has Allied First ever performed any
22 investigations or studies into compliance with the
23 TCPA at an organizational level?
24     A.  No.
25     Q.  Has Allied First ever hired an outside

