IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>ALLIED FIRST BANK, SB<br>et al.<br><br>Defendants. | Case No. 1:22-cv-05277<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSES TO DEFENDANT ALLIED FIRST BANK, SB'S
RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
AND ADDITIONAL UNDISPUTED MATERIAL FACTS**

Plaintiff Samuel Katz ("Katz"), by and through his undersigned counsel, submits this response to Defendant's undisputed material facts, as well as additional undisputed material facts warranting denial of summary judgment.

I.  **PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Samuel Katz ("Plaintiff") brought this TCPA action against Allied First relating to nine (9) calls Plaintiff received between January 8, 2022 and March 7, 2022. Allied First denies Plaintiff's allegations.

Response: Admitted in part, Disputed in part. Denied insofar as Allied First denies the Plaintiff's allegations, as this is a legal position, not a factual statement.

2. Allied First is a company that is headquartered in this District.

Response: Admitted.

3. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Response: Admitted.

    4.       This Court has personal jurisdiction over Allied First because it is a resident of this District.

    Response: Admitted.

    5.       Venue is proper under 28 U.S.C. § 1391(b) because the calls at issue were made into this District.

    Response: Admitted.

## II.    **PLAINTIFF'S ALLEGATIONS**

    6.       Plaintiff alleges that Allied First and Consumer Nsight, LLC ("Consumer Nsight") made telemarketing calls to Plaintiff's residential telephone number in violation of the TCPA. See First Amended Complaint ("FAC") at ¶¶ 3, 11, 32.

    Response: Admitted.

    7.       The FAC alleges that Consumer Nsight "placed telemarketing calls for Allied First" to Plaintiff between January and March 2022 and that Consumer Nsight "transferred" Plaintiff to Allied First's call center. Id. at ¶¶ 21, 38.

    Response: Admitted.

    8.       Plaintiff further asserts that the call made by Consumer Nsight and "transferred" to Allied First violated the TCPA because his phone number was registered on the National Do-Not- Call Registry. Id. at ¶ 20.

    Response: Admitted.

    9.       Plaintiff seeks damages and "injunctive relief prohibiting Defendants and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any residential number listed on the National Do Not Call Registry in the future." Id. at Prayer for Relief.

Response: Admitted.

III. **THE MORTGAGE REFINANCE CAMPAIGN**

10. The conduct at issue in this case centers around a former Allied First employee—Craig Mattson ("Mr. Mattson"). Mr. Mattson worked for Allied First as a branch manager in Scottsdale, Arizona. See Dep. Craig Mattson, attached hereto as Exhibit No. 1, at 8:11-18. His responsibilities included managing 80-81 loan officers and generating leads through various outlets. Id. at 8:24-12.

Response: Admitted.

11. Mr. Mattson worked with various lenders to purchase leads. Id. at 22:17. One of the vendors that Mr. Mattson worked with was Consumer Nsight. Id. at 22:20. Mr. Mattson had a longstanding relationship with Consumer Nsight and had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight. Id. at 22:22-23:11. In fact, Mr. Mattson's relationship with Rich Sabatino ("Mr. Sabatino"), Chief Executive Officer ("CEO") of Consumer Nsight, predated his employment with Allied First. Id.

Response: Admitted in part, Disputed in part. The record also reflects that *Allied First* provided Mattson full decision-making authority and oversight. Moreover, Allied First's own policies required managerial oversight and vendor approval processes that Allied First admits were not followed, without consequences. Skeffington Dep. 16:8-19.

12. On January 28, 2022, Mr. Sabatino contacted Mr. Mattson to inquire whether Mr. Mattson would be interested in utilizing Consumer Nsight's services for live call transfers to Allied First for individuals interested in mortgage refinances. See Dec. Rick Sabatino, attached hereto as Exhibit No. 2, at ¶ 8.

Response: Admitted.

13. Pursuant to this agreement, Consumer Nsight provided advertising services to Allied First, including "consulting services for live contact telephone transfers from a call center to Allied First representatives." Id. at ¶ 6.

Response: Admitted.

14. Mr. Mattson testified that he was not familiar with Consumer Nsight's processes for effectuating these leads. Mattson Dep. (Ex. 1) at 24:19-21. However, he did ensure that all the leads he purchases for Allied First were TCPA compliant. Id. at 26:24-27:9. Mr. Mattson would purchase "form fills" wherein a consumer would fill out a form to be contacted regarding Allied First's services. Id. at 27:19-28:1. In this sense, the consumers would "opt in" to receive the communications. Id. Mr. Mattson further ensured that the forms to be executed by the consumers would include a TCPA disclosure statement. Id. at 28:8-12.

