IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAMUEL KATZ, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | Case No.   22 C 5277 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| ALLIED FIRST BANK, SB | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Samuel Katz filed a first amended complaint on behalf of himself and a class of individuals against defendant, Allied First Bank, SB, and another defendant, Consumer Nsight LLC, asserting a single count—a claim for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.   The TCPA was enacted to help protect consumers from annoying telemarketing phone calls.   According to plaintiff, he and the class members are listed on the National Do Not Call Registry, which was set up under the TCPA.   Yet Consumer Nsight, he alleges, made unsolicited calls to them, and then transferred those calls to Allied—which, he avers, had contracted with Consumer Nsight to generate mortgage refinancing leads for Allied. Plaintiff thus alleges that Allied and Consumer Nsight violated the TCPA, and he seeks damages and injunctive relief on behalf of himself and the putative class.

Consumer Nsight has since settled with plaintiff, and has been dismissed as a defendant from the case.   Allied has answered, denying liability.   It also asserted a third-party complaint against Consumer Nsight, alleging that Allied entered into a contract with Consumer Nsight, under which Consumer Nsight agreed that its call transfers would not violate any laws.   Allied therefore alleged that, if plaintiff's claim is successful, Consumer Nsight breached the contract

and must indemnify Allied.   Consumer Nsight moved to dismiss the third-party complaint for lack of personal jurisdiction, and the court granted that motion, dismissing Consumer Nsight from the case [125].

Allied is now the sole defendant here, and has moved for summary judgment under Fed. R. Civ. P. 56.   Allied argues that summary judgment is proper here because there is no genuine dispute that neither Allied nor any agent of Allied initiated any telemarketing calls to plaintiff. Allied further argues that it "did not violate the TCPA as a matter of law": "The calls at issue did not violate the TCPA and, even if they did, [p]laintiff himself consented to be contacted." Plaintiff opposes the motion, contending that a reasonable jury could find in his favor.   For the reasons below, the court grants in part and denies in part Allied's motion for summary judgment.

## BACKGROUND

Craig Mattson worked for Allied as a branch manager in Arizona.   His responsibilities included managing roughly 80 loan officers and generating leads through various outlets.   To that end, he worked with various companies to purchase leads.   One such company was Consumer Nsight.

On January 28, 2022, Consumer Nsight's CEO, Rick Sabatino, contacted Mattson to see if Mattson would be interested in using Consumer Nsight's services for live call transfers to Allied for people interested in mortgage refinances.   An agreement was eventually struck, under which Consumer Nsight would provide advertising services to Allied, including "consulting services for live contact telephone transfers from a call center to Allied . . . representatives." (Quoting Sabatino's Decl.).   Mattson controlled Consumer Nsight's targeting criteria for the

2

types of consumers he was looking to have refinance a loan, and he hired Consumer Nsight with Allied's approval and managed the scope of the relationship with Consumer Nsight.

Sabatino states in a declaration that "Consumer Nsight is not a telemarketing firm" and "does not . . . initiate telemarketing calls." So Consumer Nsight engaged a company called Iconic Results to conduct the calls and initiate the live call transfers to Allied. According to Sabatino, "Consumer Nsight had a relationship with Iconic . . ., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. Iconic's CEO, Mituin Varma, further explains that Iconic's business was to call "consumers who placed mortgage rate inquiries in order to verify that certain requirements are met (size of mortgage, location of property, and so forth), and then transfer[ ] qualifying consumers to companies that placed orders for such 'warm transfer' calls." Consumer Nsight's Sabatino states that, under the agreement with Allied, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic transferred certain calls to a . . . routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied . . . via [the] routing number."

Between November 2021 and October 2022, Consumer Nsight placed three orders with Iconic for a total of 950 mortgage lead transfers, and received the warm transfers. Iconic invoiced Consumer Nsight for the calls it made as part of the campaign. Copies of invoices show that Allied accepted call transfers from Consumer Nsight and paid for them.

Mattson explained at his deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers. Mattson also explained that "everyone in the office knew that th[e] lead was coming

3

from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic."

Copies of internal Allied documents provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied . . . initially and on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List. Allied's Compliance Officer, Adam Skeffington, testified at his deposition that Allied sends the internal Do Not Call list to team managers, who are then required to send it to vendors, but that he was not aware of Mattson having sent the list to Consumer Nsight.

Allied asserts that in January 2022, an online inquiry form was executed at the webpage LenderConsultant.com, and that the name provided on the form was "James Weim" and the phone number provided was (XXX) XXX-1001. Varma, Iconic's CEO, states in a declaration that Iconic called plaintiff at that number, which "had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." Plaintiff admitted at his deposition that he has used the alias "James Weim" in relation to telemarketing calls, and that his telephone number is the 1001 number. But he denies that he used this alias to complete any online form or that he submitted his information to lenderconsultant.com. According to plaintiff, he uses this alias only when responding to illegal telemarketing calls, not when submitting information online.