> Response: Disputed. While Mr. Mattson did testify that he was not familiar with Consumer Nsight's specific processes, Allied First's own policies required him to vet vendors, familiarize himself with their TCPA compliance, and present those facts to obtain a vendor approval from Allied First's Chief Compliance Officer before the placement of any calls. Mattson Dep. 24:19-21, 26:24-27; Skeffington Dep. 16:8-19. The characterization that Mr. Mattson "ensured" TCPA compliance is contradicted by the fact that Consumer Nsight was never an approved vendor that went through the aforementioned vendor approval, Allied First's Chief Compliance Officer was never notified of do not call requests, and Allied First's own internal do not call list was never tendered to Consumer Nsight, all in contravention of Allied First's policies. Skeffington Dep. 16:8-19, 55:21-23.

15. Consumer Nsight engaged Iconic Results to conduct the calls and initiate the live call transfers to Allied First. Sabatino Decl. (Ex. 2) at ¶ 10.

Response: Admitted.

16. Specifically, Iconic Results "called consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transferred qualifying consumers to companies that placed orders for such 'warm transfer' calls." Dec. Mituin Varma, attached hereto as Exhibit No. 3 at ¶ 4.

Response: Admitted.

17. Allied First had no contract, arrangement, or otherwise any relationship with Iconic Results. Sabatino Decl. (Ex. 2) at ¶ 6; see also Varma Decl. (Ex. 3) at ¶ 15.

Response: Disputed. While Allied First claims it had no direct contractual relationship with Iconic, the evidence demonstrates that Allied First authorized Mr. Mattson to hire vendors for telemarketing activities, that Allied First knew it was receiving live transfer calls, and that Allied First paid for these services directly to Consumer Nsight. (Docs 901-903, 812-814). In other words, nothing that Iconic was asked to do differed in any way from what Consumer Nsight was already authorized to do. Allied First's managerial handbook expressly permitted managers to hire vendors for marketing activities including using "auto dialers," and expressly authorized them to do so using criteria managers dictated, provided that such vendors underwent final approval by the Chief Compliance Officer. (Docs 931). Further disputed insofar as Allied First will argue that the lack of a "contract, arrangement, or otherwise" is dispositive of vicarious liability, or insofar as the foregoing was not an "arrangement."

18. Rather, Consumer Nsight placed three (3) orders with Iconic Results between November 2021 and October 2022 for a total of 90 mortgage lead transfers. Sabatino Decl. (Ex. 2) at ¶ 7. Consumer Nsight placed the orders and received the warm transfer calls. Id. Iconic Results invoiced Consumer Nsight for the calls it made as part of the campaign. Varma Decl. (Ex. 3) at ¶ 14.

>Response: Disputed insofar as this statement omits the fact that Allied First directly paid Consumer Nsight for these transfers. (Docs 901-903, 812-814).

19. Iconic Results was clear that it did not send invoices to Allied First because "it had no contractual relationship" with Allied First. Id. at ¶ 15. In fact, Mr. Mattson testified that he was not familiar with Iconic Results' call center and its processes. Mattson Dep. (Ex. 1) at 37:21-23.

>Response: Disputed. Although Iconic Results did not send invoices directly to Allied First, Allied First received Consumer Nsight's invoices that described exactly what Allied First was purchasing and the work that Iconic Results ultimately conducted: "Prescreened Refinance Live Transfers." (Docs 901-903, 812-814.) Allied First then wired payment directly to Consumer Nsight. (Docs 903, 814.) Moreover, Mr. Mattson was not familiar with Iconic Results' specific processes but was required to do so by the terms of his managerial handbook. (Docs 931).

IV. **THE CALLS AT ISSUE**

20. In January 2022, an online inquiry form was executed at the webpage lenderconsultant.com. Varma Decl. (Ex. 3) at ¶ 10. The name provided on the form was "James Weim" and the phone number provided was (207) 802-1001. Id.