Varma states that the lenderconsultant.com website "confirmed that the following consent language had been agreed to along with the [plaintiff's] inquiry":

> By clicking "Submit," you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot) regarding financial, home, credit, final expense and solar related offers and for them to contact you (including through automated means; e.g. autodialing and prerecorded messaging) via telephone, mobile device (including SMS and MMS) and/or email, even if you are charged for the call or your telephone number is currently listed on any state, federal or corporate Do Not Call list. You agree that this consent is not a condition of purchase. That this is not a loan application and you are under no obligations.

Allied asserts that between January 12 and March 7, 2022, Iconic contacted "Mr. Weim" several times to discuss his interest in mortgage refinancing per the online inquiry. Allied further asserts that plaintiff finally answered the tenth call on March 7, 2022, stating that he was "James Weim" and confirming that he was interested in hearing mortgage rate offers. The phone-call transcript shows that the call was made by a woman who spoke with plaintiff and then transferred the call to an Allied loan officer named Jason Aldridge, who continued the call with plaintiff to discuss mortgage refinancing options. Plaintiff admits that he answered a call on March 7, 2022, and that he used the name "James Weim." But he denies that he confirmed that he was interested in hearing mortgage rate offers in any genuine sense, because, as he puts is, he was just "play[ing] along with that to the extent [he] needed to identify the party responsible for the illegal calls."

Two days later, on March 9, 2022, plaintiff sent a text message to Aldridge, asking Aldridge who the lead generator was that provided plaintiff's information. Aldridge responded, explaining that he was "not sure," that he did not have anything to do with marketing, and that

the previous call had been "transferred," so Aldridge "assumed the information was provided by [plaintiff] to the person on the phone."

A few weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." In April 2022, Mattson refused a delivery of transfers from Consumer Nsight, stating he was "done with transfers." And at some point, he spoke directly to Iconic about the warm-transfer-lead campaign and told Iconic that the leads were "not good" and that he "wasn't very happy about that." Mattson stated at deposition that Consumer Nsight and Iconic were "just shoving over some people that were not very interested."

In September 2022, plaintiff filed this lawsuit, alleging that his number is on the national do-not-call registry and that Allied and Consumer Nsight violated the TCPA by calling him. As it turns out, plaintiff is no stranger to TCPA actions. Plaintiff estimates that he has filed between five and ten TCPA actions over the last decade. And in fact, this is the second TCPA complaint he has filed against Allied (the other in 2016).

Plaintiff has since settled his claims with Consumer Nsight and Iconic (who was not named as a defendant in this case). Plaintiff states in a declaration, though, that he has "not recovered [his] full measure of statutory damages from either of [them], including in the aggregate."

**DISCUSSION**

Allied moves for summary judgment on plaintiff's sole claim—violations of the TCPA, 47 U.S.C. § 227.   Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact is "material" if it affects the outcome of the case under the governing law and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmovant.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

On summary judgment, the court determines whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a factfinder for resolution at trial.   See id. at 249.   The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in its favor.   See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).   But the nonmovant must do more than raise "some metaphysical doubt as to the material facts."   Id. at 586.   It must instead "present affirmative evidence in order to defeat a properly supported motion for summary judgment."   Anderson, 477 U.S. at 257.   In the end, the court must analyze the motion in light of both the applicable substantive law and the question of whether a reasonable factfinder could return a verdict for the nonmovant.   Checkers, Simon & Rosner v. Lurie Corp., 864 F.2d 1338, 1344 (7th Cir. 1988). If, based on the record as a whole, a reasonable factfinder could not find for the nonmovant, there is no genuine issue for trial and summary judgment is appropriate.   See Matsushita Elec., 475 U.S. at 587.

Allied makes several arguments for why summary judgment is appropriate here. The court addresses each below.

## Whether the Calls did not Violate the TCPA as a Matter of Law

Allied contends that plaintiff's TCPA claim fails for a simple reason: plaintiff "cannot establish that the calls [to him] were placed with an [automatic telephone dialing system]." Without an autodialer system, Allied asserts, there can be no TCPA violation as a matter of law.

The court disagrees. To be sure, Congress passed the TCPA in response "to a torrent of vociferous consumer complaints about intrusive robocalls." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 614 (2020). And so it is not surprising that the TCPA addresses calls from autodialing systems—in particular, in § 227(b).

But Congress was concerned with more than just robocalls. Indeed, it had determined that "[u]nrestricted telemarketing . . . can [also] be an intrusive invasion of privacy." Hossfeld v. Allstate Ins. Co., 726 F. Supp. 3d 852, 861 (N.D. Ill. 2024) (quoting 105 Stat. 2394, codified as Note to 47 U.S.C. § 227). It therefore enacted § 227(c), which directs the FCC to "protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). To aid the FCC in this endeavor, "Congress authorized the FCC to issue regulations, among other things, creating what is today commonly known as the national do-not-call registry." Hossfeld, 726 F. Supp. 3d at 862; see also 47 U.S.C. §§ 227(c)(1)(E), (c)(2), and (c)(3).