Response: Disputed. Plaintiff denies that he executed any online inquiry form at lenderconsultant.com or any other website. Katz Decl. ¶¶ 7-10. Allied First has provided no admissible evidence that Plaintiff visited this website or submitted any information, only hearsay testimony. The Varma Declaration constitutes inadmissible hearsay as it provides no foundation from the website operator to substantiate that any website visit occurred, as more fully outlined in Plaintiff's brief. *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024).

21. The following consent language was agreed to along with the inquiry: By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations. Id.

Response: Disputed. Plaintiff denies agreeing to any such consent language. Katz Decl. ¶¶ 7-11, 17. Moreover, even if such language existed (which Plaintiff disputes), this is a legal conclusion. For legal reasons, the language does not constitute legally sufficient TCPA consent because: (1) it does not name Allied First, Consumer Nsight, Iconic Results, or Mr. Mattson as entities authorized to call; (2) it does not comply with the E-SIGN Act's requirements; and (3) it purports to authorize calls from unnamed "Participating Partners," which is legally insufficient. *Williams v. PillPack LLC*, 343

F.R.D. 201, 209 (W.D. Wash. 2022); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 397 (D. Mass. 2024).

22. Plaintiff admitted in deposition that he used the alias "James Weim" in relation to telemarketing calls. See Dep. Samuel Katz, attached hereto as Exhibit No. 4, at 54:2-17. Plaintiff further admitted that his telephone number is (207) 802-1001.

Response: Admitted in part, Disputed in part. Admitted that Plaintiff has used the alias "James Weim" in relation to telemarketing calls. Denied that Plaintiff used this alias to complete any online form or that he submitted his information to lenderconsultant.com. Plaintiff's deposition testimony and declaration make clear that he uses this alias only when responding to illegal telemarketing calls to protect his identity, not when submitting information online. Katz Decl. ¶¶ 11-13; Katz Dep. 53::56.

23. Between January 12, 2022 and March 7, 2022, Iconic Results contacted "Mr. Weim" to discuss his interest in mortgage refinancing pursuant to the online inquiry. Varma Decl. (Ex. 3) at ¶ 11.

Response: Disputed. Iconic Results contacted Plaintiff, not Mr. Weim. Why Iconic did so is further disputed and has not been demonstrated by any admissible, non-hearsay evidence. Further denied that these contacts were pursuant to any legitimate online inquiry or that Plaintiff consented to receive these calls. Katz Decl. ¶¶ 16, 19.

24. Iconic Results affirmed that it did not "place prerecorded or artificial calls, or calls placed with an Automatic Telephone Dialing System ("ATDS") restricted by the TCPA." Id. at ¶ 13.

> Response: Disputed. This statement has not been demonstrated by any admissible, non-hearsay evidence. Furthermore, this fact is irrelevant as the Plaintiff does not assert claims for violations of the TCPA's ATDS regulations.

25. Plaintiff answered the tenth call on March 7, 2022. Id. at ¶ 11. Plaintiff stated that he was "James Weim" and confirmed that he was interested in hearing mortgage rate offers. Id. at ¶ 12. The call was then transferred to Allied First to discuss mortgage refinancing options with the consumer. Id.[1]

> Response: Admitted in part, Disputed in part. Admitted that Plaintiff answered a call on March 7, 2022. Denied that Plaintiff "confirmed that he was interested in hearing mortgage rate offers" in any genuine sense. As Plaintiff testified, he "played along with that to the extent [he] needed to identify the party responsible for the illegal calls." Katz Dep. 68:23-25. Plaintiff never genuinely sought mortgage refinancing and had no need for such services. Katz Dep. 69:12-14; Katz Decl. ¶ 9.

26. Jason Aldridge ("Mr. Aldridge"), a loan officer with Allied First, continued the call with Plaintiff. See Transcript of March 7, 2022 Phone Call, attached hereto as Exhibit No. 5

> Response: Admitted.

27. Plaintiff verified his home address and phone number on the call. Id. Plaintiff then informed Mr. Aldridge that he was interested in learning more about a cash out refinance. Id.

> Response: Admitted in part, Disputed in part. Admitted that Plaintiff verified his address and phone number and that Plaintiff asked about cash-out refinance options while playing

---

[1] Plaintiff authenticated the March 7, 2022 call at deposition. See Ex. 4 at 68:13-15. Response: Admitted in part, Disputed in part. Although Plaintiff authenticated the call, he noted that the recording was incomplete in that it did not capture his conversation with the initial representative.

along with the call, but Denied that this demonstrates genuine interest or consent. Katz Dep. 69:12-14; Katz Decl. ¶ 9.