The FCC eventually issued those regulations in 2003, which are found in 47 C.F.R. § 64.1200(c)(2). They provide that, among other things, "[n]o person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his . . .

8

number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). For "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the[se] regulations," the TCPA provides a private right to "bring . . . (A) an action based on a violation of the regulations . . . to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions." 47 U.S.C. § 227(c)(5).

Plaintiff's amended complaint here alleges violations related to the do-not-call registry. According to the amended complaint, Allied "or its affiliates, agents, [or] other persons or entities acting on [its] behalf" violated the TCPA "by making telemarketing calls . . . to [plaintiff] and the Class despite their numbers being on the National Do Not Call Registry." The fact that the calls were not placed with an autodialing system, then, provides no basis to enter summary judgment for Allied on plaintiff's TCPA claim.

### Whether Plaintiff Consented to Receive the Calls

Allied argues that plaintiff's claim also fails as a matter of law because he "consented to receive the calls." According to Allied, it can avoid liability under the TCPA if it proves that it made the calls with the recipient's prior express consent. And, it contends, "[t]here can be no genuine dispute that [plaintiff] filled out the online form" at lenderconsultant.com, in which he consented to receive mortgage refinancing calls. In support, Allied relies on Iconic's CEO Varma's declaration. Varma states that Iconic called plaintiff at the 1001 number, "which number had been provided in an inquiry form by a 'James Weim' at the webpage lenderconsultant.com." "That website," Varma says, "confirmed that the following consent language had been agreed to along with the inquiry":

9

By clicking 'Submit', you agree to share your information with up to 4 of our Participating Partners (potentially including Quicken Loans & Loan Depot), regarding financial, home, credit, final expense and solar related offers and for them to contact you . . . via telephone, mobile device . . . even if . . . your telephone number is currently listed on any . . . federal . . . Do Not Call list.

Allied further argues that plaintiff verified at his deposition that that he answered a call from Iconic, where he stated that he was "James Weim" and he confirmed his interest in learning about mortgage rate offers. Because plaintiff expressly consented to be contacted about mortgage refinancing, Allied concludes, "his claim for violation of the TCPA fails as a matter of law."

Plaintiff argues in response that summary judgment based on consent is improper for two reasons. First, he contends, there is a genuine factual dispute over whether he visited LenderConsultant.com and provided consent. On the one hand, plaintiff asserts, Allied fails to provide any evidence from LenderConsultant.com "to substantiate the fact that a website visit even took place," and Varma's assertions about the visit are inadmissible hearsay. And on the other hand, his own declaration—along with his uncontroverted deposition testimony—confirm that he never visited LenderConsultant.com. Second, plaintiff contends that the purported website language "is insufficient to constitute legally sufficient TCPA consent." That is because, he argues, neither Iconic, Consumer Nsight, Mattson, nor Allied are mentioned in it, and it does not "comply with the E-SIGN Act's requirements."

The court finds that Allied has failed to show that summary judgment is proper based on the consent issue. Under the FCC's regulations, an "entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating" the regulation against calling people on the do-not-call registry if "[i]t has obtained the subscriber's prior

express invitation or permission."   47 C.F.R. § 64.1200(c)(2)(ii).   "Such permission must be

evidenced by a signed, written agreement between the consumer and seller which states that the

consumer agrees to be contacted by this seller and includes the telephone number to which the

calls may be placed."   Id.   As the ABA's Business and Commercial Litigation in Federal Courts

explains:

> The purpose of the agreement—obtaining consent to be called—must be clear and
> conspicuous, identify the specific seller to whom the consent is being provided, and
> not be a condition for the person to make a purchase.   The agreement should
> include the person's telephone number, and must include the person's signature.
> An electronic signature in accordance with the National Commerce ("E-SIGN")
> Act is sufficient.

§ 114:7. National Do-Not-Call Registry—Express written consent exemption, 10 Bus. & Com.

Litig. Fed. Cts. § 114:7 (5th ed.).   "Express consent is an affirmative defense on which the

defendant bears the burden of proof."   Blow v. Bijora, Inc., 855 F.3d 793, 803 (7th Cir. 2017)

(analyzing a TCPA claim under 47 U.S.C. § 227(b) based on the use of an autodialer).

Here, putting aside whether the "consent language" is itself legally sufficient, there is a

genuine dispute as to whether plaintiff provided the online form at LenderConsultant.com in the

first place.   True, Varma states that a "James Weim" provided the form at

LenderConsultant.com with plaintiff's phone number.   And plaintiff admits that he has used that

alias before and that the phone number is his.   But Allied provides no direct proof from

LenderConsultant.com, and plaintiff has affirmatively stated in his declaration and at deposition

that he never visited that website.   Consequently, this is an issue for a factfinder to resolve.