28. Shortly after Mr. Aldridge began to pull Plaintiff's property information, Plaintiff stated that he had to get going and asked if there was a way for him to call Mr. Aldridge back at another time. Id. Mr. Aldridge then provided Plaintiff with his direct phone number. Id. Mr. Aldridge informed Plaintiff that a call back would give him a chance to get information on Plaintiff's property so they could have an informed conversation, to which Plaintiff responded "okay, yes. Sounds good." Id.

Response: Admitted.

29. Following the phone call, Mr. Aldridge sent a message to Plaintiff where he stated that it was good speaking with Plaintiff and provided him with his contact information so they could chat further. See March 2022 Conversation History, attached hereto as Exhibit No. 6.

Response: Admitted.

30. Plaintiff immediately responded to Mr. Aldridge's message by stating "Please sent me a copy of your do not call policy to [] & stop calling me." Id. Mr. Aldridge responded by stating "I have not called you since we spoke, Mr. Weim. I will add DO NOT CALL to your record in our system. Enjoy your day." Id.

Response: Admitted.

31. Plaintiff then inquired as to who was the lead generator that provided his contact information. Id. Mr. Aldridge responded that he does not have anything to do with marketing and he assumed that Plaintiff would have provided his information to the person who made the initial call. Id.

Response: Admitted in part, Disputed in part. Disputed insofar as this statement makes the legal conclusion that Mr. Aldrige's claimed lack of knowledge negates Allied First's liability for the calls.

32. Plaintiff affirmed at deposition that he did not believe he had received any calls or text messages from Allied First since March 7, 2022. Katz Dep. (Ex. 4) at 68:7-15.

Response: Admitted.

33. When asked about his commentary on the call that he was interested in mortgage refinancing, Plaintiff responded that he was just "play[ing] along." Id. at 68:21-25

Response: Disputed. Plaintiff's testimony makes clear that he played along in order to ascertain who was calling him illegally, and further that Plaintiff had no interest in the calls or Allied First's goods or services. Katz Dep. 67::69.

### V. PLAINTIFF SAMUEL KATZ

34. Plaintiff is a serial filer of TCPA actions. In fact, Plaintiff estimates that he has filed between five (5) and ten (10) TCPA actions over the last ten (10) years, if not more. Id. at 6:1-19.

Response: Admitted in part, Disputed in part. Disputed that the Plaintiff has ever stated or been held to be a "serial filer" of TCPA actions. It is telling that Defendant cites to no record evidence for this proposition. However, the Plaintiff's estimates of his litigation history are admitted.

35. This is also not Plaintiff's first TCPA complaint against Allied First. In or around June 2016, Plaintiff entered into a confidential settlement agreement with Allied First relating to calls that he received that he alleged in were in violation of the TCPA. Id. at 24:18-25:24.

> Response: Admitted. Further responding, this prior settlement (1) demonstrates Allied First's knowledge that Plaintiff does not want to receive telemarketing calls; (2) means Plaintiff's number should have been on Allied First's internal Do-Not-Call list; and (3) shows Allied First's acceptance of a call transfer for someone on its internal DNC list demonstrates knowledge of TCPA violations and supports ratification liability. Katz Decl. ¶ 6, 14; Skeffington Dep. 29:8-19; Katz Dep. 62:7-24.

36. Plaintiff is not naïve when it comes to the TCPA. When asked at deposition if he had ever signed an online web form to receive marketing calls, Plaintiff responded that he considered those to be "lead laundering where an unscrupulous third party will take data lists and put them into web forms and amass to manufacture consent where none exists." Id. at 32:22-33:7.

> Response: Admitted in part, Disputed in part. Disputed that the "Plaintiff is not naïve when it comes to the TCPA." It is telling that Defendant cites to no record evidence for this proposition. Admitted that the Plaintiff stated that websites such as the one here are "lead laundering" websites, particularly insofar as the information submitted was not public information but was "both a fictitious address and a fictitious name." Katz Dep. 67:20-21.

37. It is Plaintiff's position that where he does fill an online webform, "the consent to receive telemarketing calls is separate from the consent related to the transaction." Id. at 33:20-34:1.

> Response: Admitted in part, Disputed in part. Admitted that this is what the Plaintiff's position is regarding consent, but disputed insofar as this purports to assert that this is a legal conclusion masquerading as a fact.