Because there is a "genuine dispute as to a[ ] material fact," Allied is not entitled to summary

judgment based on the consent issue.   Fed. R. Civ. P. 56(a).

11

## **Whether Allied is Directly or Vicariously Liable for the Calls at Issue**

Allied argues that summary judgment is also proper because it cannot be found either directly or vicariously liable here.   As explained above, the FCC's regulations provide that "[n]o person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber who has registered his . . . number on the national do-not-call registry."   47 C.F.R. § 64.1200(c)(2).   And section 227(c)(5) allows "persons" to seek relief if they have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection."   47 U.S.C. § 227(c)(5).   Allied asserts that it cannot be held liable under the TCPA because neither it nor its agent ever made any call to plaintiff.

### Direct Liability

Allied first contends that it cannot be held directly liable because Varma's declaration shows that Iconic—not Allied—initiated the calls at issue, and this fact is undisputed.   And indeed, plaintiff does not argue otherwise—declining to even address the issue.   Although "one can imagine a circumstance in which a seller is so involved in the placing of a specific telephone call as to be directly liable for initiating it—by giving the third party specific and comprehensive instructions as to timing and the manner of the call, for example," Dish Network, LLC, 28 F.C.C. Rcd. 6574, 6583 (2013)—there is no evidence that Allied was so involved here.   Because there is no dispute that the evidence establishes that Iconic placed the calls at issue, the court finds that

12

no reasonable jury could conclude that Allied is directly liable.   The court therefore grants summary judgment of no direct liability.

Vicarious Liability

Allied also argues that it cannot be found vicariously liable here.   It points to <u>Dish Network</u>, explaining that the FCC there held that "while a seller does not generally 'initiate' calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles for violations of either section 227(b) or 227(c) that are committed by third-party telemarketers."   (Quoting <u>Dish Network</u>, 28 F.C.C. Rcd. at 6574.   In particular, Allied asserts, "a seller may be [held] vicarious[ly] liab[le] for TCPA violations 'under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.'"   (Quoting <u>Dish Network</u>, 28 F.C.C. Rcd. at 6584.)   But here, Allied argues, no "actual or apparent agent . . . contacted [p]laintiff in violation of the TCPA," and Allied "did not ratify the alleged conduct of its agents who contacted [p]laintiff."

In response, plaintiff contends that Allied is not entitled to summary judgment.   He, too, points to <u>Dish Network</u> in support of applying vicarious liability here, and further argues that, "[f]ollowing FCC's [<u>Dish Network</u>] Order, the Seventh Circuit has ruled [that] a TCPA defendant may be vicariously liable for its 'lead generator's unauthorized robocalling under actual authority, apparent authority, and ratification principles of agency liability.'"   (Quoting <u>Bilek v. Fed. Ins. Co.</u>, 8 F.4th 581, 587 (7th Cir. 2021)).   And "[i]n this case," plaintiff argues, "liability as against Allied . . . is clear under both actual authority and ratification theories."

13

The court begins by observing that both parties fail to note (or perhaps fail to appreciate) that the Supreme Court recently held in McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation, that a federal court "is not bound by the FCC's interpretation of the TCPA," and should instead "interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." 606 U.S. 146, 168 (2025). "The Supreme Court's instruction bears on this case because, previously, courts viewed the FCC's declaratory ruling in *Dish Network* as binding authority for the proposition that a seller may be vicariously liable under federal common law agency principles for a telemarketer's TCPA violation even if the seller did not itself 'initiate' the call." Moore v. Club Exploria, LLC, No. 1:19-CV-02504, 2025 WL 2755076, at *10 (N.D. Ill. Sept. 26, 2025).[1] "But under the Supreme Court's recent teaching in *McLaughlin*, this Court is not bound to apply *Dish Network*." Id.

This court, though, need not dwell long on the issue here. First, both parties agree that a seller like Allied can be vicariously liable under federal common law agency principles. Second, as plaintiff notes, the Seventh Circuit appears to have followed Dish Network in Bilek, where it cited the FCC's decision for the proposition that "[e]ach agency theory"—actual authority, apparent authority, and ratification—"offers an independent basis for . . . vicarious liability" in a TCPA case (at least a § 227(b) robocall case). 8 F.4th at 587. And it is not clear

---

[1] The Seventh Circuit has suggested in other cases that preceded McLaughlin that FCC Orders interpreting the TCPA are dispositive at the district court level under the Hobbs Act. See Blow, 855 F.3d at 802 ("absent a direct appeal to review the 2015 FCC Order's interpretation of an autodialer, we are bound to follow it").

that this court can disregard <u>Bilek</u> based on <u>McLaughlin</u>. Finally, the court finds that the FCC's interpretation of § 227(c) is correct, anyway—at least insofar as this case is concerned.