38. Plaintiff confirmed that he used the alias "James Weim" "in the context of an illegal telemarketing call," and even confirmed that he would entertain the calls to "play along" with telemarketers, but conveniently did not recall using that alias in this matter and denied filing out a webform with the alias "James Weim" and his personal contact information. Id. at 57:4-9; 58:22- 25; 59:24-60:2.

Response: Disputed. Plaintiff confirmed he used the alias "James Weim" only when responding to illegal telemarketing calls, not when filling out web forms. Plaintiff specifically denied filling out any web form with this alias. Katz Dep. 57:4-9; Katz Decl. ¶¶ 11-13. Defendant mischaracterizes this testimony to suggest Plaintiff submitted information online using that name, which he denied under oath.

VI. **SETTLEMENT**

39. Plaintiff settled his claims with Consumer Nsight and Iconic Results.

Response: Admitted.

40. While the terms of the settlement are confidential, upon information and belief, Plaintiff's settlements with Consumer Nsight and Iconic Results are in excess of the statutory maximum.

Response: Disputed. Plaintiff has not recovered his full measure of statutory damages. Katz Decl. ¶ 17. Defendant provides no admissible evidence to support its conclusory assertion that Plaintiff's settlements exceeded the statutory maximum or that he has been fully compensated.

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

**I.     ADDITIONAL FACTS REGARDING ALLIED FIRST'S CONTROL AND KNOWLEDGE**

1.     Allied First entrusted its employee manager, Craig Mattson, with "full decision-making authority and oversight" when it came to purchasing leads from Consumer Nsight. Def's MSJ at 6; Mattson Dep. at 22:22-23:11. This entailed instructing and obligating managers like Mattson to "initially establish the existence, purpose and service provided by the vendor" and to vet vendors, with such vetting to "be reviewed by Allied First Bank, sb initially and on an annual basis." Docs. 923-924.

2.     Allied First's policies mandated that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management" and required Allied First's Compliance Officer to approve telephone scripts or outlines. Docs. 743.

3.     When contracting with Consumer Nsight for live transfers, Mr. Mattson controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to refinance a loan with, including FHA, VA, and conventional cash-out loans, as well as minimum loan-to-value ratios and credit scores. Mattson Dep. at 43:8-25, 44:1-25, 45:2-5.

4.     Mr. Mattson hired Consumer Nsight "with the approval of the bank" and "managed the scope of [the] relationship with Consumer Nsight." Mattson Dep. at 50:14-20.

5.     Allied First and Consumer Nsight integrated their systems so that loan officers, of which a loan officer roster was provided could "get notified of the calls coming in and to receive the post as the transfers are handed off." Docs. 580, 606, 666.

6.     Mr. Mattson exercised control over call volume by refusing another delivery from Consumer Nsight in April, stating he was "done with transfers," thus controlling whether calls would be placed. Docs. 705.

7.     Consumer Nsight required advertising language and script approval from Allied First or its agents. Docs. 930-931.

8.     Allied First paid Consumer Nsight a fixed price for each live transfer of a lead interested in purchasing Allied First's services and used filters dictated by Mattson to screen leads that would not be transferred. In the event a non-approved lead was transferred, Allied First, through Mattson's team, could return the lead for a refund. Docs. 901-903, 812-814, 677-686.

## II.     ADDITIONAL FACTS REGARDING ALLIED FIRST'S KNOWLEDGE, RATIFICATION, AND VENDOR RELATIONSHIP

9.      Allied First received Consumer Nsight's invoices that specifically described what Allied First was purchasing: "Prescreened Refinance Live Transfers." Docs. 901-903, 812-814.

10.     Allied First wired payment directly to Consumer Nsight for these services. Docs. 903, 814.

11.     Allied First knew that Plaintiff's telephone number should have been on its internal Do-Not-Call list because of the parties' prior 2016 settlement. Katz Dep. at 24:18-25:24, 62:7-24; Katz Decl. ¶ 6.

12.     Mr. Mattson testified that he was "not happy" with the quality of leads he received from Consumer Nsight and Iconic, stating they were "just shoving over some people that were not very interested" and that he "didn't have a very high success rate" with the leads. Mr. Mattson further stated the leads were so poor that he "didn't recover what we paid for [them]," and communicated that displeasure *directly to Iconic itself*, stating the leads were "not good" and that he "wasn't very happy about that." Mattson Dep. at 42:9, 42:18-22, 48:21-25, 49:1-11.