Indeed, starting with the statutory text itself, unlike § 227(b), § 227(c)(5) includes language that explicitly extends vicarious liability to violations under that subsection: it allows "persons" to bring an action if they have "received more than one telephone call within any 12-month period <u>by or on behalf of the same entity</u> in violation of the regulations." 47 U.S.C. § 227(c)(5) (emphasis added). So the FCC's conclusion that "section 227(c)(5) contemplates, at a minimum, the application of . . . principles of vicarious seller liability for do-not-call violations," is persuasive. <u>Dish Network</u>, 28 F.C.C. Rcd. at 6584. That conclusion is further bolstered by "the purpose of the TCPA itself[:] 'Congress intended for the TCPA to protect individuals from the annoyance and cost of receiving certain types of telemarketing calls without their prior consent,' and 'sellers are in the best position to monitor and police third-party telemarketers' compliance with the TCPA.'" <u>Moore</u>, 2025 WL 2755076, at *10 (citation omitted). "For this reason, 'the vast majority of courts that have addressed the issue since the FCC's ruling' have similarly found that the FCC's determination squares with the TCPA's text and purpose." <u>Id.</u> (citation omitted); <u>see also id.</u> at *10-11 (finding post-<u>McLaughlin</u> that a seller may be vicariously liable for third-party violations of § 227(b)). The court therefore agrees with the FCC that a seller can be vicariously liable under § 227(c).

The only question, then, is whether the FCC was correct to "leave open the possibility that [it] could interpret section 227(c) to provide a <u>broader</u> standard of vicarious liability for do-not-call violations" than for robocalling violations under section 227(b). <u>Dish Network</u>, 28 F.C.C. Rcd. at 6586 (emphasis added). As the dissent in <u>Dish Network</u> explained: "Under

section 227(b), sellers should be held vicariously liable under federal common-law agency principles for TCPA violations committed by third-party telemarketers"; "under section 227(c), third-party liability exists whenever a telemarketer initiates a call on a seller's behalf, <u>even if that telemarketer is not under the seller's control</u>." <u>Id.</u> at 6596-97 (Pai, dissenting in part) (emphasis added).[2]   But the court need not reach the issue of just how far vicarious liability extends under § 227(c) in this case.   That is because the parties argue here only about whether Allied is liable under the federal common law agency principles, and as explained further below, the court finds that summary judgment is not proper under those narrower agency principles—to which the court now turns.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." <u>Edelman v. Belco Title & Escrow, LLC</u>, 754 F.3d 389, 396 (7th Cir. 2014) (quoting RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006)).   "[W]hether an agency relationship exists is ultimately a question of fact."   <u>Bilek</u>, 8 F.4th at 588.   Or put more bluntly: "Agency is a notoriously fact-bound question."   <u>Spitz v. Proven Winners N. Am., LLC</u>, 759 F.3d 724, 731 (7th Cir. 2014).

Allied argues that it cannot be liable based on any agency principle—actual authority, apparent authority, or ratification.   At a high-level: actual authority (or "formal agency") focuses on the relationship between the principal and its agent (whether the principal controlled or had

---

[2]   The dissent in <u>Dish Network</u> provides both statutory and policy justifications for reading § 227(c)'s do-not-call provisions more broadly than § 227(b)'s robocall provisions.   <u>See id.</u> at 2597-99.

the right to control the agent's conduct); apparent authority focuses on the relationship between the principal and a third party (whether the principal's words or actions led a third party to reasonably believe that the principal consented to an action done on the principal's behalf by the agent); and ratification focuses on the principal's conduct after the act has occurred (whether the principal knowingly accepted the benefits of the agent's act or approved it after the fact).  See Showers v. Pelican Inv. Holdings Grp., LLC, 751 F. Supp. 3d 900, 909-10 (S.D. Ill. 2024). Allied contends that summary judgment of no vicarious liability is appropriate for all three theories.

### Actual Authority

"Actual authority requires that at the time of an agent's conduct, 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'"  Bilek, 8 F.4th at 587 (quoting RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006)).  Actual authority may be express or implied.  Bridgeview Health Care Ctr., Ltd. v. Clark, 816 F.3d 935, 938-39 (7th Cir. 2016).  "An agent has express actual authority when the principal expressly grants the agent the authority to perform a particular act."  Aranda v. Caribbean Cruise Line, Inc., 179 F. Supp. 3d 817, 831 (N.D. Ill. 2016).  "A principal grants implied actual authority to an agent when the principal's reasonably interpreted words or conduct would cause an agent to believe that the principal consents to have an act done on her behalf." Id.  Ultimately, to prove actual authority, plaintiff "must show evidence that (1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the

alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency."   <u>Bilek</u>, 8 F.4th at 587.

Allied asserts that plaintiff cannot make that showing here.   It argues that its manager, Mattson, "entered into an agreement with Consumer Nsight" to provide "consulting services for live contact telephone transfers from a call center to Allied employees."   (Cleaned up).   But, Allied contends, Consumer Nsight was not Allied's agent because Allied "did not control any aspect as to how the warm transfer calls would be placed."   And even if Consumer Nsight were Allied's agent, Allied asserts, Iconic—not Consumer Nsight—placed the calls at issue here, and Allied "had no contract" or other "relationship with Iconic."