13.     Consumer Nsight was an "unapproved vendor" according to Allied First's Chief Compliance Officer, Adam Skeffington. Mattson "did not follow compliance" in using Consumer Nsight without obtaining final approval as an approved vendor from Allied First's Chief Compliance Officer, but instead hired Consumer Nsight without first seeking such approval. Skeffington Dep. at 16:8-19.

14.     Allied First's Chief Compliance Officer, Adam Skeffington, testified that he should have been notified of certain calls and do-not-call requests under Allied First's policy, but was not. Skeffington Dep. at 55:3-24.

15.     Allied First's internal policies required team managers to send Allied First's internal do-not-call list to vendors like Consumer Nsight monthly, but Mattson did not. Skeffington Dep. at 29:8-19.

16.     Neither Mattson nor Consumer Nsight were ever reprimanded or disciplined for failing to honor Allied First's internal Do Not Call list or adhere to Allied First's vendor policies, including vendor approvals. Skeffington Dep. at 16:17-24, 34:22-25, 58:16-19.

17.     Despite these compliance and contractual failures, Allied First continued to accept call transfers from Consumer Nsight and paid for them anyway. Docs. 901-903, 812-814.

18. Even after this lawsuit, Allied First admitted that its revised policies would not have prevented the calls Plaintiff received because Allied First continues to work with unapproved vendors like Consumer Nsight. Skeffington Dep. at 58:3-15.

19. Allied First never investigated whether Consumer Nsight or Iconic maintained any fraud prevention measures, investigated whether leads were fabricated, never audited Consumer Nsight for evidence of nonconsensual calls, never investigated the website language or opt-in processes used to purportedly obtain consent, never questioned why it was transferred a call with someone (Plaintiff) with whom it had previously settled a TCPA case, and never questioned why it was paying an unapproved vendor in violation of its own policies.

### III. ADDITIONAL FACTS REGARDING LACK OF CONSENT

20. Plaintiff's telephone number should have been on Allied First's internal Do-Not-Call list owing to the parties' previous 2016 settlement, as part of which Allied First was aware of Plaintiff's telephone number and the fact that he did not want to receive calls from Allied First. Katz Decl. ¶ 6; Katz Dep. 62:7-24.

21. Plaintiff never visited the LenderConsultant.com website and never submitted any of his personal information or telephone number to Defendant, Consumer Nsight, or Iconic Results, nor would he have any reason to, because at all times relevant he had no need for a mortgage loan, nor was he seeking to refinance one. Katz Decl. ¶¶ 8, 9; Katz Dep. 69:12-14.

22. Plaintiff does not and has never submitted any web form online using the alias "James Weim"; as he explained in discovery and deposition, he has used such alias only during the course of illegal telemarketing calls to protect his true identity. Katz Decl. ¶¶ 11-12; Katz Dep. 57:4-11.

23. Even if a website visit occurred (which Plaintiff denies), the language on the LenderConsultant.com website does not name Allied First, Consumer Nsight, Iconic Results, or Mr. Mattson as entities authorized to contact Plaintiff. Varma Decl. at ¶ 10.

### IV. ADDITIONAL FACTS REGARDING DAMAGES

24. Plaintiff has not recovered his full measure of statutory damages from any party, including treble damages, costs, and attorneys' fees that he seeks from Allied First. Katz Decl. ¶ 17.

Date: November 12, 2025

        */s/ Andrew Roman Perrong*
        Andrew Roman Perrong, Esq.
        *Perrong Law LLC*
        2657 Mount Carmel Avenue
        Glenside, Pennsylvania 19038
        Phone: 215-225-5529 (CALL-LAW)
        Facsimile: 888-329-0305
        a@perronglaw.com

        */s/ Anthony Paronich*
        Anthony Paronich
        Email: anthony@paronichlaw.com
        PARONICH LAW, P.C.
        350 Lincoln Street, Suite 2400
        Hingham, MA 02043
        Telephone: (617) 485-0018
        Facsimile: (508) 318-8100

*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

We certify that we filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: November 12, 2025

        */s/ Andrew Roman Perrong*
        Andrew Roman Perrong, Esq.
        *Perrong Law LLC*

        */s/ Anthony Paronich*
        Anthony Paronich
        PARONICH LAW, P.C.