In response, plaintiff argues that "a reasonable jury could find that Mattson, Consumer [Nsight], and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions."   According to plaintiff, Allied "authorized its managers, like Mattson to arrange for marketing activities, including making calls . . . using vendors, and permitted them to specify criteria for the types of leads that would be best suited for their teams." Mattson, plaintiff asserts, then "went off and hired Consumer Nsight to do exactly what Allied . . . authorized him to" do.   And, plaintiff contends, there is "no evidence that Consumer Nsight acted contrary to any instruction of Allied . . . or Mattson by hiring Iconic . . . to conduct the actual calling, using the *exact same* criteria that Allied . . . and Mattson authorized all along." (Emphasis by plaintiff).   Plaintiff thus concludes that Iconic was a subagent "acting within the same scope of authority that Allied . . . gave Mattson, and which Mattson in turn provided to Consumer Nsight."

18

The court agrees with plaintiff that Allied is not entitled to summary judgment on actual authority here: there are genuine disputes over material facts related to the relationships and control therein, and the evidence here prevents the court from concluding that no reasonable jury could find for plaintiff. Indeed, the parties agree that Mattson worked as a branch manager for Allied, that Mattson's duties included managing team member loan officers and generating leads, and that Mattson entered into an agreement for Consumer Nsight to provide "consulting services for live contact telephone transfers from a call center to Allied . . . representatives." Allied also admits that Mattson "had full decision-making authority and oversight when it came to purchasing leads from Consumer Nsight." And plaintiff asserts in his Statement of Additional Facts—to which Allied never responded[3]—that Mattson "controlled Consumer Nsight's targeting criteria for the types of consumers he was looking to [have] refinance a loan," and that he "hired Consumer Nsight 'with the approval of the bank' and 'managed the scope of [the] relationship with Consumer Nsight.'" (Quoting Mattson's Dep.).

Consumer Nsight's CEO, moreover, states in his declaration that "Consumer Nsight is not a telemarketing firm" and "does not . . . initiate telemarketing calls." "Rather," he states, "Consumer Nsight had a relationship with Iconic . . ., a call center located in Arizona, which Consumer Nsight engaged in connection with the" agreement with Allied. And, he says, under that agreement, and "as part of any live contact call transfers from Iconic to Allied," "after connecting with the called party and obtaining certain information from the called party, Iconic

---

[3] Local Rule 56.1(e)(3) states that "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."

transferred certain calls to a . . . routing number provided by Consumer Nsight, which in turn instantaneously transferred the call to Allied . . . via [the] routing number."

Plaintiff provides copies of invoices, moreover, showing that Allied accepted call transfers from Consumer Nsight and paid for them.   Plaintiff also provides emails showing that Allied and Consumer Nsight "integrated their systems so that loan officers could 'get notified of the calls coming in and to receive the post as the transfers are handed off,'" and that Mattson exercised control over call volume by refusing a delivery of transfers from Consumer Nsight in April, stating he was "done with transfers."

Mattson further stated at deposition that when he started talking to Consumer Nsight about selling leads, Consumer Nsight "introduced" him to someone from Iconic about getting transfers.   He also stated that "everyone in the office knew that th[e] lead was coming from Iconic, and it would show that on the phone, and everybody knew it was a warm transfer coming from Iconic."   And he further suggested that "a loan officer at Allied" was under no obligation to accept a transfer from Iconic.   Mattson also explained that he spoke directly to Iconic about the warm-transfer-lead campaign and told them that the leads were "not good" and that he "wasn't very happy about that."

Finally, plaintiff further attaches copies of internal Allied documents that provide: that "[a]ll telemarketing activities engaged in by Bank employees shall be approved by a member of management," and have Allied's Compliance Officer approve the telephone script or outline; that managers are to "initially establish the existence, purpose and service provided by the vendor" and to vet the vendor, the vetting of which "will be reviewed by Allied . . . initially and

on an annual basis"; and that Allied required its vendors be provided with Allied's internal Do Not Call List.

Based on the above evidence, and viewing the facts and drawing reasonable inferences in plaintiff's favor, the court concludes that a reasonable jury could find that Allied and Consumer Nsight had a principal/agent relationship, that Allied controlled or had the right to control Consumer Nsight's live-transfer-call conduct, and that the conduct here fell within the scope of the agency. The court further concludes that a reasonable jury could also find that a subagency theory "bridge[s] the vicarious liability gap to" Iconic. Hossfeld, 726 F. Supp. 3d at 878.

"A subagent is a person appointed by an agent to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal." Id. (citation omitted). "An agent has actual authority to create a relationship of subagency when the agent reasonably believes, based on a manifestation from the principal, that the principal consents to the appointment of a subagent." Id.

As explained above, Consumer Nsight is not a telemarketing firm and does not initiate telemarketing calls. So a reasonable jury could find that Consumer Nsight reasonably believed that, by hiring Consumer Nsight for call transfers, Allied was consenting to Consumer Nsight using a company like Iconic to do the actual calling. This conclusion is further strengthened: (1) by the fact that Mattson directly spoke with Iconic and that it would show on the phone that the calls were coming from Iconic, see Moore, 2025 WL 2755076, at *12 (finding subagency existed between vendor and the call center that would actually make the calls, noting that it was "undisputed that [seller] knew that [the call center] would be the entity actually placing the calls . . . ."); and (2) by the fact that Allied identifies no evidence suggesting that Consumer Nsight was

21

somehow prohibited from appointing a subagent, that Allied policy barred agents from subcontracting, or that industry-practice forbade vendors from appointing subagents for call transfers, see Hossfeld, 726 F. Supp. 3d at 879 ("No party argues that Gilmond or Fleming expressly or impliedly prohibited Transfer Kings from appointing a subagent, that any Allstate policy or practice forbade Transfer Kings from subcontracting, or that the practice in the industry was not to permit a vendor such as Transfer Kings from appointing subagents.").

And contrary to Allied's suggestion, the fact that Allied had no contract with Iconic is not dispositive: "the relevant inquiry is not necessarily whether the two entities had a contract with one another; it is whether the subagent was appointed by the agent 'to perform functions assigned to the agent by the principal.'" Moore, 2025 WL 2755076, at *12 (citation omitted). Here, again, Iconic was appointed by Consumer Nsight to place the calls.

The court thus denies summary judgment on actual authority.

### Apparent Authority

Allied next argues that plaintiff cannot show liability based on apparent authority. For his part, plaintiff does not meaningfully respond to Allied's argument. Although plaintiff argues that "apparent authority" "support[s] liability here," he never develops that argument. He has thus waived any argument in support of that theory to avoid summary judgment. Ennin v. CNH Indus. Am., LLC, 878 F.3d 590, 595 (7th Cir. 2017). Nevertheless, the court finds that summary judgment is not appropriate here. See Robinson v. Waterman, 1 F.4th 480, 483 (7th Cir. 2021) ("Even where a nonmovant fails to respond to a motion for summary judgment, the

movant 'still had to show that summary judgment was proper given the undisputed facts,' . . . with those facts taken as usual in the light most favorable to the nonmovant." (citation omitted)).

"To create apparent authority, the principal must speak, write, or otherwise act toward a third party." Bridgeview, 816 F.3d at 939. The principal's "conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him." Id. Here, plaintiff is in the position of the third party for apparent-authority purposes. See id. ("In this case, the plaintiffs would be in the position of the third party, if apparent authority existed.").

Allied contends that it did not take any actions that would instill in a third party, like plaintiff, a reasonable belief that Iconic had authority to act as Allied's agent. In support, Allied points to evidence showing that after the call was transferred from Iconic to Allied, the Allied loan officer (Aldridge) who had taken the call responded to plaintiff's inquiry about who generated the lead by telling plaintiff that Aldridge "does not have anything to do with marketing and [that] he assumed that [plaintiff] would have provided his information to the person who made the initial call." "So," Allied argues, "to the extent that [p]laintiff even did believe that Iconic . . . acted as the agent of Allied . . ., such notion was dispelled immediately following the live transfer."

But the evidence suggests that a woman working for Iconic called plaintiff on March 7, 2022, and that after plaintiff answered, she spoke with him until the live call was transferred to Aldridge who then continued the conversation. According to the phone-call transcript, Aldrige comes on the line stating, "Alright, thank you, this is Jason Aldrige," and the woman then greets Aldridge and tells plaintiff that he was "in excellent hands with Mr. Aldridge." A reasonable

jury could infer that Aldridge's conduct in continuing the conversation could make plaintiff reasonably believe that Allied consented to Iconic calling him on Allied's behalf. Although Aldridge later told plaintiff that he had nothing to with marketing and that Aldridge assumed that plaintiff had provided his information to the woman, the court disagrees with Allied that this fact mandates finding that Aldridge "dispelled [the notion that Iconic was Allied's agent] immediately following the live transfer." For one thing, Aldridge's comment came two days after the March 7 call—hardly "immediately." For another, it is unclear how Aldridge's comment would have "dispelled" the implication that Iconic was acting as Allied's agent in initiating the call to plaintiff.

The court therefore denies summary judgment on apparent authority.

### Ratification

Allied also argues that plaintiff cannot prove ratification here. "In general, 'ratification retroactively creates the effects of actual authority.'" <u>Roehrman v. McAfee, LLC</u>, 758 F. Supp. 3d 889, 899 (S.D. Ind. 2024) (quoting RESTATEMENT (THIRD) OF AGENCY § 4.02(1)). "Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions." <u>Showers</u>, 751 F. Supp. 3d at 909 (citation omitted). "It requires that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." <u>Id.</u> at 909-10 (cleaned up). "A principal can ratify an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." <u>Id.</u> (citation omitted). Such consent can arise when a principal enjoys the benefits of the conduct and "'had knowledge of facts that would have led a reasonable person to investigate further,' and the principal accepted

24

the benefit 'without further investigation.'"   Roehrman, 758 F. Supp. 3d at 899 (citation

omitted).   "A principal that learns of illegal behavior committed by its agents, chooses to do

nothing, and continues to receive the gains, is liable for the agent's acts."   Id. (citation omitted).

"The state of a principal's knowledge is a factual question."   Id. (cleaned up).

Allied contends that "[t]here is absolutely no evidence . . . that Allied . . . ratified the

conduct of Iconic."   According to Allied, it had no knowledge of who conducted the call

transfers or by what means Iconic placed the calls.   And, Allied asserts, its "understanding [was]

that consumers, like [p]laintiff, provided their information on an online web page to be contacted

regarding mortgage refinancing options and that such form included a TCPA disclosure

statement."   It thus argues that Allied "had no reason to believe that Consumer Nsight violated

the TCPA in effectuating these leads at the time it paid Consumer Nsight for its services and

there is simply no evidence in the record to the contrary."

The court finds that summary judgment cannot be granted on ratification.   Allied does

not dispute that it accepted the benefits of the calling campaign.   Indeed, Allied does not dispute

that it accepted call transfers from Consumer Nsight and paid for them, including after the call to

plaintiff.   And the billing records confirm as much.

The issue here, then, is whether Allied had knowledge of facts that would have led a

reasonable person to investigate further.   The court finds that Allied has not shown that the court

can summarily find for it on this issue.   As for Allied's assertion that it had no knowledge of

who conducted the call transfers, the evidence belies that assertion.   Again, Mattson stated at his

deposition that Consumer Nsight "introduced" him to someone from Iconic about getting

transfers, and that it would show on the phone that the calls were coming from Iconic.

25

And as for Allied's assertion that its understanding was that the consumers who were being called had provided their information on an online form that included a TCPA disclosure statement, there is evidence that suggests that Allied had knowledge of facts that would have led a reasonable person to investigate further on this issue. Mattson stated at deposition, for example, that he wasn't happy with the quality of the leads, and that Consumer Nsight and Iconic were "just shoving over some people that were not very interested." And emails show that, weeks before the March 7, 2022 call to plaintiff, Mattson or his team members were on communications with Consumer Nsight about returning leads, including, for example, for a combative person who was not interested, and for another person who "asked why [the caller] w[as] calling him and what [the caller] wanted" and who stated that he "was not interested because he wasn't even looking for anything." Further, Allied's Chief Compliance Officer, Skeffington, testified that Allied has an internal do-not-call list, and that Allied sends the list to team managers, like Mattson, who are then required to send it to vendors, like Consumer Nsight. But Allied has not pointed to evidence that Mattson ever sent that list to Consumer Nsight.

The court finds that a jury could reasonably infer that Allied knew that not all of the consumers that Iconic was calling had in fact "provided their information on an online web page to be contacted regarding mortgage refinancing options," and so would not have seen the TCPA disclosure statement. And a jury could therefore find that a reasonable person would have investigated further about who was being called during the campaign. The court thus finds that the evidence presented is enough to send to the jury the factual issue of whether Allied had knowledge of facts that would have led a reasonable person to investigate further as to whether

Iconic was placing unlawful calls.   The court consequently denies summary judgment on ratification.

In sum, the court finds that Allied is entitled to summary judgment in its favor on direct liability, but denies summary judgment on vicarious liability.

## Whether Plaintiff Recovered All Available Damages

Finally, Allied argues that summary judgment is proper because plaintiff recovered all available damages.   That is so, Allied contends, because plaintiff settled with Consumer Nsight and Iconic and did so "in excess of the statutory maximum."   The court finds that Allied has failed to show that summary judgment is appropriate on this basis.

Allied's sole support for asserting that plaintiff is no longer entitled to damages is its L.R. 56.1 statement of fact, in which it states: "While the terms of the settlement are confidential, upon information and belief, [plaintiff]'s settlements with Consumer Nsight and Iconic . . . are in excess of the statutory maximum."   This is not evidence that could support summary judgment. And regardless, in response, plaintiff provides his own declaration in which he states: "Although I have settled with both Consumer Nsight and Iconic Results, I have not recovered my full measure of statutory damages from either of [them], including in the aggregate, and thus have not been fully compensated for any alleged harm."   Allied has accordingly failed to show that there is no genuine dispute over satisfaction here.

## CONCLUSION

For the above reasons, the court grants in part and denies in part defendant Allied's motion for summary judgment [139].   The court grants the motion in favor of Allied on the

27

issue of direct liability.   The court otherwise denies the motion.   This matter is set for a
telephonic hearing on April 6, 2026, at 9:00 a.m.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:     March 6, 2026**